UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
CASE NO.  2:09-CV-529-FtM-29-DNF

BRETT A. FIELDS, JR.

       Plaintiff,

v.

PRISON HEALTH SERVICES, INC.,
a Tennessee corporation;
JOSEPH A. RICHARDS, JR., an individual, and;
BETTIE JOYCE ALLEN, an individual,

       Defendants.
_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, BRETT FIELDS, (hereinafter "FIELDS" or "PLAINTIFF"), through his undersigned attorneys and pursuant to Federal Rule of Civil Procedure 56(c), hereby responds to Defendants' Motion for Summary Judgment [DE 73] filed by Defendants PRISON HEALTH SERVICES, INC. ("PHS"), JOSEPH RICHARDS, JR. ("RICHARDS"), and BETTIE JOYCE ALLEN ("ALLEN").

## SUMMARY OF THE CASE

*The opposite of love is not hate, it's indifference. The opposite of art is not ugliness, it's indifference. The opposite of faith is not heresy, it's indifference. And the opposite of life is not death, it's indifference.*

-Elie Wiesel.

*The most distressing aspect of the world into which you are going is its indifference to the basic issues, which now, as always, are moral issues.*

-Robert Maynard Hutchins.

This case involves a tragic story which, like all true tragedies, involves events and actions which are inexplicable, unnecessary and seemingly easily avoidable.

1

Brett Fields, Jr. is a North Fort Myers, Florida resident who was booked into the Lee County Jail system on two misdemeanor charges as a healthy and athletic 24-year-old construction worker in early July 2007. Although Fields' incarceration lasted only a little over a month, it left Fields with permanent partial paralysis and a host of related severe medical problems that will afflict him for the rest of his life. Undoubtedly, the most tragic aspect of these injuries is that they could have been mitigated or even completely prevented had Defendants timely summoned basic emergency care for Fields.

The crux of this case centers on a two-day period, August 8 and 9, 2007, [1] during which Fields exhibited obvious and critical signs of loss of motor function and paralysis. Despite the fact that Fields had inexplicably and alarmingly transformed from a healthy young adult male with no significant health issues into a wheelchair-bound man with bilateral paralysis in his lower extremities, loss of motor and bodily function and even anal prolapse indicative of paralysis, Defendants refused for well over 24 hours to summon emergency medical care for Fields. Despite a situation any reasonable person may recognize as being dire, Defendants rendered no meaningful medical treatment to Fields, and in fact delayed providing Fields with emergency medical care.

When Fields was finally transported to Southwest Florida Regional Medical Center in Fort Myers in the early afternoon of August 9, 2007 (nearly 30 hours after presenting to medical staff with bi-lateral paralysis in his lower extremities and 12 hours after being found on the floor of his cell paralyzed from the waist down with his rectum and intestines having fallen out of his anus), he underwent immediate emergency spinal surgery to relieve spinal cord compression due to a spinal epidural abscess. Compression of the spinal cord is an emergency situation wherein delays of any sort can cause

---

[1] Fields' legal claims are not based on Defendants' actions occurring *prior* to August 8, 2007.

permanent damage; Fields surgery was tragically performed too late to avoid significant permanent neurological injury.

As a result of Defendants' initial refusal and delays in referring Fields to basic emergency medical treatment, he is now permanently partially paralyzed in his lower extremities, he needlessly endured horrific pain, suffering and anguish, and his long-term health has been permanently and significantly damaged.

## SUMMARY OF DEFENDANTS' ARGUMENTS

Via their Motion for Summary Judgment, Defendants make two principal arguments why summary judgment should be granted in their favor.

- Firstly, Defendants Richards and Allen assert that at the time of their encounters with Fields they saw no need to send Fields to a hospital or summon emergency medical services for him as they subjectively believed that "Fields did not have a serious medical need" that required immediate medical attention. *Defendants' Motion* at 12, 14-15. Defendants in essence assert that this case is simply a disagreement among medical professionals about the medical treatment provided to Fields and "the most that could be said is that Richards and Allen may have been negligent" as to their treatment of Fields, and thus, Defendants assert, this case is outside the ambit of a §1983 "deliberate indifference" claim.

- Secondly, Defendant PHS asserts Fields cannot show Defendant "PHS had a policy of denying healthcare to inmates" or otherwise acted in accordance with an unconstitutional custom or policy (*Defendants' Motion* at 12), as is required for liability under § 1983 to attach against an entity (such as PHS) pursuant to *Monell v. Dept. of Social Services,* 436 U.S. 658, 691 (1978).

Fields addresses both of these arguments below and has organized this response into three sections: 1) an overview of the relevant facts; 2) the issue of Defendants' Richards and Allen's individual liability under § 1983, and; 3) the issue of PHS' liability with respect to the policy, practice, and/or custom which caused the constitutional injury to Fields.

## STATEMENT OF RELEVANT MATERIAL FACTS

On July 6, 2007 Fields was booked into the Lee County Jail system as a pretrial detainee following his arrest on two misdemeanor charges. Exhibit 1, p. 2.[2]  At the time of intake, he was 24 years old, six feet tall, 160 pounds, in good health and with no history of neurological problems. *PHS Intake Receiving & Screening Form* (Exhibit 1, p. 2-3). On July 10, 2007, four days into his incarceration, Fields completed a medical request form reporting that he had a puss-filled and swollen area on his left forearm likely stemming from a spider bite. *Inmate Medical Request Form*, (Exhibit 1, p. 4); *Defendants' Motion* at 3. A furuncle[3] protocol form was completed by jail medical staff and antibiotic treatment was initiated. *Id.* at 5-6. Four days later, Fields informed a licensed practical nurse ("LPN") that the treatment was not improving the infected area. *July 14, 2007 Progress Notes* (*Id.* at p. 14).  This LPN advised Fields to fill out a form in the morning and not to lean the affected area on the cell bars. *Id.*  Following numerous verbal complaints to medical staff, Fields completed another Inmate Medical Request Form ten days later on July 24, 2007 stating that "the med's that were given to me are not helping[.] [T]he open wound is not heald [sic] …". *Id.* at 9.  This request was ignored; medical records show no further action taken by medical staff to address these concerns.[4]

---

[2] References to numeric exhibits, which include relevant deposition transcripts, refer to the numbered exhibits attached to Fields' contemporaneously filed Notice of Filing of Materials in Support of this Response in Opposition to Defendants Motion for Summary Judgment. Also hereinafter, specific pages of *Defendants' Motion for Summary Judgment* are referred to by "*Defendants' Motion* at __."

[3] A furuncle (boil) is a skin infection involving an entire hair follicle and nearby skin tissue. Furuncles are generally caused by *Staphylococcus aureus,* but they may be caused by other bacteria or fungi. … One of many possible eventual complications is spinal cord infection. *http://www.nlm.nih.gov/medlineplus/ency/article/001474.htm* (last accessed May 1, 2010).

[4] As stated earlier, Fields' does not base any of the § 1983 claims at issue in this suit upon any of Defendants' actions occurring prior to August 8, 2007.

On August 8, 2007 at 8:55 a.m. Fields presented to a registered nurse and told her he was experiencing back pain and numbness, and that, "Now I can't even walk." *August 8, 2007 Progress Notes* (*Id.* at 15). This registered nurse considered Fields' condition to be serious and referred Fields for immediate follow up with Defendant Joseph Richards, a physician's assistant. *Id.*; *Dep. of Richards* at 24-25. Richards met with Fields within about an hour, by which time Fields was confined to a wheelchair.[5] *Id.*

Despite noting the sudden onset of paralysis symptoms and Fields' claims of unbearable back pain, Richards only actions were to prescribe Tylenol twice a day for three days, scheduled a follow-up for one week later, and ordered that the wheelchair-bound Fields be placed in a cell on a medical floor. Exhibit 1, p. 15; *Defendants' Motion* at 6. This was Richards only encounter with Fields. *Dep. of Richards* at 36.

Fields was unattended for the next 15 hours or more. At about 1:30 a.m. the next day, August 9, 2007, Bettie Allen, R.N. (the highest-ranking medical official at the jail site during the night shift (*Dep. of Allen* at 48)), heard inmates yelling "man down." *Dep. of Allen* at 17. Allen responded to the yelling, and found Fields in pain on the floor of his cell.[6] *Id.* at 19. He told her "his guts came out of his rectum and both his legs and feet were numb." *Id.* at 17-18; Exhibit 1, p. 16. He told Allen he needed to go to the hospital and that "his insides were falling out." *Id.* at 27; Exhibit 1, p. 16. He also stated repeatedly, "I can't move. I can't move. I can't move." *Dep. of Allen* at 30.

---

[5] PHS' medical records do not document how or when Fields ended up in the wheelchair or who provided him with it, but it is undisputed that Fields was wheelchair-bound by the time he met with Richards. *Dep. of LPN Heather Piereira* at 65. (Exhibit 2); *Dep. of Richards* at 26, 28.

[6] Despite being in a wheelchair and in medical distress, Fields' cell was over capacity and he had not been given a bunk; he was forced to lay on the floor upon a mat and a sheet. *Id.* at 20.

Allen pulled Fields' underwear down and saw his rectum and "external hemorrhoids were visible."[7] Exhibit 1, p. 16. Allen used a gloved hand and KY Jelly to physically push the rectal area and hemorrhoids back into Fields' anal sphincter. *Id.* Fields was dragged on a sheet to an "observation cell." *Dep. of Allen* at 28-29. He was provided with no medication (*Id.* at 66) and was left alone, receiving no further medical attention that night; it was decided Fields could see a doctor the next day. *Id.* at 36-37. At this point, Fields had not had a bowel movement for a week and had urinated for an unknown period of time. *Dep. of Dr. Alvarez* at 15.

Dr. Noel Dominguez arrived for work at the jail at about 8 a.m. on August 9. *Dep. of Dominguez* at 29. No one informed him about Fields, or mentioned that Fields needed to be seen. *Dep. of Dominguez* at 30, 32. No one had called him regarding Fields' condition. *Id.* at 35.

At approximately 10:30 a.m. (about nine hours after the "mandown" call and discovery of Fields on the floor unable to move his legs and with his rectum prolapsed), Fields was finally brought to see Dr. Dominguez. *Dep. of Dr. Dominguez* at 30; Exhibit 1, p. 17. Fields told Dr. Dominguez he couldn't feel or move his legs from the hips down, that part of his rectum had fallen out the night before, and that he had never practiced anal sex or had a hemorrhoid issue in the past. *Dep. of Dr. Dominguez* at 20. Dr. Dominguez's assessment was "Sudden onset of paraplegia with loss of reflexes and loss of sensitivity with decreased rectal sphincter tone, consistent with severe neurologic disorder affecting the spinal nerve," and ordered Fields be sent to an emergency room. *Id.*

---

[7] This is called rectal prolapse. Rectal prolapse occurs when the rectum (the final section of the large intestine) turns itself inside out and protrudes out the anal opening. *http://www.mayoclinic.org/rectal-prolapse/* (last accessed May 7, 2010).

at 21-22. Dr. Dominguez regarded Fields as experiencing symptoms of paralysis in the lower body, and in need of immediate emergency care. *Dep. of Dr. Dominguez* at 27.

PHS staff did not summon an ambulance for nearly another two hours. Lee County EMS was finally contacted at 12:23 p.m. *Lee County BOCC-EMS ambulance record of August 9, 2007,* (Exhibit 5). EMS staff found Fields "supine" and noted about him, "LOWER EXTREMITIES- NEG SENSATION TO TOUCH, PUNCTURE." *Id.*

The section entitled "Objective" of the report reads:

> Leg, Left: Paralysis
> Leg, Right: Paralysis

*Id.*

Fields arrived at Southwest Regional Medical Center with "near complete paralysis" in the lower extremities, (*Dep. of Dr. Alvarez* at 16), with paralysis so thorough that Fields could not feel a Foley catheter inserted through the tip of his penis and into his bladder. *Dep. of Dr. Alvarez* at 15-16. That afternoon, neurosurgeon Dr. Jaime Alvarez performed emergency surgery to decompress Fields' spine. *Dep. of Dr. Alvarez* at 28. Dr. Alvarez believes that had he performed surgery sooner after Fields initially exhibited paralysis symptoms, Fields' would have had a better long-term outcome. *Dep. of Alvarez* at 27.

## MEMORANDUM OF LAW

I.      **Defendants Richards and Allen Each Exhibited Deliberate Indifference to Fields' Serious Medical Needs Within The Meaning of His §1983 Claims.**

Title 42 U.S.C. § 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." To state a claim under 42 U.S.C. § 1983, a plaintiff must allege: (1) that a defendant deprived him of a right secured under the United States Constitution or federal

law, and (2) such deprivation occurred under color of state law. *Arrington v. Cobb County,* 139 F.3d 865, 872 (11th Cir. 1998); *U.S. Steel, LLC v. Tieco, Inc.,* 261 F.3d 1275, 1288 (11th Cir. 2001).

It is axiomatic that a §1983 claim is predicated on an alleged violation of an underlying constitutional right. Here, because Fields was completing a jail sentence during the time period at issue (August 8 and 9, 2007), Fields' claims arise under the Eighth Amendment. [8]

The Eleventh Circuit Pattern Jury Instructions delineate the elements a plaintiff must show to prevail on a claim of deliberate indifference to a serious medical need:

> In order to establish his claim, therefore the Plaintiff must prove each of the following facts by a preponderance of the evidence:
>
> First:   The plaintiff has a serious medical need;
> Second:  The defendant was aware of the plaintiff's serious medical need;
> Third:   The defendant, with deliberate indifference, failed to provide the necessary medical care;
> Fourth:  In doing so the defendant acted "under color" of law; and,
> Fifth:   The defendant's acts were the proximate or legal cause of the damages sustained by the plaintiff. [9]

*Eleventh Circuit Pattern Jury Instruction* 2.3.2. [10]

---

[8] Fields was arrested and booked into the Lee County Jail system as a pretrial detainee on July 6, 2007 (See Exhibit 1, p. 2); however, he was sentenced on or about July 18, 2007, and thus at that point was no longer a pretrial detainee but a convicted inmate. Fields was originally scheduled to complete his sentence on or about August 18, 2007, but was released early on or about August 10, 2007 following his emergency spinal surgery and hospitalization. While a pretrial detainee's constitutional rights arise under the Due Process Clause of the Fourteenth Amendment, the Eighth Amendment applies to convicted inmates. *Purcell ex rel. Estate of Morgan v. Toombs County, Ga.,* 400 F.3d 1313, 1318 n.1 (11th Cir. 2005). However, "the standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments." *Marsh v. Butler County, Ala.,* 268 F.3d 1014, 1024 n. 5 (11th Cir. 2001)(en banc); *Hamm v. DeKalb County,* 774 F.2d 1567, 1574 (11th Cir. 1985)).

[9] As neither individual defendant has raised any sort or absolute, qualified or other immunity defense, no analysis of immunity defenses is necessary here.

As the Fourth and Fifth prongs of Pattern Jury Instruction 2.3.2 are not at issue here,[11] Fields addresses the first three prongs of Pattern Jury Instruction 2.3.2 below.

*First:        The plaintiff has a serious medical need;*

The first prong of Pattern Jury Instruction 2.3.2 is requisite to the claims against all three Defendants. "A serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Brown v. Johnson,* 387 F.3d 1344, 1351 (11th Cir. 2004). (citation and internal quotations marks omitted); *Hill v. Dekalb Reg'l Youth Ct.,* 40 F.3d 1176, 1187 (11th Cir. 1994).

Setting aside the issue of whether Defendants were cognizant of the actual nature of Fields' medical condition on August 8 and 9, 2007, it is beyond dispute that Fields had a "serious medical need" within the meaning of a § 1983 claim on those dates.  Fields' pre-operative MRI and subsequent emergency surgery on the afternoon of August 9, 2007 indisputably reveal that Fields' was suffering from "a mass compressing the nerves and bottom of the spinal cord in the lower thoracic and lumbar region," or put more simply, a spinal epidural abscess that was compressing his spinal cord. *Dep. of Dr. Alvarez* at 14.   Dr. Alvarez, (the neurosurgeon who performed the spinal decompression) testified that Fields' had a "serious medical condition" and a "surgical emergency."  *Id.* at 16-17, 22, 26-27. Moreover, Fields is to this day still partially paralyzed with a host of

---

[10] *Eleventh Circuit Pattern Jury Instructions,* (Civil Cases) Instruction 2.3.2, Civil Rights, USC § 1983 Claims, Eighth Amendment Claim, Convicted Prisoner Alleging Deliberate Indifference To Serious Medical Need (2005).

[11] Defendants' have not in any way contested that their actions were "under color of law" or that a lack of legal causation could be a basis for summary judgment here.

medical problems. In sum, by any measure, Fields' condition on August 8 and 9, 2007 (whether supposedly known or unknown to any given person at the time) constituted a "serious medical need" within the meaning of § 1983 and the governing case law.[12]

> *Second:*      *The defendant was aware of the plaintiff's serious medical need;*
> *Third:*      *The defendant, with deliberate indifference, failed to provide the necessary medical care;*

Analyzing the second and third prongs of Pattern Jury Instruction 2.3.2 (logically related issues in most cases), a reasonable factfinder could find for Fields on these points.

**Liability of Richards:**      Defendants' Motion asserts Defendant Richards, a physician's assistant, was not aware that Fields had a serious medical need upon examining him on the morning of August 8, 2007. "[Richards] did not consider Fields' condition serious at the time of the examination" (*Defendants' Motion* at 7) and based upon his assessment, "Fields did not have a serious medical need of which [Richards] had subjective awareness." *Id.* at 14-15.

These contentions are baseless. Richards *himself admits* that he was aware of the seriousness of Fields' medical needs:

| | |
|---|---|
| QUESTION: | So how is it that Mr. Fields ends up in front of you on August 8th? |
| RICHARDS: | . . . Like I said, this was on a Wednesday. So for me to see a patient on a Wednesday, it had to be a medical emergency.[13] |
| QUESTION: | Okay. Now, when you saw Mr. Fields he was in a wheelchair and he said he couldn't walk. |
| RICHARDS: | Yes, sir. |

---

[12] Indeed, *Defendants' Motion* does not appear to contest that a spinal epidural abscess compressing the spinal cord (what Fields was indisputably suffering from) is a serious medical need. Rather, Defendants' position via their Motion for Summary Judgment is that they were not *aware* of Fields' serious medical need.

[13] Richards did not normally see patients on Wednesdays. *Dep. of Richards* at 24-25.

*Dep. of Richards* at 26.

| | |
|---|---|
| QUESTION: | Is the inability to walk, is that a serious symptom? Is that a serious issue, being confined to a wheelchair? |
| DEF. COUNSEL: | Form. |
| RICHARDS: | Yes, sir. |
| QUESTION: | Why? |
| RICHARDS: | The inability to walk. The first thing you think of, if no one has motor function, first thing you think of is paralysis. So yes, that is serious. |
| QUESTION: | So an otherwise healthy 25-year old who can no longer walk, who's confined to a wheelchair, is serious? |
| DEF. COUNSEL: | Form. |
| RICHARDS: | Yes. |

*Dep. of Richards* at 50.

| | |
|---|---|
| QUESTION: | . . . What things could be causing an otherwise healthy 24-year-old male to be confined to a wheelchair and unable to walk? |
| DEF. COUNSEL: | Form. |
| RICHARDS: | The first thing you think of is -- the most common is trauma. If it's not trauma, you're thinking tumor, or something compressing the cord, the spinal cord. |
| QUESTION: | So if not trauma, then it's something that's pressing the spinal cord? |
| RICHARDS: | That's a good way to -- yes. |
| QUESTION: | And something compressing the spinal cord is a serious medical problem? |
| RICHARDS: | Yes, sir. |
| QUESTION: | And it needs to be treated? |
| RICHARDS: | Yes, sir. |
| QUESTION: | When we do have spinal cord compression, what sort of risks are associated with a delay in treatment? |

| | |
|---|---|
| DEF COUNSEL: | Form. |
| RICHARDS: | That, I'm not a hundred percent accurate on that. |
| QUESTION: | Could a delay worsen the outcome? |
| DEF. COUNSEL: | Form. |
| RICHARDS: | I would assume. |
| QUESTION: | What medical reasons would you have for delaying treatment in a situation where somebody has a compressed spinal cord? |
| DEF. COUNSEL: | Form. |
| RICHARDS: | Repeat that question again? |
| QUESTION: | What medical reasons would you have for delaying treatment for an individual who has a compressed spinal cord? |
| DEF. COUNSEL: | Form. |
| RICHARDS: | None. [14] [15] |
| QUESTION: | When you examined Brett Fields, did you have any reason to believe that he was lying, or exaggerating his symptoms? |
| RICHARDS: | No. |

*Dep. of Richards* at 53-55.

The above testimony alone mandates that summary judgment be denied as to Richards in this case.[16] Richards essentially admits every element Fields must establish for a *prima facie* claim against an individual in a § 1983 medical deliberate indifference

---

[14] As to this summary judgment analysis, Defendants (wisely) do not in any way attempt to justify the delays in treating Fields. Rather, Defendants' Motion predicates their defense in this case upon their claims *that Fields did not present to them with symptoms of motor function loss or paralysis.* As explained herein, such claims are contradicted by the record evidence.

[15] Dr. Alvarez (as well as Fields' expert witness in this case) also agree with Richards that there can be no medical justification for delaying an MRI or other emergency treatment on someone with the bilateral numbness and inability to walk that Fields exhibited at the jail. *Dep. of Alvarez* at 21, 39.

[16] In fact, an argument can be made that Richards' testimony almost justifies summary judgment as to liability being entered *against* him.

case: Richards acknowledges Fields told him he had lost the ability to walk; that he did not doubt the veracity of Fields' complains or symptoms; that Fields' symptoms required immediate medical attention and were of a known emergency nature, and there is no justification for a delay in seeking emergency intervention for someone with Fields' symptoms.

In addition to these admissions, Richards' notes of his August 8, 2007 encounter with Fields verify that Fields informed Richards that he had not experienced any significant trauma to his body, was experiencing "unbearable" "intense pain 10/10" in his back and "he cannot walk and needs a wheelchair." *Progress Notes* of 8/8/07 (Exhibit 1, p. 15).

Despite his knowledge of the gravity of Fields' symptoms, the emergency nature of the situation, the risk of injury in delaying treatment and the alarming basic circumstance that a previously healthy young adult with no neurological issues was now sitting wheelchair-bound in front of him, Richards provided shockingly cursory and wholly indifferent care: the only affirmative medical treatment he provided was to prescribe Tylenol twice a day for three (3) days, and ordered a follow-up be done *one week later.  August 8, 2007 Progress Notes* (Exhibit 1 at 15).   Dr. Alvarez (who performed the spinal decompression and an uninterested third-party to this litigation) stated at deposition that there is no medical justification for these two orders given by Richards. *Dep. of Dr. Alvarez* at 40.

The legal standard for showing deliberate indifference is high, but not unreasonably so: gross negligence at some point becomes reckless and/or deliberate action.   While, "[m]edical malpractice does not constitute deliberate indifference," (*Baxter v. Adam*, 2010 WL 3835457 *20 (N.D. Fla. 2010) citing *Estelle*, 429 U.S. at

106), deliberate indifference can *be established by showing a decision to take an easier but less efficacious course of treatment, or by medical care which is so cursory as to amount to no treatment at all. McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999); *Adams,* 61 F.3d at 1544; *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 704 (11th Cir. 1985). Deliberate indifference "entails something more than negligence, but is satisfied by something less than actions undertaken with an intent to cause harm." *Baxter,* 2010 WL at * 19.

"Delay of treatment for serious conditions can rise to the level of deliberate indifference where it is apparent that delay would detrimentally exacerbate the medical problem, the delay does seriously exacerbate the medical problem, and the delay is medically unjustified." *McMillan v. Hunter,* 2007 WL 570180 *3 (M.D. Fla. 2007) *citing Taylor v. Adams, 221 F.3d 1254,* 1259-60 (11th Cir. 2000) (*citing Hill v. Dekalb Reg'l Youth Ct.,* 40 F.3d 1176, 1187 (11th Cir. 1994)). Whether the delay was tolerable depends on the nature of the medical need and the reason for the delay. *Farrow,* 320 F.3d at 1247. Additionally, deliberate indifference to a prisoner's *future* health can constitute a constitutional violation. *Kelley,* 400 F.3d at 1284; *Powell v. Lennon,* 914 F.2d 1459, 1464 n. 10 (11th Cir. 1990).

To establish an Eighth Amendment violation based on denial of medical care, a plaintiff must establish that a defendant acted "with deliberate indifference to his or her serious medical needs." *See Estelle v. Gamble,* 429 U.S. 97, 104, (1976); *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3rd Cir. 1993). This standard has two elements: first, a plaintiff must make an "objective" showing that the deprivation was "sufficiently serious," or that the result of defendant's denial was sufficiently serious. A plaintiff must

also make a "subjective" showing that defendant acted with "a sufficiently culpable state of mind." *See Wilson v. Seiter,* 501 U.S. 294, 298 (1991).

As to the objective component, there can be little doubt that Fields' condition on August 8 and 9, 2007 (a spinal epidural abscess compressing his spinal cord and paralyzing his lower extremities, causing great pain, anal prolapse, and leaving him unable to urinate or defecate for days (Exhibit 6, p. 4)) qualifies as an objectively serious medical need. As outlined above, Richards concedes Fields presented to him with a serious medical need. Dr. Alavarez also testified that the symptoms that Fields presented with to Richards constitute a medical and "surgical" emergency. *Dep. of Dr. Alvarez* at 21-22. Additionally, it is reasonable to propose that when a previously healthy 24-year-old male inexplicably has sudden loss of sensation and motor function in the lower extremities, can no longer walk, is in great pain, and almost overnight becomes confined to a wheelchair, there exists a medical issue "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." See *Brown v. Johnson,* 387 F.3d 1344, 1351 (11th Cir. 2004).

Turning to the issue of showing the required subjective intent, a plaintiff must prove defendant acted with "deliberate indifference" by showing: (1) subjective knowledge of a risk of serious harm (i.e., both awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists and the actual drawing of the inference); (2) disregard of that risk; and (3) by conduct that is more than gross negligence. *Bozeman v. Orum,* 422 F.3d 1265, 1272 (11th Cir. 2005). In short, to establish deliberate indifference, a plaintiff must prove that he had objectively serious medical needs and that defendants actually knew of but deliberately disregarded those needs. *Meloy v. Bachmeier*, 302 F.3d 845, 848-49 (8th Cir. 2002).

Applying the law to these facts, summary judgment as to Defendant Richards must be denied. By virtually any standard, (let alone looked upon in a summary judgment analysis in a light most favorable to Fields), a reasonable factfinder could conclude that Richards was aware of Fields' serious medical need and the care he provided was so lacking and so inadequate that it amounts to deliberate indifference. As detailed above, *Richards himself admits* as much, averring that he knew Fields had a serious medical need; that Fields had lost the ability to walk; that he did not doubt the veracity of Fields' complaints; that he knew Fields' symptoms were consistent with a spinal cord injury; that Fields' condition was an emergency requiring immediate medical attention; and that a delay could worsen the outcome; and there is no medical justification for a delay in treating someone with Fields' condition. Yet Richards provided treatment so lacking and minimal it amounted to virtually no treatment at all given the circumstances.

As such summary judgment as to Defendant Richards should be denied.

**Liability of Allen:**    Defendants' Motion argues that Allen "examined Fields, found external hemorrhoids, treated him, and did not find any neurological problem," and thus, based upon her assessment, "Fields did not have a serious medical need of which [Allen] had subjective awareness." *Id.* at 14-15.

This argument is without merit. If anything, Allen's liability is even more clear-cut than Richards', as Fields' critical symptoms and condition were even more obviously dire and alarming when Allen encountered him.

Firstly, Allen's own chart notes regarding her encounter with Fields in the early morning of August 9, 2007 are replete with references to Fields' complaining of being "numb from the waist down," that "his legs and feet are numb," of loss of sensation, and general loss of motor function in his lower extremities. Exhibit 1, p. 16. It is undisputed

that Fields' anal sphincter had lost tension and that a loose rectal sphincter is a known indicator of paralysis and a condition impossible to fake. *Dep. of Dr. Dominguez* at 67. Additionally, Allen testified that she was familiar He also stated repeatedly, "I can't move. I can't move. I can't move." *Dep. of Allen* at 30.

Coupling all of these facts and symptoms together, it is simply shocking that Allen had Fields dragged on a sheet to another area, and left alone until morning. As explained in detail above with respect to Defendant Richards, any reasonable person would have recognized the fact that Fields' medical issues were serious and in need of a doctor's attention. Moreover, Dr. Dominguez received no notice whatsoever from Allen or anyone else about the urgency of Fields' status or that Fields should be examined first thing in the morning. *Dep. of Dr. Dominguez* at 30, 32.

Even Dr. Dominguez, (PHS' highest-ranking medical professional and the only doctor employed at the Lee County Jail at the time of Fields' incarceration and the person whom Allen was supposed to call during her shift if she needed a doctor's input or orders), suggests that Allen should have recognized the gravity of Fields symptoms:

> QUESTION: In looking at the chart, regarding Bettie Allen's notes, in your opinion, should she have done anything differently?
>
> DEF. COUNSEL: Form.
>
> DR. DOMINGUEZ: Knowing what I know now, yes.
>
> QUESTION: What should she have done differently?
>
> DR. DOMINGUEZ: She should have called me and said – knowing what I know now, that the patient had true paralysis, knowing what I know, if it had been me, I would've called and say, 'I have a patient here who is paralyzed . . . .'.

*Dep. of Dominguez* at 74.

Incredibly, Allen also testified that she did not call 9-1-1 or otherwise send Fields to an emergency room because she surmised that "hospitals don't like inmates" and thus, Fields wouldn't receive treatment at an emergency room.

QUESTION: In your treatment of inmates before, have you ever encountered an inmate who had a loss of motor function or symptoms of partial paralysis?

ALLEN: Yeah.

QUESTION: And what would you do in those situations?

ALLEN: I would put them in an observation cell and put them down to see the doctor, because there's nothing we can do in the middle of the night for something like that. And they're not in danger.

QUESTION: You could refer them to the hospital.

ALLEN: Yeah, but who's at the hospital? The doctors don't get there until the morning. They're going to put them in the ER, put them in a room in the far back, tie up an officer, all of that, chain them to the bed, and let them sit there until they take care of everybody else in the waiting room. He's going to see a doctor sooner staying where he is. He don't believe that, but that's the truth. Hospitals don't like inmates.

QUESTION: No?

ALLEN: No, they don't. They put them in the back room in the back-back-back where nobody else can see them and they treat them after everybody else. And where he was, he was getting treated first. It's like the doctors' offices. They don't like inmates either. They take them through the back door and put them in a little office and they sit there.

*Dep. of Allen* at 78-79.

This shocking testimony itself is essentially direct evidence of Allen's "deliberate indifference" and requires that summary judgment as to Allen be denied.

### III. Fields Asserts One Or More Of The Following Policies/Customs Of Defendants' Caused His Constitutional Injury.

Defendant PHS asserts Fields cannot show that "PHS had a policy of denying health care to inmates" or otherwise acted in accordance with an unconstitutional custom or policy (*Defendants' Motion for Summary Judgment* at 12), as is required for liability under § 1983 to attach against an entity (such as PHS) pursuant to *Monell v. Dept. of Social Services*, 436 U.S. 658, 691 (1978).[17]  However, Fields can make such a requisite showing.

The first step in analyzing Fields' § 1983 claim against PHS under *Monell* is to determine what constitutes the official policy, procedure or custom of PHS that caused Fields' injuries.  Under § 1983, a policy is a decision that is officially adopted by a state actor, or created by an official of such rank that he or she could be said to be acting on behalf of the state actor.  *Monell,* 436 U.S. at 690-91.  A custom is defined as a practice that is so settled and permanent that it takes on the force of law.  *Id.*  Further, a failure to adopt policy in the face of an obvious need may also constitute policy under § 1983.

---

[17] The Eleventh Circuit applies *Monell's* policy or custom concept in suits against private corporations acting under color of law (such as Defendant PHS) and performing traditional public functions (such as providing medical care to inmates). *Buckner v. Toro,* 116 F.3d 450 (11th Cir. 1997).  *Monell's* primary holding is that a governmental entity cannot be held liable for the torts of its agents or employees under a theory of *respondeat superior.*  Rather, *Monell* holds that when the execution of a policy or custom made by an entity's "lawmakers," or by those whose edicts or acts may be said to represent official policy, inflicts an injury, the municipality (or entity) can be held responsible. *Id.* at 692.  An individual policymaker within government who authorized policies that led to constitutional violations, or permitted practices that were so permanent and well settled as to establish acquiescence, can establish governmental liability under § 1983.  *Heron v. City of Philadelphia,* 987 F. Supp. 400 (E.D. Pa. 1997).

*Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir. 1991), *Card v. Miami-Dade County,*

147 F.Supp 1334 (S.D. Fla. 2001).

**A.  Defendant PHS Had a Policy Whereby Medical Professionals Within The Lee County Jail System Were Instructed Not To Summon Emergency Assistance For An Inmate Unless The Patient Was Facing "Impending Doom."**

There is overwhelming evidence in this case that PHS had in place a policy

whereby jail medical professionals were not authorized to send an inmate to the

emergency room or otherwise summoning emergency medical services for "ordinary"

emergencies but rather could only summon emergency services when an inmates were

experiencing critical vital signs.

Dr. Dominguez, (as the only doctor employed by PHS for the entire Lee County

Jail system and its highest-ranking medical professional, (*Dep. of Dominguez* at 37)),

testified that he was the only medical staff member within the entire Lee County Jail

system with the unilateral authority to summon emergency medical services for an inmate

in all emergency situations.  Dr. Dominguez testified that PHS had created a dichotomy

with respect to emergency situations whereby medical staff were only permitted to

summon help in emergency situations that involved "impending doom" of an inmate.  For

any other type of emergency situation, only he was authorized to summon emergency

medical services.

> QUESTION:          If Ms. Allen had determined that she wanted to send Mr. Fields to the hospital, what is your understanding of the procedure she should follow?
>
> DEF. COUNSEL:      Form.
>
> DR. DOMINGUEZ:     She calls me, or she calls one of the other providers on call, except if the patient appears to be in impending doom, in which case, she calls the ambulance first and tells staff, This patient really needs to go. He's going to

die, and then call me or have somebody call Dr. Dominguez while I'm pressing his chest, or while I'm doing something, starting a bag of fluid, to get his blood pressure going or something, because being the highest level, she may have to provide acute care and not actually be the one calling me. She could have an LPN call me and tell me that there is a patient who's very sick, and the ambulance has been called.

QUESTION: So if I understand you correctly, if a patient is facing impending doom, she does have the unilateral authority to call an ambulance, right?

DR. DOMINGUEZ: To call an ambulance, yes.

\*   \*   \*

QUESTION: All right. When you were describing those two categories of patients to me, the first category you described, as -- I forget your exact terminology. What was it? Critically acute impending doom?

DR. DOMINGUEZ: Critically acute.

QUESTION: Would a loss of motor function fall into that "impending doom" category?

DEF. COUNSEL: Form.

DR. DOMINGUEZ: Actually, no.

*Dep. of Dr. Dominguez* at 37-38.

Defendant Allen also testified that she, even though she was a registered nurse and the highest-ranking medical professional at the jail at night, was prohibited from summoning emergency services for an inmate in many emergency situations.

QUESTION: Okay. So what was your understanding of what you were authorized to do in terms of sending an inmate to the hospital?

ALLEN: I don't send anybody unless it's a critical life or going to be dead thing -- or I consider it to be that.

QUESTION: And what do you consider a critical – and you're saying a life or death matter?

ALLEN: Yeah.

| QUESTION: | So if I understand you right, it has to be a life or death matter before - |
|---|---|
| ALLEN: | Yeah, for me to do it. Otherwise, I have to call the doctor and he has to tell me to do it. |

*Dep. of Allen* at 50.

As Fields was experiencing spinal cord compression, but had relatively stable vital signs, this policy of requiring critical vital signs be present before a situation was considered an "emergency" resulted in Fields constitutional injuries.

**B.** **Defendant Allen Was An Individual Municipal Official And/Or "Policymaker" Within The Meaning Of *Monell*, Thus Exposing PHS To §1983 Liability.**

As revealed above, Defendant Allen, PHS' highest-ranking night-time medical professional within the Lee County Jail system, stated herself that she was a policymaker with respect to sending inmates to the emergency room. Her own testimony is that with Fields and other inmates who had symptoms of loss of motor function, she determined not to call 9-1-1 or otherwise summon emergency medical services because she felt that "hospitals don't like inmates." *See Dep. of Allen* at 78-79.

This testimony is enough to illustrate that Allen had her own policy regarding emergency referrals of inmates to hospitals, and thus was PHS's "policymaker" with respect to the decision and policy which resulted in Fields not timely receiving care.

This case involves a "*Monell*" claim against PHS and Fields is not proceeding under a theory of *respondeat superior*. The United States Supreme Court has held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 694 (1978). Rather, it is "when execution of a government's policy or custom, whether made by its lawmakers *or by those whose edicts or acts may fairly be*

*said to represent official policy*, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694 (emphasis added).

While *Monell* holds that a municipality cannot be held liable merely through *respondeat superior*, a municipality may, however, be held liable for the actions of "those whose edicts or acts may fairly be said to represent official policy." [18]

In *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986) the Supreme Court granted certiorari to determine "whether, and in what circumstances, a decision by municipal policymakers on a single occasion" may result in municipal liability under § 1983. The lower court in *Pembaur* had held that a single unconstitutional act cannot establish official policy.[19] The Supreme Court reversed and set forth several guiding principles: First, a municipality may be held liable for actions which it "officially sanctioned or ordered." *475 U.S. at 480*. Second, only officials possessing final policymaking authority can subject a municipality to § 1983 liability. *Id.* at 483. Third, whether an official possesses final policymaking authority is a question of state law. *Id.* Finally, the official must possess final policymaking authority in the area in which the challenged conduct occurred. *Id. at 483-84*.

---

[18]  The term "municipality liability" as referenced in *Monell* and its progeny cases applies to actual "municipalities," as well as governmental agencies and private corporations (such as PHS) which are performing traditional public functions. *Buckner v. Toro,* 116 F.3d 450 (11th Cir. 1997).

[19]  The Court noted municipal liability attaches under §1983 "where - and only where - a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986). The term "official policy" often refers to "formal rules or understandings - often but not always committed to writing - that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently over time." 475 U.S. at 480-81.

These points were refined by the Eleventh Circuit in *Mandel v. Doe,* 888 F.2d 783, 793 (11th Cir. 1989), which explains municipal liability for a § 1983 claim when a single individual is said to be the final policy maker:

> Municipal liability may attach to a single decision made by a municipal official if that municipal official is the final policymaker for the municipality with respect to the subject matter in question. Under [*7] this theory of municipal liability, the first step of the inquiry is to identify those individuals whose decisions represent the official policy of the local governmental unit. *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, (1989). As already discussed, this is a question of law to be resolved by the trial court judge. *Id. See City of St. Louis v. Praprotnik,* 485 U.S. 112, 123-24. In making this determination, the court should examine not only the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law. *Jett, 491 U.S. at 737, 109 S.Ct. at 2724. See Pembaur, 475 U.S. at 485, 106 S.Ct. at 1301* (county prosecutor found to be final policymaker based in part on relevant operational practices). *See also Williams v. Butler, 863 F.2d 1398, 1403 (8th Cir. 1988)* (en banc) (plurality opinion), *cert, denied, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989)*. The court must also ensure that the municipal official possesses the authority and responsibility for establishing final policy with respect to the issue in question. *See Praprotnik, 485 U.S. at 127, 108 S.Ct. at 926*; [*8] *Pembaur, 475 U.S. at 483-84, 106 S.Ct. at 1300*. Only after this determination is made is the second step of the inquiry relevant: Did the challenged decision or act of the official cause the deprivation of the plaintiff's rights?

*Mandel,* 888 F.2d at 792-93.

In *Mandel,* the Eleventh Circuit held that a physician's assistant was a "final policymaker" with respect to medical affairs at a county road prison, and that his acts of deliberate indifference could be attributed to the local municipality for purposes of establishing liability under ß 1983. *Id.* at 794. Although it was originally contemplated that the physician's assistant would be supervised by a medical doctor, a custom and practice developed such that he was subject to no supervision or review. *Id. at 785*. In determining that the physician's assistant was a "final policymaker," the Eleventh Circuit

reasoned that this custom and practice established a policy authorizing the physician's assistant to make medical decisions without any supervision or review unless he, in his sole and unsupervised discretion, deemed it appropriate. *Id. at 794*.

The same analysis can be applied here.  Allen was the final policymaker with respect to deciding which inmates would be sent to a hospital and had her own policies and parameters in place regarding sending inmates to a hospital emergency room.  As such, her decions pursuant to the policy caused Fields' injuries.

### C. The Decision To Refuse To Summon Emergency Medical Attention For Fields Was Related To A Policy Of Cost-Cutting With Respect To Inmate Care.

PHS had a policy of cost-cutting with respect to inmate referrals to hospitals, and thus PHS only would send inmates to the hospital in the most dire cases.  As Fields had an emergency medical condition, but not critically low vitals, this policy of cost-cutting caused his constitutional injury.

Defendant Allen testified at length that PHS medical staff were constantly admonished about cost-cutting goals with respect to inmate emergency care:

| | |
|---|---|
| QUESTION: | Okay. What did this Shawn Irving[20] say about - going back to Shawn Irving, what did she say about – you started to tell me. When should an inmate be sent to the hospital? |
| DEF. COUNSEL: | Form. Go ahead. Go ahead. |
| QUESTION: | Do you want me to rephrase it? I can do that. |
| ALLEN: | I don't know. It's the same thing. She told us that, unless it was an emergency, that we could take the initiative. If not, call the doctor and let the doctor make the decision, because it costs PHS so much money every time we take somebody to the ER. |
| QUESTION: | That's what this Shawn Irving told you? |

[20] Shawn Irving is PHS' management official in charge of the Lee County Jail system and was actually PHS' corporate representative for deposition in this litigation.

|           |                                                                                   |
|-----------|-----------------------------------------------------------------------------------|
| ANSWER:   | Well, yeah. Everybody knew that . . .                                             |
| QUESTION: | But this Shawn Irving, I mean, did she say that to you, that it costs money every time we have to send an inmate to the hospital? |
| ALLEN:    | Yeah, she said that. And all of them. . . .                                       |

*Dep. of Allen* at 56-57.   Allen went on to say numerous other PHS management employees also stressed cost-containment concerns to medical staff regarding summoning emergency care for inmates with emergency care. *Id.* at 57-59.  Based on this testimony, a reasonable factfinder could find that PHS' cost-containment concerns regarding emergency care for inmates constituted a policy which injured Fields.

## CONCLUSION

**WHEREFORE,** for the foregoing reasons, the Court should deny Defendants' Motion for summary judgment.

Respectfully served,

Dated: December 1, 2010                ATTORNEYS FOR PLAINTIFF

Dion J. Cassata, P.A.
320 S.E. 10th Court
Fort Lauderdale, Florida 33316
Phone:        (954) 364-7803
Facsimile:   (954) 251-4787

BY:     s/Dion J. Cassata
          Dion J. Cassata
          Fla. Bar No. 672564
          *dion@cassatahanson.com*

Greg M. Lauer, P.A.
320 S.E. 10th Court
Fort Lauderdale, Florida 33316
Phone:        (954) 533-4498

          Greg M. Lauer
          Fla. Bar No.  652709
          *greg@gregmlauer.com*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 1, 2010 I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Middle District of Florida using the Court's Case Management/Electronic Case Filing (CM/ECF) system. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the below Service List in the manner specified.

s/Dion J. Cassata
Dion J. Cassata

## SERVICE LIST

### *Fields v. Scott, et al.*
(All counsel or parties below have been served
via CM/ECF-generated Notice of Electronic Filing).

| COUNSEL FOR PLAINTIFF | COUNSEL FOR DEFENDANTS |
|---|---|
| Dion J. Cassata, Esq.<br>*dion@cassatahanson.com*<br><br>Dion J. Cassata, P.A.<br>320 S.E. 10th Court<br>Fort Lauderdale, Florida 33316<br><br>Telephone:   (954) 364-7803<br>Facsimile:   (954) 251-4787 | Gregg A. Toomey, Esq.<br>*GAT@bunnellwoulfe.com*<br><br>Bunnell & Woulfe, P.A.<br>1625 Hendry Street<br>Suite 203<br>Fort Myers FL 33901<br><br>Telephone:  (239) 337-1630<br>Facsimile:   (239) 337-0307<br><br>[Counsel for Defendant<br>Prison Health Services, Inc.] |
| Greg M. Lauer, Esq.<br>*greg@gregmlauer.com*<br><br>Greg M. Lauer, P.A.<br>320 S.E. 10th Court<br>Fort Lauderdale, Florida 33316<br><br>Telephone:   (954) 533-4498<br>Facsimile:   (954) 533-4501 | |