UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:09-CV-529-FtM-29DNF

VOLUME ONE OF FOUR

_____

BRETT FIELDS

        Plaintiff,

                                Fort Myers, Florida
vs.                            March 15, 2011

                                9:04 a.m.

PRISON HEALTH SERVICES, INC., et al,

        Defendants.

_____

TRANSCRIPT OF JURY TRIAL, DAY ONE

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR PLAINTIFF:    Law Offices of Greg M. Lauer, P.A.
                 320 S.E. 10th Court
                 Fort Lauderdale, FL  33316
                 BY:  GREG M. LAUER, ESQ.

                 Cassata & Hanson, PL
                 320 S.E. 10th Court
                 Fort Lauderdale, FL  33316
                 BY:  DION J. CASSATA, ESQ.

FOR DEFENDANTS:   Bunnell & Woulfe, P.A.
                 Suite 203
                 1625 Hendry Street
                 Fort Myers, FL  33901
                 BY:  GREG A. TOOMEY, ESQ.

REPORTED BY:      JEFFREY G. THOMAS, RPR-CP
                 Official Federal Court Reporter
                 2110 First Street, Suite 2-194
                 Fort Myers, FL  33901

I N D E X

| March 15, 2011 | Vol. | Page |
|---|---|---|
| Preliminary Discussions | 1 | 4 |
| Initial Instructions to the Jury | 1 | 17 |
| Stipulations of Fact Read | 1 | 22 |
| Motion for Limitation of Liability by Mr. Toomey | 1 | 23 |
| Argument in Opposition by Mr. Lauer | 1 | 24 |
| Further Argument by Mr. Toomey | 1 | 25 |
| Argument in Opposition by Mr. Cassata | 1 | 27 |
| Further Argument by Mr. Toomey | 1 | 27 |
| Further Argument by Mr. Lauer | 1 | 28 |
| Further Argument by Mr. Toomey | 1 | 29 |
| Order of Court | 1 | 30 |
| Opening Statement by Mr. Lauer | 1 | 31 |
| Opening Statement by Mr. Toomey | 1 | 53 |
| Discussions Re Deposition of Dr. Emery | 1 | 59 |
| Argument Re Plaintiff's Motion to Strike by Mr. Toomey | 1 | 60 |
| Argument in Opposition by Mr. Cassata | 1 | 65 |
| Further Argument by Mr. Toomey | 1 | 67 |
| Further Argument by Mr. Lauer | 1 | 68 |
| Order of Court | 1 | 68 |

- - -

PLAINTIFF'S WITNESSES

| WITNESS | DIRECT | | CROSS | | REDIRECT | | RECROSS | | VOIR DIRE | |
|---------|--------|-----|-------|-----|----------|-----|---------|-----|-----------|-----|
| | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. |
| TONI SILVERS | 1 | 72 | | | | | | | | |
| TRAVIS HOPKINS | 1 | 90 | 1 | 95 | 1 | 96 | | | | |
| WADEN EMERY, M.D | 1 | 99 | 1 | 123 | 1 | 129 | 1 | 130 | | |
| AMANDA DUHAMEL | 1 | 135 | | | | | | | | |

* * *

4

```
 1        THEREUPON, the above-entitled case having been called

 2   to order, the following proceedings were held herein,

 3   to-wit:

 4                          -  -  -

 5        THE COURT:  All right.  This is the case of Brett

 6   A. Fields, Jr. versus Prison Health Services, Inc., Joseph

 7   A. Richards, Jr., and Bettie Joyce Allen.  It's Case 2:09

 8   Civil 509.

 9        Counsel if you'd identify yourselves, beginning

10   with counsel for the plaintiff.

11        MR. LAUER:  Brett Lauer on behalf of the

12   plaintiff, Brett Fields.

13        MR. CASSATA:  Dion Cassata, also for the

14   plaintiff.

15        MR. TOOMEY:  Good morning, Your Honor.  Greg

16   Toomey, on behalf of all the defendants.

17        THE COURT:  All right.  And who do we have at

18   counsel table?  I know who you are.

19        MR. TOOMEY:  To my right is Shawn Irving.  She's

20   the corporate representative for Prison Health Services.

21   Next to her is Joseph Richards.  He's a defendant.  Next to

22   him is Bettie Allen, who is also a defendant.

23        THE COURT:  All right.  Thank you.

24        This is set for a jury trial.  Both sides ready?

25        MR. LAUER:  Yes, Judge.  Plaintiff's ready.
```

1          MR. TOOMEY:  Yes, Your Honor.

2          THE COURT:  All right.  What is your current

3    thinking with regard to length of trial, in terms of what I

4    should tell the jury?  I think the pretrial stipulation says

5    five days.  Is that where we're still at?

6          MR. LAUER:  Judge, I anticipate the plaintiff will

7    be able to present their case in three days, possibly four

8    at the most.

9          MR. TOOMEY:  I expect the plaintiff will call all

10   of my witnesses except one, and that would be my expert.

11   However, I've asked for, and have not been provided, five

12   times in the last week, an order of proof, so we can

13   actually get people here and make sure -- so we know what's

14   going to happen in the next day.  And I'd appreciate it.

15         THE COURT:  So in terms of telling the jury, or

16   potential jurors, should I tell them we expect to finish the

17   end of the week or into next week, is kind of the key.

18         MR. TOOMEY:  I think we should be done this week.

19         MR. LAUER:  Yes, Judge.

20         THE COURT:  All right.

21         MR. TOOMEY:  Frankly, I was thinking we'd be done

22   Thursday.  I'm hopeful that way.

23         THE COURT:  I think I'd rather tell the jurors

24   longer, and have them happy to get done sooner, rather than

25   the other way around.

1          MR. TOOMEY:  I understand.

2          THE COURT:  All right.  In terms of the witness

3    lists, I typically go through and advise the jury of the

4    names.  Is there any name in the witness list that can be

5    eliminated?

6          MR. LAUER:  As far as the plaintiff's witness

7    list, Judge?

8          THE COURT:  Well, either side.  I'm looking at the

9    defendants' at the moment, just because it's the longest.

10         MR. LAUER:  Judge, I think we established early on

11   that records custodians will not be necessary.  That gets

12   rid of witnesses 1 through 10.  Then we have my client's

13   father, who may or may not be called; his mother, who is

14   present right now, who will be called.  His brother, who

15   will be called.  Justine Hough possibly will be called.

16   Defendant Allen will be called.  Defendant Richards will be

17   called.  Mr. Dominguez will be called, my expert, Waden

18   Emery, will be called.  And then, through deposition, as

19   well, Dr. Alvarez, as well as a man named Trey Diggs.

20         And then what I did write on Number 22 is any and

21   all defendants, Rule 26 witnesses, without waiving

22   objections to the same.  I realize that's a catchall.  The

23   one individual that does encompass is going to be Amanda --

24   I apologize, what's name?  Duhamel.  This is Mr. Fields'

25   girlfriend for a few years.  She was listed on defendant's

```
 1    witness list up until the brand new one that came out two or
 2    three years ago -- two or three days ago.
 3              THE COURT:  The two or three days ago is the one
 4    I'm relying upon.  I don't remember that particular name.
 5    Amanda?
 6              MR. LAUER:  Her name is Amanda, D U H A M E L.
 7              MR. CASSATA:  Duhamel.
 8              MR. LAUER:  Duhamel.
 9              THE COURT:  All right.
10              In terms of the defendants' list, any of those
11    names that you know will not be called?
12              MR. TOOMEY:  Virtually all of them, Judge.  I
13    expect the plaintiff will call Dr. Alvarez, who is Number --
14    well, let's just say what we can get rid of.  We can get rid
15    of four.  Inna Paraschuk.
16              THE COURT:  Okay.
17              MR. TOOMEY:  Number 12, 13, 15.  And they may be
18    called.  Maybe 17.  So 1 through 16.
19              THE COURT:  Okay.
20              MR. TOOMEY:  I will not call the rest.
21              THE COURT:  All right.  We keep 17 and strike the
22    others?
23              MR. TOOMEY:  Yes, sir.
24              MR. CASSATA:  Your Honor?  If I may, there is an
25    outstanding motion to strike a witness on defendants'
```

```
 1    witness list.  Maybe, for the purposes of voir dire, you
 2    could add the name.
 3              THE COURT:  I've got the name.  We'll get to that
 4    one.
 5              All right.  Looks to me like there's three
 6    motions:  A motion to strike Mr. Lincoln.  A motion to
 7    strike evidence, which I think is a surveillance video.  I
 8    thought there was a third.  Am I missing something?
 9              MR. CASSATA:  Actually, there's two other issues.
10    There's a motion to rule on objections made during
11    Dr. Emery's deposition.
12              THE COURT:  That's right.
13              MR. CASSATA:  And there's also three contested
14    jury instructions.
15              THE COURT:  Jury instructions I don't need to
16    worry about now.
17              The deposition motion I did receive, and unless
18    you tell me otherwise, it does not seem to require attention
19    prior to the jury selection.  Anyone think it does?
20              MR. LAUER:  Judge, the reason why I would ask if
21    we could deal with it, I was planning on playing that
22    deposition today.  The DVD has been given to my audiovisual
23    person, as well as the transcript.
24              THE COURT:  You're not going to play it during
25    voir dire.
```

1          MR. LAUER:  No, no; obviously not during voir

2     dire.  But as soon as I get a ruling, I can tell him what's

3     going to be redacted.  It's probably going to take him an

4     hour, hour and a half to remove whatever portions you find

5     to be objectionable.  So if there was time to get that done

6     which would give him time to take care of that issue today,

7     that would be helpful; but it's up to you, Judge.

8          THE COURT:  All right.  We can do that after

9     picking the jury.  Who's Mr. Lincoln?

10          MR. TOOMEY:  He's a private investigator I hired,

11     Your Honor.

12          THE COURT:  And what's his function?

13          MR. TOOMEY:  Well, I only need him as a witness to

14     authenticate the tape he made February 25th through

15     February 27th.

16          THE COURT:  That's the surveillance video?

17          MR. TOOMEY:  It is, Your Honor.

18          THE COURT:  All right.  We'll deal with those two,

19     as well, then, after getting the jury.

20          I've received proposed voir dire questions from

21     plaintiff, but not from the defendant.  Is that correct?

22          MR. TOOMEY:  That's correct, sir.

23          THE COURT:  All right.  And I think, as we

24     discussed at the pretrial conference, the Court does allow

25     brief follow-up voir dire questions by counsel.  I do mean

1    brief, and I do mean follow-up.  Did we discuss the number

2    of alternate jurors?

3            MR. TOOMEY:  I think we did, Your Honor.  You said

4    you'd seat eight?

5            MR. LAUER:  Yes.

6            THE COURT:  That's what I typically do.  And I

7    presume we also discussed that they're not really

8    alternates?

9            MR. LAUER:  Yes.  Yes, we did.

10           MR. TOOMEY:  Yes, sir.

11           THE COURT:  All right.  Unless there's some reason

12   not to do so, we'll have the jurors come on up.  I'm told

13   there's 27 prospective jurors.  We'll seat 18 in the jury

14   box, and the others on the right-hand side of the courtroom.

15   The Court will do the voir dire of the 18 as a group, and

16   then, if that's not enough, after the peremptories and cause

17   challenges, we'll do the rest.

18           MR. TOOMEY:  Do we have a list of names, Judge?

19           THE COURT:  We will.  I don't have one yet, but

20   we'll get it when they come up.

21           All right.  Have the jurors come on up.

22           (At 9:15 a.m., court stood at ease while awaiting

23        the arrival of the jury venire.)

24           MR. LAUER:  Judge?

25           THE COURT:  Yes.

```
1            MR. LAUER:  If I may, my client has some issues
2     with the restroom.  Sometimes he needs to go much more often
3     than other people, and sometimes it takes much longer a
4     period of time.  So, possibly, when things are going on in
5     court, it may become an issue.  I was just . . . any
6     guidance on how we can address that.  I don't know
7     how . . . .  Later.
8            (At 9:22 a.m., the jury venire was escorted into
9        the courtroom.)
10            THE COURT:  Counsel, come to sidebar, please.
11                        AT SIDEBAR
12            THE COURT:  What do you want to do about your
13     client's need to go to the bathroom, just have him get up
14     and leave?
15            MR. LAUER:  Yeah.  I mean, we could do that, if
16     that's okay with the Court.
17            THE COURT:  Sure.  That's fine.  Do you want me to
18     tell the jury anything about that?  So if when we get the
19     jury selected, they see that happen?
20            MR. LAUER:  Yes.  So they don't think that he's
21     just taking off because he doesn't care.
22            THE COURT:  Right.  Okay.  Any objection?
23            MR. TOOMEY:  No, sir.
24                        IN OPEN COURT
25            (At 9:23 a.m., jury selection began.)
```

1      (The jury having been selected and seated at 10:51

2      a.m., the following proceedings were held, herein,

3      to-wit:)

4          THE COURT:  All right.  Ladies and gentlemen, you

5   are the jury that will decide the case.  First thing we're

6   going to do is take a recess.  We'll have you go into the

7   jury room, you can get familiar with the facilities there.

8   There should be juror buttons in there.  I would request

9   that you wear the buttons both in court, during any recess,

10  and at lunch.  The buttons really help all of us to remember

11  who you are, particularly at lunchtime.  It's a relatively

12  small downtown area, and none of the parties involved in the

13  case are allowed to talk to you or in your presence, so it

14  helps all of us if you'd wear those buttons.

15          I will some preliminary instructions after you

16  come back, and then we'll hear the opening statements from

17  the attorneys.  That will probably take us to the lunch

18  hour, then we'll come back and start with the testimony

19  thereafter.  So let's take about 15 minutes, and we'll get

20  you back a little bit after 11:00 o'clock.

21          (At 10:52 a.m., the jury was escorted from the

22      courtroom.)

23          THE COURT:  All right.  Let's take 15 minutes.

24          Mr. Lauer, my only question to you is if you want

25  me to preserve your issue with regard to Juror Number 6.

1   You felt the need to do that before.

2              MR. LAUER:  I'll take a look at it, Judge.

3              THE COURT:  Let's do that now, before we forget

4   it, if that's what you need to do.

5              MR. LAUER:  I believe I put -- are we on the

6   record still?

7              THE COURT:  Yes.

8              MR. LAUER:  I believe I put most of it on the

9   record at sidebar, but Mr. Reyes was the only Hispanic male

10  who was on -- actually, the only individual of color,

11  Hispanic, Asian, black, any individual of color, was Juror

12  Number 6, Mr. Reyes.  The reason given by defense counsel

13  for the strike was that he appeared to be meek, and was a

14  little bit -- could be identified as a follower.  I objected

15  at sidebar, based on Batson v. Kentucky, that this was a

16  violation of his equal protection rights, and anyone's equal

17  protection rights being a minority being allowed to serve on

18  a juror in this country.  Defense counsel gave their race

19  neutral reason, and the response was that it was found to be

20  genuine.  After some inquiry.  And so therefore defense

21  counsel's peremptory challenge to Juror Number 6 was

22  granted.  Once again, I am maintaining that objection that

23  that should not have been granted for a peremptory strike.

24             THE COURT:  All right.  To the extent you need

25  preserve it, in my view it is preserved.  The reasons I

1    stated still apply, and your objection is overruled, but

2    preserved.

3              All right.  Let's take 15 minutes.

4              MR. LAUER:  Just one more thing.  So there is no

5    need for me to object again immediately before jury is

6    sworn, in your opinion, my objection both to my for cause

7    challenges that have been denied and what I just went over

8    dealing with Mr. Reyes, has been preserved?

9              THE COURT:  In my view, it is.

10             MR. LAUER:  All right.  My understanding is I'm

11   okay.

12             THE COURT:  If you can, give me case law

13   otherwise, but it's hard to believe it's not preserved if

14   all we're doing between now and swearing the jury is taking

15   a recess.

16             MR. LAUER:  Thank you, Your Honor.

17             THE COURT:  All right.  15 minutes.

18             (At 10:55 o'clock, a.m., court was recessed.)

19                         AFTER RECESS

20             (At 11:12 o'clock, a.m., court was reconvened.)

21             THE COURT:  Both sides ready for the jury?

22             MR. LAUER:  Actually, Judge, just one or two . . .

23   I don't want to call them housekeeping matters, but just to

24   refresh on the motion in limine, absolutely no reference to

25   plaintiff's conviction for misdemeanors, traffic citations,

1    unadjudicated felonies; that is, until, under Rule 609, the

2    plaintiff testifies, and the Court has a chance to evaluate

3    whether or not they should be coming in.  So I would just

4    want to get a specific order that they are not to be opened

5    on by defense counsel.

6          MR. TOOMEY:  They were never going to be, Your

7    Honor, as I said at the pretrial.

8          THE COURT:  All right.

9          MR. LAUER:  And as well as paying child support,

10    any child support issues.

11          MR. TOOMEY:  That's only an issue for the Court if

12    it comes up later, after verdict.

13          THE COURT:  Okay.  I think we're on the same page,

14    then.

15          MR. LAUER:  Also, I believe that there were some

16    issues that were filed over the weekend, by Mr. Cassata,

17    dealing with the late added witness, a Mr. Lincoln, and some

18    surveillance that was taken; and because everybody is about

19    to open and say what the evidence is going to show, a

20    decision on whether or not this is going to be evidence or

21    strictly for impeachment purposes, I think, would assist

22    myself and defense counsel, at this time, in formulating an

23    opening statement.

24          THE COURT:  Do you intend to refer to that?

25          MR. TOOMEY:  I never comment on evidence that I

1    don't know is in already.  No, sir.

2                THE COURT:  All right.

3                MR. LAUER:  All right.  That being said, evidence

4    that we don't know is in already, on January -- not January,

5    February 14th of this year, we met in this courtroom.

6    Plaintiff's Exhibit 1 through 20 was admitted into evidence.

7    If you need it, Mr. Cassata has a copy of the minutes from

8    that proceeding.  I have, in my hand, the majority of

9    Plaintiff's Exhibits 1 through 20, I would like to place

10   them on plaintiff's table so I can use them when and if

11   necessary.  Copies have provided to defense counsel.  With

12   the exception of the medical records from Southwest Florida

13   regional medical center.  This is the original copy.  I have

14   copies that have my work product all over it, but with the

15   size of this, it was not feasible for us to photocopy this

16   last night.  But this was previously admitted as

17   Plaintiff's 3.

18               THE COURT:  That was my question.

19               MR. TOOMEY:  I have copy of it, Your Honor.  I

20   have no objection.  The exhibit is already in the record.

21               THE COURT:  All right.  I've got my exhibit list

22   from our status conference, and you're correct that

23   Exhibits 1 through 20 have already been admitted; so you can

24   put them at the table and may make use of them as you will.

25   As may defense counsel.

```
 1              All right.  What else?

 2              MR. LAUER:  I believe that's it, Your Honor.

 3    Thank you.

 4              THE COURT:  All right.

 5              Have the jury step in, please.

 6              (At 11:16 a.m., the jury was escorted into the

 7         courtroom.)

 8              THE COURT:  The jurors may be seated.

 9              If you will have the jurors placed under oath,

10    please.

11              THE CLERK:  Stand and raise your right-hand side,

12    please.  Do each you solemnly swear or affirm that you will

13    well and truly try the issues in the case between the

14    plaintiff, Brett Fields, and the defendants, Prison Health

15    Services, Bettie Joyce Allen, and Joseph A. Richards, and

16    render a true verdict according to the evidence and the

17    charge of this Court, so say you all?

18              (All jurors indicated affirmatively.)

19              THE CLERK:  You may be seated.

20              THE COURT:  Ladies and gentlemen, you have now

21    been sworn as the jury to try this case.  By your verdicts,

22    you will decide the disputed issues of fact.  I will decide

23    all questions of law and procedure that arise during the

24    trial, and before you retire to the jury room, at the end of

25    the trial, to deliberate upon your verdict and decide the
```

1   case, I will explain to you the rules of law that you must

2   follow and apply in making your decisions.

3          The evidence presented to you during the trial

4   will consist primarily of the testimony of witnesses and

5   tangible items, including papers or documents, called

6   exhibits.  You should pay close attention to the testimony,

7   because it will be necessary for to you rely upon your

8   memories concerning what the testimony was.

9          Although, as you can see, a court reporter is

10  making a stenographic record of everything that is said,

11  transcripts will not be prepared in sufficient time, or

12  appropriate form, for your use during your deliberations,

13  and you should not expect to receive them.

14         On the other hand, any exhibits admitted in

15  evidence during the trial will be available to you for your

16  detailed study, if you wish, during your deliberations.  So

17  if an exhibit is received in evidence, but is not fully read

18  or shown to you at the time, don't be concerned, because you

19  will get to see and study it later, during your

20  deliberations.

21         If you would like to take notes during the trial,

22  you may do so.  On the other hand, of course, you are not

23  required to take notes if you do not want to.  That will be

24  left up to each of individually.

25         If you do decide to take notes, I suggest that you

1    not try to write down everything, because you might get so

2    involved in the note-taking process that you may become

3    distracted from the ongoing proceedings.  I suggest that, if

4    you make notes, you make notes with regard to names, dates,

5    places, things that might be difficult to remember later.

6    Also, your notes should be used only as aids to your memory;

7    and if your memory should later differ from your notes, you

8    should rely upon your memory, and not your notes.

9         If you do not take notes, you should rely upon

10   your own, independent recollection, or memory, of what the

11   testimony was, and you should not be unduly influenced by

12   the notes of other jurors.  Notes are not entitled to any

13   greater weight than the impression or recollection of each

14   juror concerning what the testimony was.

15        During the trial, you should keep an open mind,

16   and should avoid reaching any hasty impressions or

17   conclusions.  Reserve your judgment until you have heard all

18   of the testimony and the evidence, the closing arguments, or

19   summations by the lawyers, and my instructions, or

20   explanations to you concerning the applicable law.

21        Because of your obligation to keep an open mind

22   during the trial, coupled with your obligation to then

23   decide the case only on the basis of the testimony and the

24   evidence presented, you must not discuss the case during the

25   trial, in any manner, among yourselves or with anyone else;

1    nor should you permit anyone to discuss it in your presence.

2    And you should avoid reading any newspaper articles that

3    might be published about the case, and also avoid seeing any

4    television or radio news commentary.

5           From time to time during the trial, I may be

6    called upon to make rulings of law on objections or motions

7    made by the lawyers.  You should not infer or conclude, from

8    any ruling or comment I may make, that I have an opinion on

9    the merits of the case favoring one side or the other; and

10   if I should sustain an objection to a question that goes

11   unanswered by a witness, you should not guess, or speculate,

12   what the answer might have been, nor should you draw any

13   inferences, or conclusions, from the question itself.

14          During the trial, it may be necessary for me to

15   confer with the lawyers from time to time, out of your

16   hearing, concerning questions of law or procedure that

17   require consideration by the Court alone.  On some occasions

18   you may be excused from the courtroom for that reason.  On

19   other occasion, we may have sidebar conferences, as you've

20   seen already.  We will try to limit the interruptions as

21   much as possible.

22          The order of the trial's proceedings will be as

23   follows:  In just a moment, the lawyers for each of the

24   parties will be permitted to address you, in turn, and make

25   their opening statements to you.  The plaintiff will then go

1   forward with calling of witnesses and the presentation of

2   evidence during what we call the plaintiff's case in chief.

3          When the plaintiff finishes by announcing that he

4   rests, the defendants will proceed with witnesses and

5   evidence; after which, with some limitations, the plaintiff

6   may be permitted to call witnesses or present evidence

7   during what we call the rebuttal phase of the trial.  The

8   plaintiff proceeds first and may rebut in the end because

9   the law places the burden of proof, or the burden of

10  persuasion, on the plaintiff, as I will explain to you in

11  more detail in my final instructions.

12         When the evidence portion of the trial is

13  completed, the lawyers will then be given another

14  opportunity to address you, and make their summations, or

15  their final arguments in the case, after which I will

16  instruct you on the applicable law, and you will then retire

17  to deliberate upon your verdicts.

18         We will begin now by affording the lawyers for

19  each side an opportunity to make opening statements in which

20  they may explain to you the issues in the case and summarize

21  the facts they expect the evidence to show.

22         I caution you that the statements that the lawyers

23  make now, as well as the arguments they present at the end

24  of the trial, are not to be considered by you either as

25  evidence in the case, or as your instructions on the law.

1    Nevertheless, the statements and arguments are intended to

2    help you understand the issues and the evidence as it comes

3    in, as well as the positions taken by both sides; so I ask

4    that you now give the lawyers your close attention as I

5    recognize them for the purpose of making opening statements.

6              Mr. Lauer?  Oh, I'm sorry.

7              MR. CASSATA:  Your Honor, if I may, the parties

8    previously agreed that jury instructions, some brief

9    stipulations of fact, would be read before opening.

10             THE COURT:  Yes.  Give me the page number, please.

11             MR. CASSATA:  It would be Page Number 13.

12             THE COURT:  Yes.  Do you want just Page 13?

13             MR. CASSATA:  That's correct, Your Honor.

14             THE COURT:  Okay.

15             Members of the jury, the parties have agreed to

16   certain facts.  You must accept these facts as true.  The

17   facts to which the parties stipulate, and therefore require

18   no proof at trial, and which you must accept as true, are as

19   follows:

20             1.  Mr. Fields was booked into the Lee County Jail

21   as a pretrial detainee on July 6th, 2007.  He was a pretrial

22   detainee until late July, 2007, when he appeared in court

23   and was sentenced.  Thereafter, he was a convicted inmate

24   scheduled to complete his misdemeanor sentence on or about

25   August the 18th, 2007.

1              2.  At all times material to this action, the

2    individual defendants, Ms. Bettie Allen and Mr. Joseph

3    Richards, were employees of defendant Prison Health

4    Services, Inc.

5              3.  At all times material to this action,

6    defendant Prison Health Services, Inc. had a contract with

7    the Lee County Sheriff's Office to provide medical care to

8    inmates in the custody of the Lee County Jail.

9              That is the stipulation of all the parties.

10             MR. TOOMEY:  Your Honor?  There is something we

11   should have addressed at the last break.  May we approach?

12             THE COURT:  You may.

13                         AT SIDEBAR

14             MR. TOOMEY:  I just want to make sure, before we

15   get too in depth here, that the plaintiff has stipulated

16   that this case is only about what occurred on August 8th and

17   August 9th, 2007, in the jail.  Nothing before that.  The

18   plaintiff stipulated --

19             THE COURT:  Are you asking or telling me?

20             MR. TOOMEY:  I'm telling you, Judge.

21             THE COURT:  Okay.

22             MR. TOOMEY:  That stipulation was in their

23   response to the motion for summary judgment, and that's all

24   this case is about.  It's got to be all it's about, because

25   otherwise I would have argued the rest of it, and did argue

1   it at summary judgment.  He was in the jail for like six

2   weeks before.  So, due to the stipulation that is in the

3   motion for summary judgment, Page 4, Footnote 4, I think

4   this case is restricted to August 8th and August 9th as far

5   as the claim goes.

6            THE COURT:  So tell me what that means.  Does that

7   mean there can't be events other than what happens in those

8   two days.

9            MR. TOOMEY:  No evidence of wrongdoing.  That's

10  what their case is about.

11           THE COURT:  Okay.

12           MR. LAUER:  Judge, I don't think that's close.

13  We've taken I don't know how many pages of depositions, and

14  it's never been restricted to those two dates.  Mr. Cassata

15  did our motion for motion for summary judgment, and I think

16  he can probably speak to that; but my client came in on a

17  certain day, and he was neglected pretty much from the very

18  beginning.

19           There was language in your order that were

20  addressing days in July and days in August, and absolutely

21  not restricted to a 24-hour period and that we can't discuss

22  wrongdoing prior to that window.  It was never stipulated,

23  and never would be.

24           MR. CASSATA:  Additionally, Your Honor, the

25  parties spent a great deal of time comprising what was going

1    to be stipulated, and that was never discussed.

2              MR. TOOMEY:  Judge, can we take a look at the

3    summary judgment response?  If I have it on me.

4              (Mr. Toomey sidebar and returned with a document.)

5              MR. TOOMEY:  It's a Document Number -- Docket

6    Entry 79.  Page 4, Footnote 4.  It was stated in the

7    document.  Right there.

8              (The Court reviewed a document.)

9              MR. TOOMEY:  For the purposes of summary judgment,

10   I responded and said, at the very least, on August 8th and

11   9th, he had a serious medical condition with relationship to

12   the 1983 claim.  That's how we responded.

13             THE COURT:  Hang on.  Go back.

14                       IN OPEN COURT

15             THE COURT:  Ladies and gentlemen, this is going to

16   take a few more minutes, so rather than just have you sit

17   there watching us talk, we're going to have a recess.

18             Every with time we take a recess from now on, I'm

19   going to give you the same instruction, and it's very

20   important.  You're going to get tired of hearing it, but

21   it's very important:  Do not discuss the case among

22   yourselves, or allow anyone to discuss it with you nor your

23   presence.  You can't discuss the case as it goes along.  You

24   can talk baseball, basketball, anything you want, just not

25   anything dealing with this case, until I tell you at the end

1   of the trial.

2          We are going to take a few minutes, I can't tell

3   you exactly how long.  We'll get you back as soon as we can.

4          (At 11:30 a.m., the jury was escorted from the

5      courtroom.)

6          THE COURT:  Be seated.

7          All right.  Frankly, I forget which one of you I

8   left off with, but it was just getting a little bit out of

9   hand at sidebar.  It's easier to do it without the jurors'

10  presence.

11         Mr. Toomey, tell me, again, what it is you think

12  the import of your position is.

13         MR. TOOMEY:  Well, Judge, at summary judgment, the

14  plaintiff limited their response in such a way as to

15  stating, in two different places, one in Footnote 1 and one

16  in Footnote 4.  Footnote 1 says, "Fields' legal claims are

17  not based on defendants' actions prior to August 8, 2007."

18  Footnote 4 says, "As stated earlier, Fields does not base

19  any of the Section 1983 claims at issue in this suit upon

20  any of the defendants' actions occurring prior to

21  August 8th, 2007."

22         Now, that limited my argument.  I had a reply

23  memorandum filed in this case.  That limited my argument, at

24  that time, to just the facts of the 8th and the 9th of

25  August of 2007.  That's as good as a stipulation anywhere,

1    Judge.  In a legal pleading, in the response to a motion for

2    summary judgment, the plaintiff abandoned any claims prior

3    to August 8th, 2007.

4              THE COURT:  All right.  Mr. Cassata, I understand

5    you are the author of that, so you get tasked with arguing

6    it.  Let me hear your position again.

7              MR. CASSATA:  Your Honor, we responded -- that's a

8    response to summary judgment, and we're saying that the 1983

9    claims that are being brought . . . he had a serious medical

10   condition, within the meaning of 1983, on August 8th and

11   9th, 2007; and, for the purposes of summary judgment, we're

12   not arguing anything that happened to prior to that.

13             Our job is to defeat his motion.  He said the

14   plaintiff never suffered from a serious medical condition,

15   and I filed a response saying at the very least, August 8th

16   and 9th, he did.  And, I mean . . . prior to -- sorry.

17             THE COURT:  I'm sorry.  Go ahead, finish up.

18             MR. CASSATA:  No.  That's all right.

19             MR. TOOMEY:  May I, Your Honor --

20             THE COURT:  Go ahead.

21             MR. TOOMEY:  -- briefly?  When I wrote my motion

22   for summary judgment, I also argued things that occurred

23   prior to August 8th.  I got the response.  The response said

24   this case has nothing to do with anything prior to

25   August 8th.  And these footnotes couldn't be any more clear.

1          THE COURT:  So I guess, again, my question is what

2    do you see as the impact of that?  Do you say there can't be

3    evidence as to when he went in, and what happened between

4    July of . . . whatever the date is, and August the 8th, and

5    we just pick up with testimony beginning August the 8th?

6          MR. TOOMEY:  I think there should be a stipulation

7    that –– or an order that this case –– the liability portion

8    of this case is only to do with the events of August 8th and

9    August 9th, 2007.

10         THE COURT:  And that wouldn't necessarily preclude

11   evidence from prior to that date.

12         MR. TOOMEY:  No.

13         THE COURT:  All right.  And refresh my memory as

14   to when he became a sentenced inmate.

15         MR. TOOMEY:  It was prior to that.

16         MR. CASSATA:  It was July 20 something.

17         THE COURT:  The end of July, that's right.

18         MR. LAUER:  Judge, if I could just give a real

19   brief response.  Under Rule 402, all relevant evidence is

20   intended to be admissible.  This isn't the type of situation

21   where a plaintiff can be expected to try a case like this in

22   a vacuum, and pretend that the month prior did not happen.

23         I understand the defendant's position at this

24   point, although I'd never heard it until right now.  I can

25   see where he's getting; but, this being such a momentous

1   issue, I would ask that I'm able to make a full opening on

2   all relevant evidence that I intend to introduce, and, if

3   this is even remotely an issue, Mr. Cassata will be working

4   very hard to address all of it, and why we are constricted

5   to just those dates, why that may have been a poor word

6   choice, and other issues, Judge.

7           THE COURT:  Well, whether it was a momentous issue

8   or not is kind of beyond the point.  I don't think

9   Mr. Toomey is saying that the evidence doesn't come in if

10  it's not evidence from August the 8th forward.  And it seems

11  clear to me that the evidence, literally from his admission

12  to the jail through some days afterwards, is relevant, even

13  if the liability is limited to the eighth and the ninth.

14  So, in terms of your opening and defense counsel's opening,

15  I don't see this issue impacting that.

16          I also don't necessarily see it impacting the

17  admissibility of evidence, although, to the extent

18  Mr. Toomey wants to argue to the contrary, I'll let you.  It

19  really seems to me to come down to the matter of a jury

20  instruction in terms of when we're focusing the jury's

21  attention, and saying whatever happened before X date, the

22  defendant's view is there can't be liability based on that,

23  I gather.  The plaintiff's view is to the contrary.

24          MR. TOOMEY:  That's not really what I'm seeking,

25  Your Honor, the instruction to the jury saying this is how

1    the parties are different.  I'm looking for an order from

2    the Court saying that the liability in this case is limited

3    to August 8th and -- what occurred on August 8th and

4    August 9th, 2007, because it's been stipulated.

5              THE COURT:  But why -- isn't that what I would do

6    in the instructions to the jury?  Isn't that when I would do

7    it?

8              MR. TOOMEY:  Yes.  I would hope so.  But the way

9    the Court just explained it was that this is what the

10   plaintiff says are the important dates, and this is what the

11   defendant says are the important dates.  That's not what I'm

12   seeking.

13             THE COURT:  What you're seeking -- basically what

14   you want me to do is give a jury instruction that limits

15   their consideration to liability to the dates August the 8th

16   and 9th.

17             MR. TOOMEY:  Yes, sir.

18             THE COURT:  And does that impact what we're about

19   to do now?

20             MR. TOOMEY:  No, sir.

21             THE COURT:  Okay.  All right.  We'll proceed with

22   the openings, and I'll take under advisement what is

23   essentially a request for a jury instruction.

24             You're on notice in terms of the position of the

25   defendant with regard to what you said in your pleading.

ORDER OF COURT                                    31

```
 1    Pleading not in a technical term, but in your papers.  I'll

 2    deal with that when the time comes then.

 3              All right.  Have the jury step in.

 4              MR. TOOMEY:  Thank you, Judge.

 5              (At 11:38 a.m., the jury was escorted into the

 6         courtroom.)

 7              THE COURT:  Mr. Lauer, you may proceed.

 8              MR. LAUER:  May it please the Court.  Ladies and

 9    gentlemen of the jury.

10              Ladies and gentlemen, in this case, through

11    evidence that will be presented -- a lot of it has already

12    been admitted, you will have a chance to go through it --

13    you are going to find that this is a case about a company

14    that ends at I N C, Prison Health Services, that made a

15    conscious decision to put their bottom line, to put profits,

16    ahead of the welfare of individuals that they had promised

17    to take care of, that they had promised the Lee County

18    Sheriff we will accept your money, we will accept this

19    contract, and we will provide medical care.  And you will

20    see, in this case, that they did not; that they acted with a

21    callous disregard for the welfare of Mr. Fields when he had

22    a serious emergency medical issue.  And that evidence will

23    come, very often, from some of their own mouths.

24              Well, first, let me start out with Prison Health

25    Services and tell what you they are.  It's a for profit
```

1   company.  They work in 22 states.  They have 150 different

2   contracts.  You're going to hear how large this company is.

3   You're going to hear about them copyrighting all of their

4   policies, their procedures, you're going to hear testimony

5   about defensive note taking, and you're going to see notes

6   that were taken by people, inside of the jail, dealing with

7   Mr. Fields and his condition.

8        Now, how do we know that these two individuals -- we

9   have Mr. Richards and we have Miss Allen.  How do we know

10  that their conduct was driven by Prison Health Services'

11  intent to maximize profits?  The majority of it is going to

12  come from their own mouths.  Depositions were taken, sworn

13  testimony, which is going to be read to you.

14       And you're going to hear from Miss Allen, when she

15  was under oath, that said, oh, yeah, many times the higher

16  ups at Prison Health Services talked to us and said it is

17  too expensive to send people to the emergency room.  It

18  costs too much money.  Every time you do it, it also ties up

19  a deputy, and they have to go in, and it's just too much

20  money.  Don't do it.  Keep them in house.  Okay?  Multiple

21  times, for multiple people, at meetings.  She's going to

22  actually, in her own words, it's going to say that they used

23  to fuss at us, they used to yell, they used to tell us these

24  things, drive these points home.

25       And this is what it all comes down to, because if

1   Mr. Fields had been brought to the hospital, he would not be

2   in the condition that he is in right now.  And we're going

3   to get to that in a minute.  But there was a delay, and

4   there was a delay that was intentional.

5         Now, Nurse Allen was -- actually, let's start off

6   with Mr. Fields ends up in jail.  Middle of July.  He has a

7   wound on his arm.  They come, they take a look at it.  It's

8   diagnosed.  Some call it a furuncle.  There's a furuncle

9   protocol started, it's a staff infection.  Turned out to be

10  MRSA.  They started a, quote unquote, protocol, and we have

11  the records, and they gave him most of the medicine they

12  were supposed to.  They changed his bandage once.  Supposed

13  to be once every day.  Supposed to be washed once every day

14  for four or five days.  And, by their own notes, you're

15  going to see that it was not done.

16        Now, Mr. Fields is eventually released from that MRSA

17  contained area -- put all the people with MRSA in one area

18  because it's so highly contagious.  And then comes the back

19  pain, and then comes the numbness in the legs, and the

20  inability to walk.  Okay?

21        Now, this is in early August.  And you're actually

22  going to hear from an individual -- probably not going to be

23  the most eloquent person.  He's going to call himself a

24  "celly".  He goes by Trey.  He didn't know Mr. Fields before

25  this happened, but they were in the cell together.  They

1   were at the cell together in Ortiz.  But he's going to tell

2   you all the times that Brett hit the button, asking for

3   help, because his legs weren't working, he could not support

4   his own weight.  How many times he had to do it, how many

5   days it went on for.  And what finally happens?  Well, they

6   finally get Brett, and Brett can't walk.

7           THE COURT:  Counsel, surnames, please?

8           MR. LAUER:  I apologize.

9           Mr. Fields is placed in a wheelchair, and he is

10  brought down to the main facility.

11          Now, that's where Mr. Richards comes in.  He's a

12  physician's assistant.  Mr. Richards is going to tell you

13  that it was a Wednesday.  Okay?  And the reason Wednesday is

14  important is because he only sees emergencies on Wednesdays.

15  Wednesday is a lab day.  And we're going to go with his own

16  testimony again, already given under oath.  I can put it up

17  on the big screen for you.

18          Wednesdays are only for emergencies.  Mr. Fields

19  presents in my office.  Mr. Fields is in a wheelchair.

20  Mr. Fields is complaining of numbness in both legs.

21  Numbness meaning paralysis.  And the nurse before that had

22  written it down that he had been complaining of this since

23  Saturday.  So we have Saturday, we have Sunday, we have

24  Monday, Tuesday, and now Wednesday.  An otherwise completely

25  healthy individual.

1          And something else to keep in mind, that Nurse

2    Allen also saw Mr. Fields the day he was booked into the

3    jail.  So we'll get to her later, but she actually has a

4    baseline.  She saw him healthy, strong, legs that worked,

5    and later on he's not in that condition.

6          So back to Mr. Richards.  PA Richards.  This is

7    maybe 8:30, 10:30 in the morning.  You're going to see, from

8    his own testimony that he really has no idea how Mr. Fields

9    got in to see him.  There was no medical documentation

10   filled out.  He all of a sudden just appeared.  There's

11   supposed to be a policy, there's supposed to be a procedure

12   where you fill things out, and that's how you get to see

13   somebody.  None of that happened.  He just showed up, and

14   that meant that it was an emergency.  And he had an

15   individual who was paralyzed from the waist down and could

16   not support his own weight.

17         Now, what happens?  He prescribes him Tylenol.

18   Tylenol.  And sends him back to his cell in a wheelchair.

19   So 18, 15 hours passes.  About 1:30 in the morning, and all

20   of a sudden, you're going to see in the deposition in the

21   sworn testimony of Nurse Allen -- she is the highest ranking

22   medical official that's on staff at night -- there was

23   screaming from the inmates.  Man down.  Man down.  This man

24   needs to go to the hospital.  Don't just let him die here.

25   Man down.  Man down means emergency.  Everyone in that

1    facility knows man down equals emergency.

2              So Nurse Allen comes over, and she finds that

3    Mr. Fields is in the middle of this cell that's packed

4    with -- we'll use her own words again -- probably about ten

5    individuals.  They didn't have enough bunks so some of them

6    were just on sheets on the floor.  Mr. Fields is unable to

7    come over to the side of the cell where she needs to examine

8    him because he can't use his legs.

9              Now, Mr. Fields -- and the man down call was

10   brought on because he had tried to use the restroom.  Now,

11   he hadn't used the restroom in a few days at this point, and

12   he hadn't walked in probably three days.  When he got on the

13   toilet, he felt something coming out of him.  Okay?  It was

14   his intestines.  And the reason it was his intestines is

15   because when you go paralyzed from the waist down, your

16   sphincter no longer holds.  Things just start to come out.

17   Okay?  That's where the man down, with the screaming, with

18   everyone, all these inmates pleading, do something for this

19   man.

20             They bring over Mr. Fields, and, for security

21   purposes, they have to get everybody out of the cell.

22   That's understandable.  Takes maybe 10 or 15 minutes.  And

23   he's in a one-piece jumpsuit.  He has two females getting

24   ready to take his clothes off in front of ten other inmates

25   and three or four deputies.  And, understandably, he's a

1    little self-conscious about being stripped down completely

2    naked on a concrete floor on the floor of a cell.  But he

3    ends up allowing it.

4           And Nurse Allen is going to tell you that, you

5    know, she thought these were hemorrhoids.  Besides the

6    packet that no neurological exam was conducted, he hadn't

7    walked in three days, and he couldn't use his legs.  So she

8    went and got some KY Jelly and put everything back in there.

9    It didn't come flying back out instantly, so she will tell

10   you that she thought that meant everything was okay, even

11   though he had already been seen, the day before, for an

12   emergency situation, he's been in a wheelchair, he can't

13   walk and there's no explanation for any of this.  This

14   doesn't happen to 24-year-old men.

15          So, after it's placed back inside -- and you're

16   going to see, from her own words, yeah, it was an emergency

17   situation.  It was a fiasco.  You know, we couldn't get him

18   back in the wheelchair.

19          So they drag him, on a sheet, to another cell,

20   which is an observation cell.  And he falls off the sheet on

21   the way there.  And then when they get him in there, they

22   give him a sheet, and his mat.  And she'll tell you, her own

23   words, that she watched him sort of scoot around until he

24   got comfortable, and she had absolutely nothing to do with

25   him the rest of the day, the rest of that night.  And she

1   thought the doctor would be there tomorrow morning at 7:00,

2   the doctor could take care of him.

3           And when asked the specific question, you could

4   have sent him to the emergency room, the answer was, what

5   are they going to do him for at the emergency room?

6   Hospitals don't like inmates.  They wouldn't have done

7   anything for him.  They would have put him in the back, and

8   they would have ignored him until they took care of

9   everybody else.

10          But you know what?  We're going to have real

11  doctors that are going to come in, and they'll tell that you

12  that's not the way it works; that whether or not they

13  dislike inmates, that is a medical surgical emergency.  He

14  was paralyzed from the waist down because he had a spinal

15  epidural abscess that was growing in his spine, that was

16  caused by MRSA, and it had been going on for days.

17          So, maybe 2:00, 2:30 in the morning, she leaves

18  him in the observation cell.  He scoots himself around.

19  Brett is going to tell you -- Mr. Fields is going to tell

20  you all of this as well.

21          He gets seen the next day.  The doctor -- Nurse

22  Allen is going to tell you she thought he came in at 7:00,

23  but it turns out he came in at 8:00.  So she leaves before

24  then.  They're two ships passing in the night.  She wrote

25  Mr. Fields' name down to be seen.  For whatever reason --

1    we'll see this in the documentation -- Mr. Fields was not

2    seen until 10:30 by Dr. Dominguez.  Hours and hours passing.

3            And what's important about these hours is that the

4    medical experts, the doctors, are going to tell that you

5    this time delay is causing paralysis, because as his spine

6    is compressed, the nerves are dying, and when they die, they

7    don't come back.  And that's why hours matter, and that's

8    why seconds matter.  And in this case the delay is what

9    caused these problems for Mr. Fields.

10           So, at 10:30, Dr. Dominguez sees him, and pretty

11   much instantly Dr. Dominguez realized, yeah, this is a

12   surgical emergency.

13           Oh, another thing.  You're going to read in

14   Dr. Richards, in PA Richards' deposition, is when he saw

15   Fields -- I don't know, talking 24 hours prior to what I was

16   just telling you now -- Dr. Dominguez was 20 feet away.  He

17   had a man in front of him, in a wheelchair, Dr. Dominguez

18   was 20 feet away, and he doesn't ask.  He could have yelled

19   why don't you come check this guy out.  Nothing.  Tylenol

20   and sends him back to his cell.

21           All right.  So, 10:30, Dr. Dominguez -- and it's

22   all here in their handwriting, their records.  Dr. Dominguez

23   orders that Mr. Fields be sent to the emergency room.  For

24   whatever reason, EMS shows up at about 12:30.  Maybe there

25   will be an explanation from somebody about that delay, about

1    all the other delays that occurred in this case.

2              And then, when Mr. Fields gets to the emergency

3    room, it really doesn't take them long.  It turns out they

4    don't hate inmates.  That is a medical emergency.  He is

5    given an MRI instantly, a spinal mass is identified in his

6    spinal column, and he is rushed to emergency surgery.  And

7    at that point Dr. Alvarez, who is going to come in here and

8    testify -- he's not a paid expert, he is a treating

9    neurosurgeon.  He works right over there, a few miles away.

10   He is going to say here is what I know about Brett, here is

11   what I heard about Brett, and this is what I found.

12             It's basically like taking a roof off a house.

13   They cut off the top of the spine.  And what did they find

14   in the spine, it was packed with free flowing pus.  And that

15   free flowing pus, they took a culture.  MRSA.  MRSA is what

16   was causing this problem.

17             So what did the doctor do?  He scraped out the

18   tissue that was dead.  And he's going to tell you that,

19   because of certain tissues that were in there, I know that

20   this was not an instant problem.  This had been there for a

21   little while.  And he's going to tell you what a little

22   while means.  He's going to tell you everything that he did

23   for Brett, and he's going to tell you that what was found in

24   that spine was MRSA.

25             He's going to tell you he's done hundreds and

1    hundreds of these surgeries, and he's going to tell you that

2    the time you can get somebody onto the surgical table, and

3    decompress that spinal cord, that is the most important

4    factor.  The faster it's done, the better the outcome.  And

5    the outcome can go from someone who regains complete use of

6    their legs to someone who is completely paralyzed from the

7    waist down.  But seconds matter.  Minutes matter.  He's

8    going to tell you.  As well as another expert, who is a

9    neurologist, his name is Dr. Emery.  We're playing his

10   deposition on an video.  And he's going to say that, you

11   know what?  Yeah, if Brett was seen eight hours, ten hours,

12   12 hours, if he was seen earlier, yes, he would have been

13   treated, and yes, he would not have had this outcome.  The

14   delay is what caused Brett's problem.

15         Now, the evidence is going to show, why delay?

16   The delay is because maybe it gets a little better, maybe it

17   goes away, maybe they don't have to spend the money to send

18   him to the emergency room, maybe no one gets fussed at,

19   maybe a nurse doesn't get in trouble for doing something,

20   for spending the company's money.  That's what caused the

21   delay.

22         So Brett has his surgery.  It was done August 8th,

23   9th.  The medical records are all here, so it doesn't need

24   to be completely exact.  And Dr. Alvarez will tell you what

25   it is.  He spends . . . I don't know, I think he's released

1    from the hospital on his birthday.  Sometime in late August.

2    So you've got a healthy 24, 25-year-old man who spends, now,

3    the next eight months in a wheelchair.  This is where it

4    starts.  Starts in a wheelchair.  And he's going to have --

5    he's also going to tell you, but he's going to have his

6    girlfriend, and he's going to tell you that he lost bowel

7    function.  He's lost bladder function.

8            For him to use the restroom, it takes a very long

9    time, because he can't feel it.  He can't feel when it's

10   full.  He can't feel when it's empty.  And he lacks the

11   muscles to push and excrete these things.  When Mr. Fields

12   uses the bathroom, he has to lean forward and use his own

13   body weight to expel what needs to be expelled.  Sometimes

14   it takes hours.  And you're going to hear from his friends

15   and family members that, for the first year, he spent the

16   majority of his life in the bathroom.

17           Now, this is an individual who used to be healthy.

18   He used to be a metal framer, who walked around on stilts to

19   frame things.  The muscle mass and the body on this

20   individual was above average.  He was a healthy, strong

21   young man.  Not the way that he is right now.

22           He's not taking his pain medication today, and he

23   won't be tomorrow, because he has to be very clear headed to

24   testify.  That's the reason why you might see some pain.

25   More pain than you normally would.

1          So, Brett, what does he have to look forward to in

2     that first eight weeks, besides his girlfriend giving him

3     suppositories and enemas.  He had lost his house.  He's not

4     living in a trailer, with his girlfriend, working a minimum

5     wage job, trying to put money together to take care of him,

6     because guess what.  He got declined for Medicaid.  So the

7     family is putting together money.

8          Brett Fields goes to his physical therapy.  Three,

9     four, five, six, eight times, the medical records there are.

10    And then they say, well, the next time you come, you got to

11    bring some money.

12         Brett does not come from a situation of means.

13    The money is not readily available.  So everything starts to

14    be done at home.  And his girlfriend is going to tell you

15    about the physical therapy regime that they started, and how

16    much has changed for Brett.

17         His mother, who -- and you're going to hear from

18    some people who haven't really talked about this in three or

19    four years, because they have to remain strong for Brett,

20    because they can't let him see how bad they hurt, because he

21    needs their support.  They're going to come here, and

22    they're going to tell you what he was like before and what

23    he was like after.

24         You're going to hear about the rehabilitation that

25    he did himself.  You're going to hear about one day he said

1    you know what?  I'm going to walk.  This is it.  I've had

2    it.  I'm going to walk.  Starts off in the trailer, and we

3    have the walls close to each other, so he can actually put

4    his hands on each wall, and that's where the footsteps

5    start.  About eight months.

6              You're going to hear about the sores that end up

7    on his backside from spending so much time in that chair.

8    After he takes his first step, he has his girlfriend take

9    him to Wal-Mart, and they trade in the wheelchair for a

10   walker.

11             During this time that Mr. Fields is in a

12   wheelchair, you're going to hear about where he's living.

13   He has a family friend that allows him to stay in a trailer

14   in change for painting.  You'll hear bout his wheelchair was

15   completely covered with paint.  He was doing the manual

16   labor that he could do in that chair to pay rent to take

17   care of himself.

18             So one day he says I'm going to walk.  And they

19   switched to a walker, and he starts that walker from that

20   day, and he has to retrain his legs, retrain his hips.  And

21   Mr. Fields, probably tomorrow, is going to role up his

22   pants, or put on a pair of shorts, and we'll take off the

23   ankle braces that he has on right now.  There is nothing

24   from the knees down.

25             He has strong quadriceps.  You'll see muscles in

1    the quadriceps.  You'll see muscles in the glutes, which

2    would be someone's rear end.  Zero.  The feet flop

3    lifelessly.

4              You're going to see what it's like for somebody to

5    walk with no balance, with none of those issues.  You're

6    going to see Mr. Fields, sometimes he uses a cane, sometimes

7    he doesn't have to use a cane.  His upper body is still

8    incredibly strong.  He can still do many things.  He doesn't

9    wait for people to do thing for him.  He's had to move out

10   of several houses.  Some people helping him.  But He can

11   carry things.  He is not someone that wants to lay around

12   and do absolutely nothing with his leg.  But you're going to

13   see him walk, you're going to actually evaluate his legs

14   very closely.

15             So we get him in the walker, and the walker

16   starts.  And then one day his mother had a bicycle that

17   she'd gotten, she said Brett, come on over, I need to you

18   put something together for me.  He gets there, he says this

19   is a really nice bike.  She says I haven't really ridden it

20   yet.  At any rate, the way it ends is that she gives it to

21   Brett, Mr. Fields.  And that's where he started his workout

22   regimen.  That's what did the most to get him where he is

23   right now.  He'll tell you he probably put a thousand miles

24   on the bicycle.

25             You'll here about the way that he has to ride it.

1    He has to start from a set of stairs, because he can't put

2    both feeds on the ground and get both feet on the pedals,

3    because his feet don't work.  So either someone has to push

4    him, or he has to push off from something.  And then, when

5    he's out riding, he can't stop at a stop sign, so if there's

6    a car coming, he has to do a big loop around and wait until

7    it's through.  You're going to hear him talk about how many

8    miles he put on this bicycle.

9          You're going to hear from his brother, you're

10   going to hear from his mother, you're going to hear from

11   some of his friends who are going to tell you about how they

12   were concerned, concerned about Brett's depression,

13   concerned that he may commit suicide, concerned about all

14   the things that this has cone to him to have changed his

15   life.  All he wanted to do was be normal, the way he was

16   before.  You're going to hear from Mr. Fields, as well.

17         And could it have all been prevented?  You're

18   going to hear from Nurse Allen, her own words that, oh,

19   yeah, sometimes the Prison Health Services, company reps

20   come by, and they tell us, hey, we've got a bid coming.  Got

21   to keep those bids.  Got to look good.  They tell us whether

22   or not we're going to get the bids, because you know the

23   Sheriff bids on us.  The sheriff's paying them money to care

24   for people in the jail.  Yes, people in the jail, some of

25   them are very bad.  Some of them are not so bad, but most of

1    them have done something to end up in the jail.  But they're

2    accepting money and making a promise to care for these

3    individuals.  What you're going to hear is that the money is

4    important to this corporation.  And you're going to hear

5    that it's run for profit.

6          As far as Mr. Fields, and his physical therapy,

7    and his medication, you're going to hear that, besides

8    scraping it together from friends and family members, he's

9    wondering why Medicare was taking so long.  Supposed to be

10   taken care of with a health care worker at the hospital who

11   would do the paperwork.  But something went wrong, and the

12   government, surprisingly, was a little bit slow, and they

13   had to fill something out -- you're going to hear about a

14   phone call to Bill Nelson's office for somebody to assist

15   him, to write a letter, to speed this up, to get his

16   medication, to get the physical therapy, to get the

17   wheelchair, all of these things.  You're going to hear about

18   how lots of things were hand-me-downs from his family

19   members.

20         Mr. Fields is going to tell you he applied for

21   Social Security Disability on September 11, 2007.  He'll

22   tell you how long it took for that to come through.  He's

23   permanently disabled at this point.

24         At the end of this case, you're going to get five,

25   six, seven pages.  They're going to be jury instructions

1    that the Judge is going to give you.  And you're going to

2    compare those jury instructions to the evidence, evidence

3    that's going to come from people who take an oath, and

4    promise you to tell the truth.  And you're going to evaluate

5    whether or not they're telling you the truth; what you

6    believe, and what you don't believe.  You will apply that to

7    the written case law, to the written jury instructions, and

8    you'll decide whether the case has been proven; whether PA

9    Richards was deliberately indifferent to a serious medical

10   condition.  Did he recognize it?  Was it an emergency?  You

11   said it's Wednesday.  We wouldn't have been here if it

12   wasn't an emergency.

13           He's in a wheelchair.  He can't.  There's no

14   reason a 24-year-old should be in a wheelchair, unable to

15   walk.  Nothing is done.  Tylenol.  Is that the easiest way

16   out?  All this is going to come up in the jury instructions.

17           And then, 1:30 in the morning, Nurse Allen finds

18   an individual.  She's going to claim I thought it was

19   hemorrhoids.  Which could be reasonable if an individual

20   walked up and said, hey, I believe I may have some

21   hemorrhoids, can you help me with this; but when they

22   haven't walked for two or three days and it just happened

23   because they were using the bathroom, it's not hemorrhoids.

24   It's rectal prolapse because they're paralyzed from the

25   waist down.

1          You'll hear the about the numbness.  You will hear

2    from the doctors who come in here who say that is a medical

3    emergency.  They second that the have the numbness and the

4    weakness, that is paralysis.  That's what it is.  And the

5    longer you are wait, the longer that spinal cord gets

6    compressed, the more it dies.  And it does not regenerate.

7          So that night, when Nurse Allen found him, you're

8    going to be asked was that the appropriate course of

9    treatment?  Shove it back in with some KY Jelly, and drag

10   him on a sheet, not do anything, not call anybody?  Put his

11   name on a list somewhere?  Maybe somebody will get to it

12   later?  Is it appropriate?  And you're going to have medical

13   doctors and medical experts that are going to give you

14   information to help you come to the conclusion of whether or

15   not that is okay.

16         Now, then, you're also going to be asked, Prison

17   Health Services, is their philosophy of -- introduce their

18   SEC filings.  They're part of a corporation that's actually

19   traded on the NASDAQ.  Is the way they run their business,

20   is their policy, whether or not it's the sterilized policy

21   that they write down, that says here is the way things are

22   done, or the way that things are actually done, the way

23   things are told -- the way people are told to do things,

24   don't send them.  It's too expensive.  You're going to see

25   that on that overhead.  It's said probably ten different

1    ways.  She heard it from somebody, from higher ups.  She

2    didn't make it up.  If that is appropriate.  And if that

3    conduct, if that conduct was the moving force, if it caused

4    this delay, and if it caused this injury.

5              She's not a bad person.  She wouldn't act this way

6    to hurt somebody.  It was put in -- it was -- they were the

7    moving force behind it.

8              Now, you're also going to get a contract, and the

9    contract is going to be between Prison Health Services and

10   Lee County, and Lee County Sheriff.  We're going to find out

11   that there are numerous contracts.  150 of them.  22

12   states., Michigan, Pennsylvania, California.

13             And what this contract says is that there's a

14   certain amount of money that we are going to pay for

15   individuals who end up going to the hospital.  If we get

16   above that dollar amount, if we send everybody to the

17   hospital and get above that dollar amount, well, then, the

18   sheriff is just going to pick up the bill.  But if we're

19   below that, if we don't send anybody to the hospital, we go

20   ahead and write the sheriff a check.

21             And the sheriff is the person who approves their

22   contract every single year.  That's their employer.  They

23   are a company that is an employee.  They are a contractor.

24   They contract to provide these services.  And if you're a

25   subcontractor, you need to keep your general contractor

1    happy.

2             At the end of this, ladies and gentlemen, you're

3    going to be given elements of damage.  Okay?  After you take

4    a look at Mr. Fields, after you listen to all of the

5    evidence, listen to his family members who are going to tell

6    you, before and after, what he is like, after you listen to

7    the doctors, you're going to be asked certain questions.

8             Has Mr. Fields' ability to earn an income been

9    decreased in any way?  You'll get some instructions on how

10   to decide that.  We've got his tax records.  He was a

11   working individual in 2006.  Okay?  It's been decreased.

12            He can't really be a metal framer anymore.  There

13   aren't that many jobs that somebody who didn't get a high

14   school education can do.  Manual labor, being a framer,

15   there's nothing wrong with it.  That's an honorable

16   profession.  That's what he did.  He worked with his body.

17   So has his future income been decreased?

18            Has his ability to enjoy his life been affected?

19   I'm going to ask Brett these questions -- Mr. Fields these

20   questions.  I'm going to ask his family these questions.

21   And you're going to have to decide.  Has it, has it not?

22            Now, will he need any future medical care?  You're

23   going to hear some testimony about that.  And use your

24   common sense on what's gonna happen to Mr. Field in the

25   future.  And there's these things, people call them soft

1    damages.   Sometimes people are terrified of them because how

2    can you just give somebody money for pain and suffering?

3            Now, when you listen to Mr. Fields talk, and when

4    you listen to his family talk, if you find that pain and

5    suffering occurred, and if that pain and suffering is as a

6    result of this company and its employees, ladies and

7    gentlemen, you can award it, and you can award it in

8    whatever amounts you'd like to award it.

9            There's an additional element of damages, and

10   they're called punitive damages.   And those are damages that

11   are designed to keep somebody from repeating these things

12   again and again.   Corporations, things that end in, Inc.,

13   don't have emotion, empathy.   They have accountants, they

14   have boards of directors, they have meetings, they have

15   bottom lines.   And the way to get the response from a

16   corporation is not to write them a strongly worded letter

17   that you would really like them to behave in a more

18   responsible way in the future, but, boy, we wish you guys

19   wouldn't have done this.   Okay?   It is to send them a

20   message that their accountants understand.   The bottom line

21   is affected.   And that it will be affected in the future

22   unless you act in a more socially responsible manner.

23           MR. TOOMEY:   Excuse me, Your Honor.   Far be it for

24   me, but this is argument.   It's not statement.

25           THE COURT:   Overruled at this point.

1          MR. LAUER:  You're going to be asked, and you're

2     going to be shown evidence, of how much this company is

3     worth.  How much they make.  And based on that, if, in your

4     own determination, if your judgment tells you that this

5     conduct is not acceptable, it's not acceptable just because

6     somebody may have gotten themselves into trouble and it's

7     not acceptable for other people who may be presumed

8     innocent, who may be there for a DUI, or maybe they're there

9     for something really bad, it's not appropriate in our

10    society for U.S. citizens who have constitutional rights,

11    then you are allowed to award an amount of money that will

12    send that message.

13         At the end of this case, when everything gets put

14    together, ladies and gentlemen, I'm going to go step by step

15    with you, but it is, at the end of the day, 100 percent your

16    judgment.  I just ask you to keep an open mind, and evaluate

17    every witness that comes and speaks before you, and to do

18    justice for Mr. Fields.  That's all I can ask.

19         Thank you.

20         THE COURT:  Thank you.

21         Mr. Toomey?

22         MR. TOOMEY:  Thank you, Your Honor.

23         Good afternoon, folks.

24         Probably wondering why you're in federal court,

25    why this case is here.  Well, it's here because of the

1    nature of the case.  Mr. Fields is suing my clients for a

2    violation of his 8th Amendment constitutional rights under

3    the Federal Constitution, and hence we're in federal court,

4    instead of state court up the street.

5           What this case is not about, and what Judge Steele

6    will instruct you at the close of evidence, is mistakes.

7    He'll instruct you that mistakes, or negligence, do not

8    constitute a federal civil rights violation.  It's important

9    to keep that in mind as you listen to the evidence coming

10   in.

11          What you're gonna see is that, yes, Mr. Fields was

12   in the Lee County Jail, and he was out on Ortiz first, when

13   the important things started to happen on August 8th and

14   August 9th, and that's the important period in this case.

15   And you'll hear that he was seen by a nurse not for some

16   mysterious reason, but during what's called sick call.

17   That's where inmates go to see a nurse if they've got some

18   problem.

19          Mr. Fields told the nurse, Miss Rigby, that he was

20   having pain in his back since he stretched four days before,

21   on Saturday.  Nurse Rigby examined Mr. Fields, found that he

22   could move all of his extremities on August the 8th, and

23   decided that maybe it would be beneficial if Mr. Fields also

24   saw the physician's assistant, Mr. Richards, who was

25   six feet away.  She says hey, Joe, I want you to take a look

1   at this guy for me.  And Mr. Richards did.

2          He found that Mr. Fields was complaining only of

3   pain.  He didn't complain of numbness to Mr. Richards, he

4   complained of pain.  And he told him the same thing that he

5   had told Nurse Rigby just a couple minutes before.

6          Mr. Richards, among other things, raised

7   Mr. Fields' legs with his arm, and found that Mr. Fields had

8   no pain doing it.  When he asked Mr. Fields to raise his

9   legs on his own, and actually engage muscles, that

10  Mr. Fields had pain.

11         Mr. Richards, based on his experience, decided

12  that -- or diagnosed Mr. Fields with muscle strain.  He

13  took -- he gave the order that you were just told.  He was

14  given Tylenol, and he was told to follow up in one week, and

15  an order was entered bring this guy back to me in one week.

16  But, just as a precaution, he also sent him downtown, to be

17  put in what's called a medical floor.

18         Now, in the medical floor, you'll learn, there are

19  nurses there 24/7, 365; and if Mr. Fields had any additional

20  problems, then he could have easy access to a nurse by just

21  pretty much calling out, because the nurses are there.

22  You'll hear they spend their day, some of the nurses,

23  passing pills, because folks that are sick on the medical

24  floor need regular medications.

25         Nothing happened with Mr. Fields until 1:30 the

1    next morning, when Miss Allen was on.

2              Miss Allen is a registered nurse, she has been a

3    registered nurse for a long time.  She's no longer a nurse.

4    She's retired.

5              Miss Allen responded to what's called a man down

6    call.  It's something that all the inmates in the jail know

7    to do when somebody has a problem and they need a nurse.  I

8    think it's also done in the military.  But you'll hear that,

9    when there's a problem in the jail, they call, "Man down,"

10   and people come running.  And, in this case, two corrections

11   officers and Nurse Allen came running, along with also a

12   licensed practical nurse.

13             And they found Mr. Fields sitting in the middle of

14   the floor.  And you'll hear how this is designed, how this

15   cellblock is designed.  And it has individual cells along

16   the back wall, and then there are -- there's an open area

17   where folks can congregate.  And Mr. Fields was assigned --

18   because there was short bed space, the sheriff had assigned

19   Mr. Fields to what's called a temporary bed.  It's a mat and

20   an upside down sort of plastic bed frame.

21             Nurse Allen found Mr. Fields.  He told Nurse Allen

22   that his insides had fallen out.  And other inmates in the

23   cellblock told Nurse Allen that it happened while he was on

24   the toilet.  Nurse Allen originally saw Mr. Fields in his

25   jumpsuit.  And you'll see, and all inmates wear jumpsuits.

1    His jumpsuit was buttoned all the way up.  And Mr. Fields

2    wouldn't allow Miss Allen to examine him.  She said to him,

3    I've got to examine you to see what's wrong with you so we

4    can figure out what to do for you.  He refused to allow her

5    to do that.

6           Working in jails for quite a while, Nurse Allen

7    was concerned that Mr. Fields might have been attacked by

8    some of his cell-mates.  She was afraid he might have been

9    raped.  Because he wouldn't let her exam him.

10          Eventually, she was able to examine him only by

11   having corrections officers remove everybody else from the

12   cellblock, and they took him away.  She got his pants down,

13   saw what she believed to be hemorrhoids, pushed them back

14   in -- or she got some lubricant, and some gloves, pushed

15   them back in, and they held.  And that's really a critical

16   sort of thing because, you'll learn, you're not paralyzed if

17   your anal sphincter holds.  As a precaution, she also sent

18   him down to an observation cell.  So he was removed from the

19   medical dorm down to an observation cell where somebody is

20   always watching the cell.  And, for the rest of the night,

21   Mr. Fields complained of nothing.

22          In the morning -- well, she also put him on a list

23   to be seen by Dr. Dominguez when he came in, in the morning.

24   And Nurse Allen will tell that you, in order to have

25   somebody seen, and let them know that something happened

1    overnight, it's written in red.  She wrote a little note, in

2    red, with the inmate's name.  In red.

3            Next morning, Dr. Dominguez sees him.  Finds him

4    without feeling in his legs.  Immediately issues an order to

5    send him out to the hospital.  And, at the hospital, he's

6    found with an abscess on his back.

7            Like I said to you when I began, this isn't a case

8    about mistakes.  It's about whether these defendants

9    actually knew that Mr. Fields had a serious problem and yet

10   intentionally ignored him.  Through the evidence, you're

11   going to see that that's not what happened.

12           Thank you for your time.

13           THE COURT:  Thank you.

14           Ladies and gentlemen, we'll break for lunch.  I'm

15   going to take a little bit more than an hour, which is

16   typical, because I've got some matters to talk to the

17   lawyers about, and hopefully we'll get that done before you

18   get back.  So we'll get you back here about 1:00 o'clock.

19           Please do not discuss the case among yourselves,

20   or allow anyone to discuss it with you or in your presence.

21   I'll see you back here at 1:00 o'clock.  Wait.  Wait.  Wait

22   a second.  I can't tell time since they changed the time.

23   Obviously, I meant 1:30.  Let's try 1:30.  That will give

24   you an hour, and us a few minutes to do our business.  Thank

25   you.

1          (At 12:18 p.m., the jury was escorted from the

2      courtroom.)

3          THE COURT:  Be seated, please.

4          Counsel, with regard to the objections to the

5      deposition of Dr. Emery, have the two of you been able to

6      work out any objections, or do I just need to go through it

7      and rule?

8          MR. LAUER:  Mr. Cassata has done some work on this

9      with Mr. Toomey.

10          MR. CASSATA:  He has agreed to waive two

11      objections.  I can give you the line.  Mr. Toomey withdrew

12      his objection on Page 25, Line 25, and then he also withdrew

13      his objection on Page 13.

14          THE COURT:  All right.  So everything else is in

15      play?

16          MR. CASSATA:  That's correct, Your Honor.

17          THE COURT:  Any reason I shouldn't just go through

18      and let you know, after lunch, how I rule?

19          MR. TOOMEY:  No, sir.

20          THE COURT:  All right.  We'll do it that way.  And

21      I have, looks like, two deposition transcripts?  Is that

22      what I should have?

23          MR. TOOMEY:  Only one of them matters.

24          MR. LAUER:  There's a direct and a cross.  The

25      cross-examination was done about 19 or 20 something days

1    after the direct.

2           MR. TOOMEY:  The one that's at issue, Judge, is

3    February 18th.

4           THE COURT:  I don't need to read March?

5           MR. TOOMEY:  No, sir.

6           MR. LAUER:  No, Judge.

7           THE COURT:  All right.  That works.  I'll do that

8    over lunch.

9           The second motion, probably related issues, a

10   motion to strike Mr. Lincoln, and a motion to strike

11   evidence relating to a video surveillance.  Who wants to be

12   heard?  I've read the motion, obviously.  Let me hear from

13   Mr. Toomey.

14          MR. TOOMEY:  All right, Judge.  First, a little

15   background.  Real quick.  Mr. Lincoln was hired by me to do

16   some surveillance on Mr. Fields.  And I hired him the week

17   of -- a few days before the 25th, when he actually went and

18   did the surveillance.  I did this because I had some

19   information that Mr. Fields was going to be moving that

20   weekend, and I also saw the . . . that the plaintiff, during

21   this particular deposition of Dr. Emery, had a videotape of

22   Mr. Fields that Dr. Emery partially, to a great extent,

23   based his opinion on.  When I viewed that 90-second video, I

24   noticed that Mr. Fields was always walking with a cane on

25   the video; and I remembered, also, that I had seen

1    Mr. Fields twice in this case, once in mediation and once in

2    his deposition, and he didn't have a cane.

3         So I hired Mr. Lincoln to do some surveillance.

4    And he got the surveillance.  There's interesting stuff on

5    there.  As soon as I got it, which was Friday, I think the

6    4th of March, I didn't see it.  I didn't see it Monday.  I

7    was in depositions in Fort Lauderdale, dusk to dawn.  Dawn

8    to dusk.  I did see parts of it on Tuesday, before I went

9    and took my end of Dr. Emery's trial testimony.  I didn't

10   see the whole thing.  When I got back to my office on

11   Wednesday, I made a copy.  I sent it out to get a copy.  On

12   Thursday, I sent it to the plaintiff.

13        This is just for impeachment, Your Honor.  And it

14   has two prongs.  First, there was a tape given, and a video

15   created, for Dr. Emery's benefit, that shows Mr. Fields

16   walking only with a cane.  Second, Mr. Fields claims he

17   needs the cane.  And he's going to testify that way.

18        Now, the plaintiff has filed its motion -- their

19   motion, and they cite a Fifth Circuit case, and some

20   District Court cases based on that.  They use that as

21   authority.  But I found my own, and I have a copy for the

22   Court.  I provided a copy to counsel.  The plaintiff cited

23   the Chiasson case, C H I A S S O N, out of the Fifth

24   Circuit, March 31, 1993.  Judge, would you like a copy of

25   the case I'm about to mention?

1           THE COURT:  What's the name of it?

2           MR. TOOMEY:  The name of it is Baker versus

3    Canadian National Illinois Central Radio.

4           THE COURT:  Yes.

5           MR. TOOMEY:  May I approach, Your Honor?

6           THE COURT:  You may.

7           MR. TOOMEY:  Now, the plaintiff's primary

8    contention is that, anytime evidence can be considered both

9    substantive and for impeachment, it has to be disallowed

10   unless it is timely provided.  I couldn't have provided it

11   anymore timely.  We took the -- we received the item after

12   discovery was cut off.

13          In Chiasson, Your Honor, the video was never

14   provided until trial.  In 2008, in Baker, the Court

15   specifically addressed Chiasson, and it's on Page 14 of 18

16   of the opinion, and it's Paragraph 16.  And here is what it

17   says.  "The District Court admitted surveillance videos of

18   Baker.  Baker argued that the videos, one, were disclosed

19   after the discovery cutoff; two, did not impeach the

20   plaintiff's witnesses, and three, were more prejudicial than

21   probative.  The surveillance videos show Baker engaging in a

22   variety of daily chores:  Driving, spending," and on it

23   goes, and finally the Court makes its decision.  The Court

24   says, "Baker cites Chiasson versus Zapata Gulf Marine

25   Company, arguing that it's reversible error to admit

1   surveillance evidence that was not disclosed during the

2   discovery period.  This is incorrect.  Chiasson dealt with a

3   surveillance video that was never disclosed to the plaintiff

4   before, despite plaintiff's interrogatory regarding the

5   existence of still or motion pictures of the plaintiff."

6           Judge, the case that the plaintiff relies on

7   doesn't stand for what they rely on, that just because

8   discovery is over, the after-created surveillance video must

9   be out because it's substantive.  And in this case, it's

10  only for impeachment value that I'm using it.

11          There's also, under the 11th Circuit, Alfonso

12  versus Esfeller, E S F E L L E R, Oil Construction, Inc.

13          May I approach, Your Honor.

14          THE COURT:  No.  I've got that case.

15          MR. TOOMEY:  Okay.  Thank you, Your Honor.

16          And, in Esfeller, Page 4 of 5, Paragraph 4.

17  "Rule 26 does not require pretrial disclosure of evidence

18  that might be acquired solely for impeachment."  That's what

19  I'm doing, Judge.  I didn't have to turn this video over if

20  I'm just using it for impeach.  I did it anyway.  And I did

21  it before trial.  I don't think there is any reason to keep

22  this out now.

23          THE COURT:  Let me ask you, make sure I understand

24  what your position is, or what your intent is.  Presumably,

25  the plaintiff will testify with regard to whether or not he

1    needs a cane.  And it's your view, depending upon what his

2    testimony is, the surveillance video may be relevant to

3    impeach that testimony?

4              MR. TOOMEY:  Yes, sir.

5              THE COURT:  And if he were to say, for example, he

6    does not always need a cane, or says something that is

7    consistent with what's depicted on the video, the video

8    would not be proffered as evidence?

9              MR. TOOMEY:  No, sir.  I don't think that can be

10   done.  If I may, briefly.  There's also another reason for

11   this.  The plaintiff -- like I said, Dr. Emery mainly based

12   his opinion on this.  And plaintiff never turned over that

13   video to me until much later.  More than a week after the

14   trial testimony was taken, started, that I was finally given

15   that 90-second video.  It goes not only to the plaintiff, it

16   goes to Dr. Emery.

17             THE COURT:  So you would anticipate, to cross

18   examine Dr. Emery as to his -- something along the effect of

19   would your opinion be different if the plaintiff did not

20   need a cane?

21             MR. TOOMEY:  No, sir.  Would your opinion be

22   different if you saw the video?  It might have been.  But I

23   haven't.  Dr. Emery isn't going to appear.  I intend to show

24   it as impeachment of evidence both as to what Mr. Fields is

25   going to say and what Dr. Emery has already testified to,

1    that this man needs a cane.

2              THE COURT:  You need to say that again.  I lost

3    you somewhere.  I'm sorry.

4              MR. TOOMEY:  It's going to be impeachment

5    evidence.  I intend to show it both as impeachment of

6    Mr. Fields and as an impeachment to Dr. Emery, who's already

7    testified in this case, just hasn't been shown, but has

8    already testified in this case that this man must use a

9    cane.  And so the Court knows, this video shows things like

10   Mr. Fields walking around with two doors over his head.

11             THE COURT:  All right.

12             Mr. Cassata?

13             MR. CASSATA:  Opposing counsel keeps saying the

14   surveillance video is being offered purely for impeachment,

15   but it's not.  He has it as a substantive exhibit on his

16   supposedly amended exhibit list.  And as you can see from

17   the cases in the motion, the vast majority of courts find

18   video like that to be both substantive and impeachment; and

19   under Rule 26 under the federal rules, if you don't disclose

20   substantive evidence prior to trial, you can only use it

21   solely for impeachment.  And I'm a little bit confused as to

22   why opposing counsel keeps saying it's offered solely for

23   that when it's a substantive exhibit.

24             THE COURT:  If that's your argument, that he's

25   given it an exhibit number, and that makes it inadmissible,

1    other than impeachment, the Court rejects that.

2              MR. LAUER:  Judge, I know some courts have a real

3    big problem with one attorney arguing.

4              THE COURT:  Pick one of you to argue.

5              MR. CASSATA:  Let me finish the argument, Your

6    Honor.

7              This video is dropped on us one business day prior

8    to trial.  They disclosed this Charlie Lincoln.  There's no

9    information.  It's a P.O. box.  There is no number, there's

10   no address.  And it's being -- if the Court wants to allow

11   the video for solely impeachment use, I can understand that.

12             THE COURT:  Well, it's my understanding that

13   that's what Mr. Toomey is offering it for.  I don't have any

14   problem with that to the extent he says it's offered as

15   impeachment of the plaintiff.  Depends what the plaintiff

16   testifies, of course.  And, depending on what he says, it

17   may moot the need for the surveillance video.  So, in that

18   regard, I don't have any problem to the case cited by

19   Mr. Toomey, Alfonso versus Esfeller Oil Field Construction,

20   Inc., which is 380 Fed.Appx. 808, a 2010 11th Circuit case.

21             While I understand, as a non-published case, it's

22   not binding, but persuasive, I do find persuasive, and the

23   Court will allow the video if and when it serves a function

24   as impeachment of the plaintiff.

25             I have a little bit more difficulty seeing the

1    impeachment of the Doctor's opinion and what you intend to

2    do with it.  It's my understanding that you intended to play

3    it for the jury, with the Doctor as a witness, and say --

4              MR. TOOMEY:  As though he was here.  Your Honor,

5    here is what's up.  There's a 90-second video that must be

6    shown to this jury.  Their video must be shown to this jury,

7    even though it's not in evidence, because their expert

8    relied on it.  Their expert relied heavily on it.  And that

9    video shows the plaintiff in a miserable state, using a

10   cane, and as though he can't walk at all.  It must be shown

11   to the jury because, otherwise, Dr. Emery must be stricken.

12             THE COURT:  So who's going to show it?

13             MR. TOOMEY:  There's one more thing.

14             THE COURT:  Hang on a second.  Answer my question

15   first.  Who is showing it?

16             MR. TOOMEY:  They must.

17             THE COURT:  I see one of the lawyers shaking his

18   head like he's not going to do it.

19             MR. LAUER:  I didn't list it as an exhibit, I have

20   no intention of playing it.

21             THE COURT:  And why must they do that?

22             MR. TOOMEY:  Because their expert relied on it.

23   The expert has to rely on the evidence that's in the case.

24             MR. LAUER:  An expert can rely on inadmissible

25   evidence.

1          THE COURT:  So you think, because the expert

2    relied on it, they have to introduce it?

3          MR. TOOMEY:  Yes, sir.  Or I can.

4          THE COURT:  I'm with you on the or part of that.

5    You're going to need to convince me on the first part of

6    that.

7          MR. TOOMEY:  I can.  And I can also introduce our

8    video showing that Dr. Emery's opinions are based on faulty

9    evidence.

10          THE COURT:  When was the incident in the 90-second

11    video taken?

12          MR. LAUER:  February 14, 2010, on the waterfront,

13    right there, after our pretrial hearing, Judge.

14          THE COURT:  2010 or 2011?

15          MR. LAUER:  2011, I apologize.  I used a camcorder

16    that my of wife had just gotten for me.  Mr. Cassata and I

17    took the video.  My wife downloaded it a few days later.

18    Brought it with me to the deposition.  There were four

19    photographs.  They were given to Walgreen's.  I have the

20    date on the back of them, February 17th.  They were

21    developed, and that's what some of the information the

22    expert based his opinion on, among many other things which

23    he goes over in his deposition.

24          THE COURT:  All right.  Mr. Toomey, to the extent

25    you want to convince me about the first part of that, I'll

1   give you the lunch hour to try to find the rule or case law.

2   I think I know what the rule says.  I'm not convinced it's

3   in your favor.  At least that's my memory of it.

4           The Court's already ruled with regard to the

5   admissibility of the surveillance video as to the plaintiff,

6   and my ruling basically depends on what the plaintiff says,

7   whether it's going to impeach or not.  I'll take it under

8   advisement as to the testimony of the Doctor.

9           Is that the Doctor whose transcript I'm reading

10  over the lunch hour?

11          MR. LAUER:  Yes, sir.

12          MR. TOOMEY:  Yes, sir.

13          THE COURT:  So no one expects him to be here live.

14          MR. LAUER:  No, Judge.

15          THE COURT:  So how are you going to impeach a

16  transcript?

17          MR. TOOMEY:  With evidence.  Without testimony.  I

18  have evidence that can impeach his opinion, and I don't need

19  testimony.

20          THE COURT:  You never -- you have evidence that

21  may be different.  I'm not sure it impeaches.  At least not

22  in the sense that all these situations where video

23  surveillance normally is.

24          MR. TOOMEY:  I understand, Your Honor.

25          THE COURT:  I'm not convinced, but you've got the

1    lunch hour, and probably the evening too.  I don't expect us

2    to get to that point.  At this point, let me just tell you

3    I'm going to reserve ruling, but the burden is on you; and

4    if I had to rule right now, I'm with the plaintiff on that

5    part of it.

6            MR. TOOMEY:  I understand.

7            THE COURT:  All right.  Let's break for lunch.

8    1:30.

9            MR. LAUER:  Judge, as far as the videotape

10   deposition of Dr. Emery goes, I have an IT person.  My hope

11   was that I could get him a ruling, and get that information,

12   and possibly get it played.  It's a 38-minute deposition.

13           THE COURT:  I'm going to enjoy lunch and the

14   deposition at the same time.  So have him come back at 1:30.

15           MR. LAUER:  Thank you, Your Honor.

16           (At 12:37 o'clock, p.m., court was recessed.)

17                       AFTER RECESS

18           (At 1:37 o'clock, p.m., court was reconvened.)

19           THE COURT:  Both sides ready for the jury?

20           MR. LAUER:  Yes, Your Honor.

21           MR. TOOMEY:  Yes, sir.

22           THE COURT:  I assume you each have found the copy

23   of the transcript that I've made my rulings on.  The

24   original I'll direct to be filed, so that is how it will be

25   reflected in the record.

```
 1              Have the jury step in, please.

 2              (At 1:38 p.m., the jury was escorted into the

 3         courtroom.)

 4              THE COURT:  Mr. Lauer, you may call your first

 5    witness.

 6              MR. LAUER:  Call Miss Toni Silvers, Mr. Fields'

 7    mother.

 8              THE COURT:  Come forward, please.

 9              THE CLERK:  If you would raise your right hand,

10    please.  Do you solemnly swear or affirm to tell the truth,

11    the whole truth, nothing but truth, in the case now before

12    the Court?

13              THE WITNESS:  I do.

14              THE CLERK:  You may have a seat.  Move up to the

15    microphone, please.

16              If you would state your full name, spelling your

17    last.

18              THE WITNESS:  Toni Ann Silvers.  S I L V E R S.

19              MR. LAUER:  Judge, for questioning witnesses,

20    should I be at this podium, or would you like me seated,

21    or . . . .

22              THE COURT:  I'd prefer at the podium, and use the

23    microphone.  It's easier for the court reporter.

24              MR. LAUER:  Okay.

25                        TONI ANN SILVERS,
```

1    called as a witness by the Plaintiff, and having been first

2    duly sworn, was examined and testified as follows:

3                        DIRECT EXAMINATION

4    BY MR. LAUER:

5    Q       How do you know Brett Fields?

6    A       He's my son.

7    Q       How old is Brett right now?

8    A       27.

9    Q       Did you spend -- how many years have you -- no.

10   Where was Brett born?

11   A       Fort Myers, Florida.

12   Q       Has Brett always lived in Fort Myers?

13   A       Yes, he has.

14   Q       Who did he live with when he was growing up?

15   A       With me.  And sometimes his grandmother.

16   Q       Okay.  Tell me what Brett was like when he was

17   younger.  When I say, "Like," I mean physically and

18   mentally.

19   A       He was healthy.  And, mentally, he was in good

20   spirits.  He . . . he liked sports.  He liked his brother,

21   playing around with his brother.  Football, basketball.

22   Skateboard and bicycling.  Just typical kids things.

23   Q       Did he have a close relationship with his family

24   members?

25   A       Pardon me?

TONI SILVERS — DIRECT/LAUER                    73

1   Q      Close relationship with his family members?  His

2   brother?

3   A      Yes, he does.

4   Q      Okay.  Where were you living in the summer of 2007?

5   A      I was here.

6   Q      All right.  Was there a point during the summer of

7   2007 when you left the State of Florida?

8   A      Yes.

9   Q      Okay.  Where did you go?

10  A      In 2007?

11  Q      Yes.  July, August.

12  A      Oh.  I'm sorry.  I moved to Crystal River, Florida.

13  I moved out of Fort Myers to Crystal River.

14  Q      What type of work were you doing at that point?

15  A      Construction.

16  Q      What type of construction?

17  A      Structural.  Working at power plants.

18  Q      What is structural construction?  What does that

19  mean?

20  A      Where they rebuild -- they go in and rebuild power

21  plants.  They take out old burners and put new ones in, and

22  just different things that need to be done.  Pretty much

23  refurbish the old power plant.  Or build new ones.

24  Q      How many years have you been in the construction

25  industry for?

1    A      Six years.

2    Q      All right.  Now, in July and August of 2007, you were

3    in South Carolina?

4    A      Yes.

5    Q      Okay.  Tell me about the phone call that you got that

6    brought you back to Florida.

7    A      I got off work that afternoon.  I was out on my

8    motorcycle.  And my youngest son called me.  'Cuz he was

9    living with me at the time.  And he told me that my son was

10   in the hospital, paralyzed from his waist down.  And . . . I

11   was in J.C. Penny's at the time, and when he told me he was

12   paralyzed, I just . . . I collapsed.  One of the end caps

13   they had, I just fell on top of it, and . . . I'm like,

14   okay.  All I could think about was getting my motorcycle,

15   back home without getting into an accident, because I didn't

16   know what was going on with my son.

17         I went home, I took a shower, threw some clothes in a

18   suitcase, got in my car, and drove 12 hours straight from

19   there to here.  Straight to the hospital.

20   Q      When you first got to the hospital, what did you see?

21   A      I went to the receptionist's desk.  They told me I

22   couldn't see my son, that visiting hours were over.  And I

23   just looked at them, I said I just drove 12 hours from South

24   Carolina.  My son is in here.  He just had surgery.  And

25   they kind of argued with me a little bit, and then they let

1  me go back and there visit with him.

2  Q      What did you see?

3  A      My son in a hospital bed.  He's crying.  He can't

4  move his legs.  He just got out of surgery.  You know, I'm

5  just . . . I didn't know what was going on.  And . . . I was

6  asked to leave because somebody come in to check on him, and

7  I -- and when she got through, I went back in there, and I

8  was talking to him.  And he told me that he had just had

9  surgery.

10            MR. TOOMEY:  Objection.  It didn't call for a

11  hearsay response, but it's getting one.

12            THE COURT:  All right.  Well . . . the

13  anticipatory objection, then, is overruled, and we'll see

14  where it goes from here.

15            MR. TOOMEY:  Thank you, Your Honor.

16  BY MR. LAUER:

17  Q      Without telling me what other people told you.  It's

18  got to be what you observed, what saw, things of that

19  nature.  So, day one, when you see your son, is he connected

20  to machines, is he . . . tell me about this.

21  A      He had tubes running out of his back.  Drainage

22  tubes.  He had a catheter in him.  He was laying in a bed,

23  so -- the first day that I come in, he was behind a curtain.

24  And I visited with him for a little bit, and he was kind of

25  in and out of it a little bit.  So he really didn't get into

1    details and tell me why he was there.

2    Q      Did you visit him the day after?

3    A      Yes, I did.

4    Q      And what did you see when you came to see him the day

5    after?

6    A      He was behind a glass -- he was in a glass room.  He

7    was pretty much quarantined.  You had to wear gloves, masks,

8    a gown, before you can go into his room.

9    Q      And what kind of condition was he in when you saw him

10   on day two?

11   A      He couldn't move his legs.  He couldn't roll over

12   hardly.  He had to have help.  He couldn't go to the

13   bathroom.  He had to have a nurse come in, put a bed pan

14   under him.  He wasn't in good shape at all.  He didn't look

15   like my son.

16   Q      What did he look like?

17   A      Wasn't my son.

18   Q      Okay.  Did you see him on day three, and day four,

19   and day five?

20   A      I seen him every day that I was here.

21   Q      How did his condition change on day three, day four,

22   day five?

23   A      He just wanted to die.

24   Q      What was his . . . his emotional state?  Tell me

25   about it.

1   A      He went from playing with his kids, helping me do

2   things, coming to visit me, his brother, his friends.  He

3   went from being able to do just about anything he wanted to

4   do to pretty much nothing.  For a while.

5   Q      Do you remember how long he was in the hospital for?

6   A      I know he was in there a few weeks.  I wasn't here

7   when he got released.  I had to go back home, because I had

8   a job, and I had responsibilities.  So I had to go back

9   home.  But I know he was there pretty much the whole month

10  of August.

11  Q      When did you come back to Florida?

12  A      In . . . December.

13  Q      Okay.  And throughout this time in 2007, up until

14  today, how often do you speak with your son?

15  A      I try to speak to my son every single day.  If not,

16  maybe a week.  A week does not go by.  If he doesn't call

17  me, I call him.  Just to see how he's doing.

18  Q      Were you concerned about your son's emotional state

19  when he was in the hospital?

20  A      I was.

21  Q      Okay.  Why?

22  A      Because he . . . he's just . . . he just wasn't my

23  son.  It just wasn't him.  Because he went from a young man

24  that had all the confidence in the world to nothing.  His

25  whole self-esteem, everything about him, it just went

1    downhill.  He just . . . .  He just felt he had no reason to

2    live anymore.  Because he couldn't move his legs.  He

3    couldn't do nothing.

4    Q      When you came back to Florida in December -- is that

5    what you said?

6    A      Um-hum.

7    Q      Was your son still in a wheelchair at that point?

8    A      He was.

9    Q      Okay.  Did you have a chance to see him learning how

10   to walk, and attempting to walk?

11   A      I have.

12   Q      Give me a . . . give me an example.  We spoke in the

13   past, and you told me about one time at a family picnic.

14   Tell me about that.

15          MR. TOOMEY:  Objection, Your Honor.  Leading.

16          THE COURT:  Sustained.

17   BY MR. LAUER:

18   Q      Tell me about the very beginning, when he's just

19   starting to learn how to regain his balance and walk.  What

20   was that like?

21   A      It was hard to watch.  I didn't want to . . . I,

22   personally, did not want to see my son walking the way he

23   had to walk, because, from a young man, a healthy young man,

24   to get up and just walk across the yard, or walk across the

25   house, or anywhere, just as a normal person, to somebody

1    that . . . stumbles, falls down, wobbles, has to hold

2    things . . . at times crawl across the floor just to get to

3    the restroom.  Because the walkway wasn't wide enough for

4    him to get a wheelchair through.  And hang onto people, and

5    hang onto things to get from Point A to Point B.  That's not

6    my son.

7    Q    About how many months do you remember him being in a

8    wheelchair?

9    A    About eight months.

10   Q    Okay.  And after -- well, first let me ask this.

11   Where did the wheelchair come from?

12   A    I got it for him at the Goodwill thrift store.  I

13   don't remember exactly where, but I know I bought a used

14   wheelchair for him because I couldn't afford to go buy him a

15   new one.  And he wasn't . . . he was denied disability -- or

16   Medicaid and Medicare.  Nobody would help him.

17   Q    Now, after the original eight months of him being in

18   a wheelchair, he's then in a walker.  Were you present for

19   that transition from the wheelchair to using a walker?

20              MR. TOOMEY:  Objection, Judge.  Leading.

21              THE COURT:  Sustained.

22   BY MR. LAUER:

23   Q    Tell me with about when he began to use a walker.

24   A    My mother had picked a walker up, a used one.  He was

25   tired of sitting in the wheelchair all the time.  Because he

1   would get sores.  And he wanted to be able to get up and

2   move around, because he sat in one spot all day long.  So he

3   got a walker.  And he would take a few steps, and that's

4   about all he could do at first.  But at least he tried.

5   Q      Now, you said sores.  Describe these sores to me.

6   A      They're like bed sores.  Pressure points.  From

7   somebody sitting too long, or laying too long in one spot.

8   You have to rotate all the time.  And you sit in one spot,

9   with no feeling whatsoever, you're gonna get sores.

10  Q      Where are these sores located on your son?

11  A      On his side.  And on his rear end.  Because he had to

12  sit all the time.  He couldn't -- he couldn't get up and

13  walk.

14  Q      Now, we've progressed into a -- actually, let me ask

15  you about Christmas.  Tell me about what happened Christmas.

16  I think it would have still been -- well, let me ask, was it

17  2007?

18  A      Um-hum.

19  Q      Tell me about that Christmas.

20  A      I had come into town, and my son was by hisself.  And

21  I called him up.  I went over there to pick him up.  And I

22  went out to a friend of mine's house, because we was invited

23  to go out there for Christmas.  So I picked him up, and I'm

24  driving down the road, and he was just so depressed, and he

25  looked at me, and he told me, he says, "I just want to die,

1    mom."  He says, "I don't want to live no more.  I have

2    nothing to live for."  And . . . .  And I tried to talk to

3    him and tell him you've got three beautiful babies, and I

4    would rather see him in a wheelchair the rest of his life

5    than to be buried at 25 years old, because no mother wants

6    to bury a child at 25.  Or at any age.  But that was our

7    conversation on Christmas Day, that he wanted to die.

8    Q      Were you concerned that your son might harm himself?

9    A      Several times.

10   Q      And what . . . what did you do?

11   A      I just tried to talk to him, and tell him that he

12   needs to think about his kids.  He needs to remember that

13   he's got a family that loves him.  And that's here for him.

14   And that we will do the best we can for him.  And we're here

15   for him no matter what.  And we'll just try to get through

16   it the best we can.

17   Q      Did your son ever start riding a bike?

18   A      He did.

19   Q      When was that?

20   A      It was . . . .  2007.  2008, maybe.  I don't know.

21   Q      How did it happen?

22   A      It was about 2008.  Because I had -- I had a bike

23   that I'd had for a couple years, that was still in a box.

24   And I asked him if he could come over to the house, and he

25   says yeah, mom.  What do you need?  I said I need you to put

1    something together for me.  I just need your help.  He said

2    okay.  So he came over, sat out on the carport, took the

3    bike out of the box, and put it together for me.  And he

4    told me, he goes, well, mom, that's a nice bike.  I said

5    yeah, it is.  He goes let me have it.  I looked at him, I

6    was like Allen, I haven't even rode it yet.  He said hey,

7    mom, let me have it, let me have it.  I said let me think

8    about it.

9         And a couple hours went by, and he decided I'm going

10   to go home.  I said hey, Allen, before you go home, I said,

11   push the bike over to my truck.  And he says for what?  I

12   said I'll take it home for you.  And he said no.  He says

13   I'm going to try and ride it.  And he wobbled over to the

14   bike, and . . . got on the bike.  Of course, he couldn't

15   hold the bike up by hisself.  He had to hang onto the pole,

16   or the side of a vehicle, or somebody, to . . . push off, or

17   somebody push him, to where he can start pedaling.

18        And he would -- he rode the bike, and he's like,

19   okay, mom, he says, I'm gonna go.  And I said I'll take you

20   home, Allen.  And he said no, I'm going to try and get home,

21   and I'm gonna try to ride my bike.  And I gave him a kiss,

22   and I said be careful, and told him I loved him.  He goes I

23   love you too, mom.  And he rode his bike home.

24        And, pretty much, that's how he got around.  That was

25   his therapy.  Because he couldn't -- he doesn't get therapy.

1    He couldn't get the help.

2    Q       What's it like going out in public with your son?

3    Can you take me sort of -- you know, I guess the beginning,

4    because there's been a progression.  He's definitely

5    improved since the beginning, so tell me what it's like the

6    when you're in public with him.

7    A       At first, it was hard for him.  People would stare at

8    him, and they would look at him, and they would make their

9    comments, and they would look at us, and -- you know, he's

10   in a wheelchair, you know?  Okay.  So what?  He's in a

11   wheelchair.  And then, when he started to walk, of course,

12   he doesn't walk normal.  He wobbles, and he falls, and he

13   stumbles.  And people think he's drunk, but he's not.  He

14   doesn't drink.  I mean, he . . . he can't get -- he can

15   walk, but not like he should.

16   Q       When you're with him in public, what types of things

17   do you do to help accommodate him?  If you're taking him

18   somewhere, driving him somewhere.

19   A       I don't park out in parking lots too far out.  I try

20   and get the first parking spot if I can.  If I can't, I'll

21   drive up to the door, I'll drop him off, and then I'll go

22   park the car.  And I'll tell him to stand at the door, or by

23   the curb, or wherever we're at.  I go to get the car, I come

24   back and I pick him up.  I try not to let him walk too far,

25   because he has to stop.  And it's just difficult for him to

1  walk long distances.

2  Q      Were there ever occasions when you were sleeping in

3  the same house that Mr. Fields was in after this injury?

4  A      Yes.

5  Q      Did things used to occur during the nighttime hours?

6  A      Yes.  I would . . . .

7  Q      What would you hear?  Be.  Specific?

8  A      I would hear moaning and groaning, and I was like --

9  you know, when I first heard had it, I didn't know what it

10 was.  And I was like, okay, you know, him and his

11 girlfriend, you know, they lived together.  So I didn't

12 think nothing of it at first.  And then I got up the next

13 morning, and I just kind of joked around with him a little

14 bit, and . . . I said oh, I heard you all in there, you

15 know?  And Allen's like, no, mom.  He goes that's my legs,

16 because I'm in so much pain.  They hurt him so bad that it

17 keeps him up all hours of the night.  And he can't sleep,

18 and it just causes him a lot of pain.

19         MR. TOOMEY:  Move to strike, Your Honor.  Move to

20 strike the portion that is hearsay.  While counsel is not

21 specifically asking hearsay questions, we're getting a lot

22 of hearsay responses.

23         THE COURT:  Do you care to be heard?

24         MR. LAUER:  Judge, it wasn't being offered for the

25 truth, it was being offered for her sense of what she had

1    heard, and her impression of it.

2              THE COURT:  The objection is sustained.

3    BY MR. LAUER:

4    Q      Is your son currently on medications?

5    A      He is.

6    Q      What type of medications?

7    A      I don't know.

8    Q      Can you give me specific names?

9    A      I don't know the specific names of them.  I just know

10   he's on medication.

11   Q      Does it worry you that he takes . . . .

12   A      It does.

13   Q      Why?

14   A      Because he -- I don't know the names, but he's told

15   me he has to take certain pills, so many of them a day, just

16   for the pain, that it worries me.  And . . . .

17             MR. TOOMEY:  Same objection, Your Honor.  Same

18   objection.  Move to strike.  I'm sorry.

19             THE COURT:  That one is overruled.

20             MR. TOOMEY:  Same basis.

21             THE COURT:  That's overruled.

22   BY MR. LAUER:

23   Q      Has your son's personality changed since the summer

24   of 2007?

25   A      It has.

1   Q       How?

2   A       He just doesn't feel like he's good enough for

3   anything anymore.  His . . . he looks at things different.

4   He doesn't feel like he's a whole man because of what's --

5   what he's living with now.  It's . . . .  Not like he used

6   to be.

7   Q       Before the summer of 2007, did he work?

8   A       He did.

9   Q       What kind of work did he do?

10  A       He did metal framing.

11          MR. LAUER:  No further questions.  I'll tender the

12  witness for cross-examination.

13          THE COURT:  All right.

14          Mr. Toomey?

15          MR. TOOMEY:  No questions, Your Honor.

16          THE COURT:  You may stand down.  Thank you.

17          (The witness was excused from the witness box.)

18          THE COURT:  You may call your next witness.

19          MR. LAUER:  Judge, very brief sidebar?

20          THE COURT:  You may.

21                          AT SIDEBAR

22          MR. LAUER:  I have a video, that's going to be

23  delivered in just a few minutes, playing Dr. Emery's

24  deposition.  And there's also an individual who will be

25  testifying who should be on the courthouse steps right now.

1   I just need to check and make sure that he is here.  But we

2   talked to him during lunch, and he is being delivered to us.

3              THE COURT:  All right.

4              MR. TOOMEY:  Who is that?  Since I don't have an

5   order.

6              MR. LAUER:  His cell-mate.

7              MR. TOOMEY:  Trey?

8              MR. LAUER:  Trey, yeah.

9              THE COURT:  Do you want to check, or do you want

10  me to send the jury out?

11             MR. LAUER:  If you could send them in for just a

12  minute, and let me check, Judge, I would appreciate it.  He

13  might be the kind of guy that they slow down at the front

14  entrance for a little while.

15             THE COURT:  Okay.

16                      IN OPEN COURT

17             THE COURT:  Ladies and gentlemen, counsel needs to

18  coordinate some witnesses here, so we're going to take a few

19  minutes recess while he does that.  Hopefully, that will

20  make things go a little bit smoother for the rest of the

21  afternoon.  So we'll take a recess of maybe five or ten

22  minutes.  I don't know how long to tell you.  But in any

23  event, please do not discuss the case among yourselves, or

24  allow anyone to discuss it with you or in your presence.

25  We'll get you back here as soon as we can.

1          (At 2:05 p.m., the jury was escorted from the

2      courtroom.)

3          THE COURT:  All right.  Let me know when you're

4  ready, please.

5          (At 2:05 o'clock, p.m., court was recessed.)

6                       AFTER RECESS

7          (At 2:18 o'clock, p.m., court was reconvened.)

8          THE COURT:  Any news?

9          MR. LAUER:  We have a witness, and the video is

10  going to be done in about 30 seconds, and will be delivered

11  here in the next 10 to 12 minutes.

12          THE COURT:  Is your witness going to take more

13  than 10 to 20 minutes?

14          MR. LAUER:  My direct won't.  It depends upon how

15  vigorous the cross-examination is.

16          THE COURT:  Any sense?

17          MR. LAUER:  I don't know.

18          MR. TOOMEY:  I don't know, Judge.

19          MR. LAUER:  I don't think it will take more than

20  10 or 15 minutes.  He has a very brief portion.

21          THE COURT:  I guess what I'm suggesting is do we

22  wait a few minutes to allow the video get closer.

23          MR. TOOMEY:  Probably not a bad idea.  Do you give

24  the jury an afternoon break?

25          THE COURT:  I do, but it's a little bit early for

1    that.

2              MR. LAUER:  I would be fine with a couple extra

3    minutes to make sure we have the DVD and everything ready.

4              THE COURT:  Let's take five minutes, and then

5    we'll start.

6              MR. TOOMEY:  Thanks, Judge.

7              (At 2:19 o'clock, p.m., court was recessed.)

8                         AFTER RECESS

9              (At 2:27 o'clock, p.m., court was reconvened.)

10             THE COURT:  All right.  Let's go ahead and get

11   started again.  Have the jury step in, please.

12             (At 2:27 p.m., the jury was escorted into the

13        courtroom.)

14             THE COURT:  You may proceed.

15             MR. LAUER:  The plaintiff will call as it is next

16   witness, Travis Hopkins.

17             THE CLERK:  Raise your right hand, please.  Do you

18   solemnly swear or affirm to tell the truth, the whole truth,

19   nothing but the truth, in the case now before the Court?

20             THE WITNESS:  Yes, ma'am.

21             THE CLERK:  You may have a seat.

22             Move up to the mike.  State your full name,

23   spelling your first and last names.

24             THE WITNESS:  Would you like me to spell my name?

25   Travis, T R A V I S.  Last name Hopkins, H O P K I N S.

```
 1              THE CLERK:  Thank you.

 2              MR. LAUER:  You can probably scoot back just a

 3    little.

 4              THE WITNESS:  It's a little loud.

 5                         TRAVIS HOPKINS,

 6    called as a witness by the Plaintiff, and having been first

 7    duly sworn, was examined and testified as follows:

 8                      DIRECT EXAMINATION

 9    BY MR. LAUER:

10    Q      When is the first time you met Mr. Fields?

11    A      While we were incarcerated.

12    Q      When, approximately, was that, if you remember?

13    A      It was . . . it was a little while back.  I would

14    say, you know, four years maybe?

15    Q      Summer of 2007?

16    A      Yeah.  Sounds about right.

17    Q      Okay.  Had you ever met Mr. Fields prior to that?

18    A      Never.

19    Q      And what type of -- difficult question.  What type of

20    environment were the two of you sharing?  How did you end

21    up -- not how did you end up together, but where were you

22    together?

23    A      He was assigned to the . . . the room that I was in,

24    and the dorm that I was incarcerated in.

25    Q      Okay.  How many people were in there with you?
```

1   A       Me, him, and one other person, I believe.

2   Q       How many days were you in there with Mr. Fields?

3   A       To my recollection, at least three.

4   Q       During that three-day period, did you notice if

5   Mr. Fields was having any difficulty using his legs?

6   A       Absolutely.

7   Q       Tell me about what you noticed.

8   A       I think he was in severe pain.  He . . . .

9   Repeatedly asked for help, and was not taken seriously.  He

10  was having trouble even using the restroom, getting his

11  meals.  At one point, I believe, a nurse came and -- you

12  know -- started to take him seriously, and there was a

13  correction officer that -- you know -- told her that

14  everything's fine.

15  Q       Which jail facility was this?

16  A       It was Lee County.

17  Q       Are there more than one actual facilities or --

18  A       I was Dorm C, Cell 6.

19  Q       Was it downtown, or was it out on Ortiz?

20  A       It was out in Ortiz.

21  Q       Okay.  Is there a button or something that an inmate

22  can hit inside of those cells, or dorms?

23  A       Yes, sir.  In each room they have a button that you

24  can press for emergencies and -- you know, if something --

25  you know, like a fight is going on in the room, or be it a

1    medical emergency, there's a button in each room you press;

2    yes.

3    Q       During that three-day period, did you ever see

4    Mr. Fields press that button?

5    A       I saw him press that button . . . I couldn't even

6    count how many times he pressed that button, and they

7    actually, while pressing the button, told him to stop

8    pressing the button.

9    Q       Did you ever press the button for Mr. Fields?

10   A       Yeah.  I actually did press the button once for him.

11   Q       During the three-day period that you were with

12   Mr. Fields at Ortiz, was he able to walk, and support his

13   own weight?

14   A       No.  No way whatsoever, at all.  He was crawling,

15   literally, with his hands, to lift himself up to use the

16   restroom.

17   Q       As far as eating, how did he manage eating?

18   A       One of his cell-mates would bring him his tray,

19   and . . . that's pretty much it.  He couldn't stand, at all.

20   I know that.  And anytime he moved, even when not trying to

21   stand, he would moan, in extreme pain.  So I felt very -- I

22   felt pretty bad for the guy.

23   Q       And did you see -- when did he get moved from your

24   facility?

25   A       Three days since he was moved to my -- to where I

1    was, and then, three days later they moved him out.  And

2    that's the last I saw of him until I saw him later on.

3    Q      Okay.

4    A      Afterwards.

5    Q      So you weren't present that night that there was the

6    man down call at 1:00 a.m., and everybody rushed in and

7    emptied out the cell, and the true medical emergency.  You

8    weren't there for that part.  That was downtown.

9    A      No, I don't believe so.

10   Q      Okay.  When was the -- after you were with Mr. Fields

11   at the Ortiz facility, when was the next time that you saw

12   him?

13   A      I saw him at a pool hall, and he was in a wheelchair.

14   And we got to discussing about -- he started telling me how

15   serious --

16           MR. TOOMEY:  Objection, Your Honor.  Move to

17   strike.

18           THE COURT:  The objection is sustained.  The jury

19   is instructed to disregard what he started to say that

20   someone else told him.

21           You may proceed.

22   BY MR. LAUER:

23   Q      When I ask you questions, you've got to tell me what

24   you saw, what you know, things of that nature --

25   A      Okay.  I'm sorry.

1   Q      What people told you is not going to be okay, all

2   right?

3          So when was the next time you saw Mr. Fields?

4   A      I saw him, next time, at Hustler's Pool Hall.

5   Q      Okay.  And what did you see?  Was Mr. Fields in a

6   wheelchair?

7   A      Yes; he was in a wheelchair.

8   Q      About how many months after you were with him at

9   Ortiz did you see him at this pool hall?

10  A      Years.

11  Q      Okay.

12  A      Probably about a year ago I saw him for the first

13  time since we were incarcerated.

14  Q      All right.  Did you notice a difference in the size

15  of his legs between when --

16  A      Big difference.  Big, big difference.

17  Q      I didn't even get to finish my question, you started.

18  Tell me about the difference.

19  A      It didn't even look like legs.  It looked like

20  there's poles.  No muscle, no fat, nothing.  Just . . . .

21  Q      How was Mr. Fields' built physically when he was with

22  you in the Ortiz facility?

23  A      He had a nice build to him.  He had some muscle to

24  him.

25  Q      And when you saw that lower body however many months

1   later it was, and he was in a wheelchair, had it changed?

2   A     Yes.  Severely.

3         MR. LAUER:  No further questions.  Tender the

4   witness for cross.

5         THE COURT:  Mr. Toomey?

6         MR. TOOMEY:  Briefly, Your Honor.

7                    CROSS EXAMINATION

8   BY MR. TOOMEY:

9   Q     Mr. Hopkins, I just want to make sure I got

10  everything straight here.  You knew Mr. Fields when you were

11  incarcerated in the Lee County Jail, out at the Ortiz

12  facility, for three days; is that correct?

13  A     That is correct.

14  Q     And the next time you saw him after you all were

15  released from jail was last year; is that right?

16  A     Yes.  Roughly, yes.

17  Q     After the three days that the two of were you in the

18  same cell, Mr. Fields was moved out; right?  You never saw

19  him again while were you incarcerated.

20  A     No.

21  Q     And you were still at Ortiz.

22  A     Yes.

23  Q     When Mr. Fields was pushing the button, who came and

24  told him to stop, the corrections officers?

25  A     There is just a speaker.  They don't actually come.

1    There's a booth where they can view, like an observation

2    booth.  And they're the -- the correction officers are in

3    there.  They're the ones that respond when you press a

4    button.

5    Q      So the corrections officers -- as far as you know,

6    the corrections officers that responded to Mr. Fields are

7    saying stop pushing the button.

8    A      Yeah.

9            MR. TOOMEY:  Nothing else, Your Honor.

10           THE COURT:  Any redirect?

11           MR. LAUER:  Yes, actually, there is.

12                       REDIRECT EXAMINATION

13   BY MR. LAUER:

14   Q      During that three-day period, did anyone other than a

15   corrections officer come to the cell?

16   A      Yeah, there was --

17           MR. TOOMEY:  Objection, Your Honor.  Not covered

18   on my cross.

19           THE COURT:  Overruled.  I'll give you a chance to

20   recross.

21   A      I'm sorry, repeat that?

22   Q      Other than corrections officers, did anybody come to

23   that cell to see Mr. Fields during the three-day period?

24   A      Yeah.  There was a nurse that came there at first.

25   There was a nurse that came.

```
 1              MR. LAUER:  Thank you.

 2              THE COURT:  Mr. Toomey?

 3              MR. TOOMEY:  Nothing further, Your Honor.

 4              THE COURT:  You may stand down.  Thank you.

 5              (The witness was excused from the witness box.)

 6              THE COURT:  You may call your next witness.

 7              MR. LAUER:  Judge, we have the videotaped

 8  deposition.

 9              THE COURT:  Did you have an instruction with

10  regard to that, or not?

11              MR. LAUER:  Mr. Cassata has just run out on me,

12  Judge.  He's much better at the instructions.  Can I run out

13  and ask him?  I think I can still see his shirt.

14              THE COURT:  Sure.

15              (Mr. Lauer confers with Mr. Cassata privately.)

16              MR. LAUER:  No, Judge.  I believe there's a jury

17  instruction that is read with the final charge to the jury,

18  and that's when we would like it to be read.

19              THE COURT:  All right.

20              Let me just tell the jury, at this point, the

21  plaintiff is going to play a videotape of a deposition

22  instead of having the witness appear in person.  You may

23  consider the deposition as you would live testimony.  It

24  will appear, questions and the answers, and you may give it

25  whatever weight you think is appropriate.
```

98

1          Why don't you identify for us, first of all, who

2     it is.

3          MR. LAUER:  This is the deposition of Dr. Waden

4     Emery.  I don't believe it's been admitted into evidence

5     right now.  Has it been marked?

6          MR. CASSATA:  Yes.

7          MR. LAUER:  This is Plaintiff's Exhibit 15, the

8     videotaped deposition of Mr. Waden Emery.

9          THE COURT:  All right.  You may proceed.

10                 WADEN EMERY, M.D.,

11     called as a witness by the Waden Emery, M.D. via prior sworn

12     testimony, the prior sworn testimony was published to the

13     jury as follows:

14          VIDEOGRAPHER:  "Okay.  Here begins the video

15       deposition of Dr. Waden E. Emery, Tape 1, Volume 1, in

16       the matter of Brett A. Fields, Jr. versus Prison Health

17       Services, in the United States District Court, Middle

18       District of Florida.

19          Today's date is February 18th, 2011.  The time on

20       the monitor is 11:47 a.m.  The videographer is Jim

21       Rockledge of Olinger Reporting.  The court reporter is

22       Nicole Masters Simone, of Olinger Reporting" --

23          THE COURT:  Is that loud enough for everyone?

24          VIDEOGRAPHER:  -- "today's deposition is being

25       taken on behalf of the plaintiff, and is taking place at

1       Emery Neuro Center at 5340 North Federal Highway,

2       Number 205, Lighthouse Point, Florida.

3           Counsel, please introduce yourselves and who you

4       represent."

5               MR. LAUER:  "Greg Lauer on behalf of the

6       plaintiff, Brett Fields."

7               MR. TOOMEY:  "Greg Toomey for the defendants."

8               VIDEOGRAPHER:  "Will the court reporter please

9       swear in the witness?"

10          (The witness was placed under oath.)

11                      DIRECT EXAMINATION

12  BY MR. LAUER:

13      "Q  All right, Doctor, we're here on the case of Brett

14      Fields versus Prison Health Services, Inc. a Tennessee

15      corporation, and defendant Joseph Richards, as well as

16      defendant Bettie Allen.  This is a videotaped deposition

17      that will be used for trial purposes.  So if you could,

18      could you go ahead and introduce yourself to the jury.

19      Tell them your name, and what you do for a living.

20      "A   My name is Waden Emmett Emery, III, M.D.  I'm a

21      physician, and I have been in the private practice of

22      neurology for 25 years and about eight months.  In Fort

23      Lauderdale.

24      "Q   What is neurology?

25      "A   Neurology is the study of the nervous system, both

1   the central and peripheral nervous system.  The central

2   nervous system is the brain, the spinal cord; and the

3   peripheral nervous system are the nerve roots emanating

4   from the brain stem, spinal cord, that extend into the

5   arms and hands, and into the thorax, as well as into the

6   thighs, legs, and feet, as well as the autonomic nerves,

7   which extend into the areas of the lung, heart, bladder,

8   kidneys, intestines, and blood vessels.

9   "Q   Could you please tell the jury how many years of

10  schooling -- college, medical school, internship and

11  residency -- it took to become a neurologist?

12  "A   I spent five years in college, four years in

13  medical school, one year of internship, and three years

14  of residency.

15  "Q   And are you board certified in any subspecialty of

16  medicine?

17  "A   I'm board certified in neurology.

18  "Q   What does it take to become a board certified

19  neurologist?

20  "A   To become a board certified neurologist, a

21  candidate must complete a medical school education at an

22  acceptable medical school by the American Board of

23  Psychiatry and Neurology; then must complete a residency

24  and internship that's acceptable to the American Board

25  of Psychiatry and Neurology; and then, approximately one

1    year after finishing the residency, submit himself or

2    herself for a written examination in neurology and

3    psychiatry; and then, approximately one year later, have

4    an oral examination in neurology and psychiatry.

5        "In my case, I completed my residency in 1985.  I

6    took the written examination in 1986, and passed that

7    the first time; and the oral examination in January of

8    1987, and passed that the first time and became board

9    certified by the American Board of Psychiatry and

10   Neurology as of January of 1987.

11   "Q   Is board certification the highest level of

12   certification a doctor can receive in any particular

13   subspecialty?

14   "A    No.  In my case, I became -- later became a fellow

15   of the American Academy of Neurology.  Essentially, when

16   you become board certified, you become a diplomat of the

17   American Academy of Neurology; and then, if you, with

18   teaching, community service, and you submit yourself,

19   approximately ten years later or so, you may be awarded

20   the distinction of being a fellow of the American

21   Academy of Neurology, which is the highest level a

22   neurologist can attain.  And I became a fellow about ten

23   years ago now.

24   "Q   Do you have staff privileges at any hospitals?

25   "A    Yes, I do; at Holy Cross Hospital, Imperial Point

1     Hospital, and North Broward Hospital.

2     "Q   Have you ever accepted to testify as an expert in

3     court before?

4     "A   Yes, I have.

5     "Q   On about how many occasions?

6           "MR. TOOMEY:  Objection.

7     "Q   Actually, I'll strike that question.

8     "A   Maybe 50.  I testify about once a year, let's say;

9     and I have been in practice for 25 years, so somewhere

10    between 25 and maybe 50.

11          "MR. TOOMEY:  Move to strike.

12    "Q   Okay.  How many times have you testified in the

13    past?  What did you say, 25 years?

14    "A   Yeah.  About 25, I would say.  I've testified in

15    federal court, worker's comp court, civil court,

16    criminal court.  As an expert witness.

17    "Q   How many times per year, on average, would you say

18    you testify in court?

19          "MR. TOOMEY:  Objection.

20    "A   Probably once a year.  Maybe a little bit more.

21    "Q   All right.  How much of your practice is devoted to

22    the legal aspects of medicine?

23    "A   It's less than ten percent of my new patients are

24    involved in litigation.

25    "Q   Now, I -- my law office, on behalf of Mr. Fields,

1       has paid you for your time here today.  Is that a

2       customary thing, that you're paid for your time, whether

3       it's treating a patient, or whether it's being in court

4       or giving a deposition?

5       "A    Yes.

6       "Q    Okay.  And do you have any records for the amount

7       that has been paid for your record review, as well as

8       meeting with me, and then also this deposition?

9       "A    Yes.  I have a charge journal from -- that was

10      generated by my office, and for record review it looks

11      like the charge was $1,237.50.  And about three fourths

12      of that has been paid.

13      "Q    Okay.  And, for the videotaped deposition, was your

14      hourly rate?

15      "A    $800.

16      "Q    To prepare for this deposition and to review this

17      case, did you have a chance to review any records?

18      "A    Yes.

19      "Q    Did you have a chance to review any EMS records for

20      this case?

21      "A    Yes.

22      "Q    All right.  The medical records from Prison Health

23      Services, Inc., those would be the jail medical records?

24      "A    Yes.

25      "Q    And medical records from Southwest Regional Medical

```
 1      Center?
 2      "A   Yes.
 3      "Q   And the deposition of the treating neurosurgeon,
 4      Dr. Alvarez?
 5      "A   Yes.
 6      "Q   Did you also have a chance to view photographs of
 7      Mr. Brett Fields?
 8      "A   Yes.
 9      "Q   Did you have a chance to view a videotape of
10      Mr. Brett Fields walking?
11      "A   Yes.
12      "Q   Do you need anything else in order to be able to
13      give an opinion in this matter as to what caused
14      Mr. Fields harm and what his prognosis will be?
15      "A   No.
16      "Q   Is it necessary for you to evaluate Mr. Fields?  I
17      mean to actually see Mr. Fields in front of you, touch
18      him, do things that like, or are photographs and the
19      video, as well as the medical records, enough?
20               "MR. TOOMEY:  Form.
21      "A   Not to form a medical opinion as to his diagnosis,
22      his status, and his prognosis.
23      "Q   Now, I'm going to ask you for your opinion on some
24      matters, and I need -- each time you give me an opinion,
25      it needs to be within a reasonable degree of medical
```

1    probability.  Is that fair?

2    "A   Yes, sir.

3    "Q   All right.  Based on your review of the medical

4    records, was Mr. Fields suffering from a serious medical

5    condition when he was in the Lee County Jail?

6    "A   Yes.

7    "Q   Okay.  Let's talk first about the infection, the

8    MRSA.  Is that a serious medical condition?

9           "MR. TOOMEY:  Objection.

10   "A   Yes; it's serious and life threatening.

11   "Q   And why is MRSA a serious medical condition?

12          "MR. TOOMEY:  Objection.

13   "A   Because the infection itself is very difficult to

14   treat, and is known and has been known to kill people.

15   "Q   And, on the morning of August 8th, 2007, based on

16   your review of the medical records, what was Mr. Fields

17   suffering from?

18   "A   He was --

19          "MR. TOOMEY:  Objection.

20   "A   He was suffering from --

21          "MR. LAUER:  Let me cut you off.

22     "What was your specific objection, Mr. Toomey?  Was

23   it form?

24          MR. TOOMEY:  I'm sorry, was it August 8th, you

25   said?

1                    MR. LAUER:  Yes.

2                    "MR. TOOMEY:  Okay.  You're fine.

3      BY MR. LAUER:

4           "Q   August 8th, 2007, about 10:30 in the morning.

5           "A   He was suffering from the neurologic symptomatology

6           of a spinal cord compression.

7           "Q   Okay.  And how did that -- how does a compressed

8           spinal cord manifest, or show itself?

9           "A   Initially, the patient will have pain and spasm of

10          the back.  The patient will suffer from symptoms of

11          urinary retention, bowel incontinence or bowel

12          retention, and weakness of the legs.  And inability to

13          walk.

14          "Q   During your medical career, have you had an

15          opportunity to treat individuals that have either --

16          that are either suffering from spinal cord compression

17          or after they have suffered spinal cord compression?

18          "A   Yes.

19          "Q   Now, is a compressed spinal cord a serious medical

20          condition?

21                    "MR. TOOMEY:  Objection.

22          "A   Yes.

23          "Q   Why is it a serious medical condition?

24                    "MR. TOOMEY:  Objection.

25          "A   Because, if not treated in a timely manner with

immediate decompression, a patient may suffer paralysis, which is muscle weakness of both lower extremities; sensory loss, which is inability to feel, pin prick, soft tissue, light pressure, in both lower extremities; and autonomic nerve dysfunction, which is inability to urinate properly, inability to have bowel movements properly, and inability to have erections properly.

"Q What actually happens to the spinal cord while it's compressed? Or what does compression do to a spinal cord.

"MR. TOOMEY: Objection.

"A Essentially, the nervous system lives on blood. Blood contains, and carries to the spinal cord, both oxygen and sugar. If the spinal cord is compressed, initially what is compressed is the rich vascular supply that surrounds the spinal cord. That compression of those blood vessels deprive the spinal cord of those nutrients I mentioned, specifically glucose and oxygen. So the initial compression leads to a buildup of lactic acid within the spinal cord itself, and that creates spinal cord damage in and of itself.

"Then, as the abscess grows, there's direct compression of the spinal cord, which causes death to the spinal neurons, foraminal track neurons, autonomic neurons, that travel within the spinal cord.

1          "So, depending on the severity of the compression,

2     you initially see the blood vessel -- vessels

3     compressed, which deprive the spinal cord of the energy

4     that it needs.  Then, later, you see direct damage to

5     the spinal cord.

6     "Q   When the spinal cord is damaged and dies, can it

7     repair itself?

8     "A   No.  Unfortunately, we do not have the technology,

9     at this time, to repair spinal cords once they've been

10    damaged.

11    "Q   At 10:30 in the morning on August 8th of 2007, did

12    Mr. Fields present with symptoms of severe neurological

13    problems?

14    "A   Yes.

15    "Q   And, once one presents with severe neurological

16    problems like Mr. Fields, is a delay in treating him,

17    meaning spinal depression, will that cause a worse

18    outcome?

19         "MR. TOOMEY:  Objection.

20    "A   Yes.

21    "Q   Let me rephrase that question.  Tell me about the

22    damage that's caused by not quickly decompressing a

23    spinal epidural abscess.

24    "A   I was trying to elucidate the series of

25    pathophysiological events that occur when a spinal cord

1    is compressed into two major categories:  First, the

2    blood vessels being compressed; and then, secondly, the

3    direct compression of the spinal cord.

4        "If the spinal cord is decompressed before there is

5    irreversible damage to the spinal cord because of direct

6    compression, then revascularization to the spinal cord

7    can prevent permanent damage to those neurons traveling

8    within the spinal cord, and therefore some of the loss

9    is reversible.  However, once there's been significant

10   spinal cord compression, and those nerves are dead, they

11   will never return to life.

12       "So what you're looking at is a phenomenon in

13   neurology we refer to as penumbra.  Penumbra is that

14   area of the spinal cord and/or brain that has been

15   damaged, either by lack of nutrients or by direct

16   compression, in which those nerve cells are damaged but

17   not dead; and it's that penumbra that the emergency

18   surgery helps to revive those damaged neurons.  So, if a

19   surgery is performed in a timely fashion, then that

20   penumbra is minimized, and those nerves will return to

21   function.

22   "Q   You said if the spinal decompression is completed

23   within a timely fashion.  What time period constitutes

24   timely when we're talking about a compressed spinal

25   cord?

1        "A   Well, here you're dealing with two significant

2     problems.  Here you have an abscess growing, presumably

3     rapidly, because of the MRSA itself; and then you're

4     dealing with the amount of time it takes to get into the

5     OR.  So, essentially, you're dealing with a growing

6     abscess and time limitations with respect to getting the

7     patient transported from the prison to an emergency room

8     for surgery.

9        "So what any neurologist or neurosurgeon is going to

10    say is that . . . what we look for is the existing

11    clinical state of the patient.  If the patient is moving

12    their extremities at the time of the diagnosis, then we

13    have a reasonable chance of saving that patient's legs

14    and, of course, the sensory and the autonomic functions

15    that go along with that.

16       "However, if the patient is paralyzed at the time of

17    the diagnosis -- in other words, unable to lift their

18    legs, or move their legs -- then the chances of getting

19    that person to surgery, getting the decompression

20    performed, and having a good result is minimized.  And I

21    think we saw that situation in this case, because by the

22    time he was diagnosed, he was paralyzed, and his return

23    to function was less than ideal.

24          "MR. TOOMEY:  Move to strike.

25    "Q   Do you have an opinion as to whether the delay of

1    even a few hours caused Mr. Fields additional harm in

2    this case?

3    "A    It did.  Because we saw, in the notes by the

4    physician assistant, that the patient went from weakness

5    of the legs to paralysis of the legs.  Before the

6    transport was made.

7    "Q    Is there any medical justification for delaying

8    transfer to the emergency room, or spinal decompression,

9    in this situation?

10   "A    No.

11   "Q    The care that Mr. Fields received from Joseph

12   Richards, the physician's assistant, what did

13   Mr. Richards do for Mr. Fields?

14            "MR. TOOMEY:  Objection.

15   "Q    All right.  Strike that.

16      "Brett Fields was seen by Mr. Richards, the

17   physician's assistant, on August 8th of 2007.  Do you

18   see that in the notes?

19   "A    Yes.

20   "Q    What did Mr. Joseph Richards do for Mr. Fields?

21            "MR. TOOMEY:  Objection.

22   "A    Essentially, his notes indicate that he thought

23   that this patient was malingering.  When he says that

24   the inmate's leg is lifted passively, the inmate denies

25   pain, but when it was not lifted passively, it hurts.

1      "Q   The course of treatment chosen by Dr. Richards, the

2      physician's assistant, to prescribe Tylenol, and to

3      follow up in one week.  Have you seen that?

4      "A   Yes.  And that's confirmation of my interpretation

5      of his . . . passive versus active examination of the

6      lower extremities.  By treating the patient only with

7      Tylenol, it . . . tells us that this physician's

8      assistant totally misdiagnosed the patient's neurologic

9      status, and inappropriately treated him with this

10     Tylenol.  And the follow-up in one week is

11     obviously . . . never occurred.

12          "MR. TOOMEY:  Move to strike.

13     "Q   Is the treatment of Tylenol and follow-up in one

14     week the easiest possible treatment that the treatment

15     plan and physician's assistant to have come up with?

16          "MR. TOOMEY:  Move to -- objection.

17     "A   Yes.

18     "Q   What would have been -- strike that.

19       "Now, Mr. Fields is next seen approximately 15 hours

20     later, at about 1:30 a.m., by Nurse Allen.  Have you

21     found those notes?

22     "A   Yes, I did.

23     "Q   Based on your review of Nurse Allen's notes, at the

24     time when Nurse Allen found him, was Brett Fields

25     suffering from a serious medical condition?

1       "A   Yes, he was.

2       "Q   And what makes you come to that conclusion?

3       "A   Because he was paralyzed that the point, and he had

4       lost anal sphincter tone, which is why his intestines

5       had opened up into his buttocks area.  And . . . I'm

6       sure, at that time, he also had a sensory level 2,

7       although that was not documented.

8           "So at this point he's paralyzed, and that's

9       documented by his anal sphincter losing total control,

10      and his intestines coming out through his buttocks.

11      Into his buttocks.

12      "Q   Is the fact that he was carried out in a sheet

13      evidence of paralysis?

14      "A   Yes.

15               "MR. TOOMEY:  Objection.

16      "Q   What other evidence of paralysis can you find in

17      Nurse Allen's note?

18      "A   He did not flinch when pressure was applied to his

19      legs, feet, and buttocks.  Which tells us that his -- he

20      likely had a sensory level -- in other words no

21      sensation to his lower extremities or buttock area.

22      "Q   Is there a medical justification for delaying

23      transport to hospital -- strike that.  Is there any

24      medical justification for delaying the transport of

25      Mr. Fields to the hospital at 1:30 a.m. on August 9th,

1       2007?

2                "MR. TOOMEY:  Objection.

3       "A   Absolutely none.  You have a paralyzed man, and

4       with no anal sphincter tone, no sensation; and for the

5       nurse to say we'll have the doctor check in the a.m. is

6       totally inappropriate.  This was a true neurologic

7       emergency.

8       "Q   Would Mr. Fields have benefited if he was

9       transported to the hospital promptly at 1:30 and could

10      have been seen by a neurosurgeon?

11               "MR. TOOMEY:  Objection.

12      "A   Yes.

13      "Q   Okay.  And why?  What would a neurosurgeon probably

14      have been able to do for him?

15               "MR. TOOMEY:  Objection.

16      "A   A neurosurgeon would have diagnosed, at this point,

17      a subacute spinal cord compression, spinal cord syndrome

18      as we call it, and would have initiated diagnostic

19      studies to confirm the clinical impression, and operated

20      on.  So, probably before 10:30 in the morning, he would

21      have had his abscess decompressed and his spinal cord

22      relieved.

23      "Q   Was Mr. Fields in pain during this time period?

24               "MR. TOOMEY:  Objection.

25      "A   He was, but what happens when the spinal cord is

1    compressed is that you lose any pain sensation below the

2    area of compression, which is why he did not feel pain

3    when Nurse Allen applied pressure to his buttock,

4    thighs, legs, and feet.

5    "Q   Did the delay in decompressing Mr. Fields' spinal

6    cord cause him additional harm?

7    "A   Yes.

8    "Q   Now, the next note is approximately nine hours

9    later.  We have Mr. Fields being evaluated by a doctor.

10   Have you had a chance to review that note?

11   "A   Yes, I have.

12   "Q   And who was that who reviewed -- who evaluated

13   Mr. Fields at that time?

14   "A   I think his name was Dominguez.

15   "Q   And what were Dr. Dominguez's findings?

16   "A   Both lower extremities paralyzed, areflexic, not

17   reactive to pain, from the proximal one third of both

18   sides downwards.  Rectal . . . .  There were external

19   hemorrhoids with severe pain, and decreased rectal

20   sphincter tone.

21   "Q   And what time was Mr. Fields seen by Dr. Dominguez?

22   "A   10:30 in the morning.

23   "Q   Do you know when Mr. Fields was transported to the

24   hospital?

25   "A   I'm not sure of the exact time.  I don't have that

1     record.

2     "Q   If the EMS records or the Doctor's orders

3     reflected 12:30, would you --

4     "A   That's as I remember.

5     "Q   What is the medical justification for a two-hour

6     delay after Dr. Dominguez has examined Mr. Fields?

7              "MR. TOOMEY:  Objection.

8     "A   There's no justification.

9     "Q   And did that delay cause Mr. Fields additional

10    harm?

11             "MR. TOOMEY:  Objection.

12    "A   Yes.

13    "Q   And why is it that a delay of even two hours causes

14    Mr. Fields additional harm?

15             "MR. TOOMEY:  Objection.

16    "A   Because you're dealing with, again, this . . .

17    penumbra, which I tried to elucidate before, which is

18    that area of the spinal cord that's been damaged but not

19    killed, if you will.  And the goal of emergency

20    treatment is to minimize the penumbra from damage to

21    death.  And so every minute, let alone two hours, means

22    a great deal in trying to save the spinal cord from

23    dying.  Which is essentially what happened.

24    "Q   Would Mr. Fields' outcome have been better if he

25    had been transported to the hospital, say, two hours

 1        earlier?

 2        "A    Yes.

 3              "MR. TOOMEY:  Objection.

 4        "Q    Would Mr. Fields' outcome have been better if he

 5        was transported to the hospital 12 hours earlier?

 6        "A    Yes.

 7        "Q    If Mr. Fields was transported to the hospital 18

 8        hours earlier, would he have had a better outcome?

 9              "MR. TOOMEY:  Objection.

10        "A    Yes.

11        "Q    If Mr. Fields was transported to the hospital 24

12        hours earlier, would he have had a better outcome?

13              "MR. TOOMEY:  Objection.

14        "A    Yes.

15        "Q    What happened to Mr. Fields' spinal cord?

16              "MR. TOOMEY:  Objection.

17        "A    His spinal cord has, essentially, severe damage to

18        the motor tracks, sensory tracks, and the autonomic

19        nerve tracks, extending from approximately T-12 to S-5.

20        And that spinal cord damage would be reflected in an MRI

21        scan of his back as showing atrophy of the spinal cord.

22            "There would also be extensive scar tissue from the

23        abscess that was decreased and removed.

24        "Q    Is the damage to Mr. Fields' spinal cord permanent?

25        "A    Yes.

1      "Q   Let me ask you, what does Mr. Fields have to look

2      forward to as a result of the damaged spinal cord?

3           "MR. TOOMEY:   Objection.

4      "A   Let me refer to the video that I saw of his

5      walking.  He currently has proximal strength, and can

6      walk with a waddling type of gait, and what we call a

7      steppage type gait.  He is able to walk with a cane, but

8      is prone to falling because of weakness of both of his

9      feet, proximal weakness in both of his thighs, and

10     decreased sensation of his legs, which means he can't

11     feel his feet hit the ground, or touch the ground.  And

12     he can't maintain his balance, which is why his station

13     is broad based.  In other words, his feet are widespread

14     apart to try to control his balance.

15          "And then, as he moved, instead of moving his hip

16     flexors forward, he has to waddle, which means he has to

17     throw his hips out, one side and then the other side,

18     and throw his thigh, and his leg, and his foot out, in

19     order to take a step.  And then he plants one foot down,

20     and then throws his hip and pelvis, thigh, and leg, and

21     foot forward, on the other side, in order to complete

22     that step.  And that makes him prone to fall.

23          "He also has suffered a great deal of atrophy, we

24     call it neurogenic atrophy, of both of his lower

25     extremities, and his feet, because of the damage to his

1    spinal cord.

2         "He also suffers from symptoms of a neurogenic

3    bladder, which he cannot feel the need to urinate, nor

4    does he feel himself urinate, because of the lack of

5    sensation.  He has lack of bowel movement control and he

6    has lack of erections.

7         "He also suffers from . . . foot ulcers, because of

8    the splint study, whereas -- we call them AFO splints,

9    which is a way of maintaining his foot up, so that he

10   doesn't trip over his foot when he walks.

11   Unfortunately, the splints that he currently has have

12   caused ulcers in his Achilles tendon area; in other

13   words, the back of the foot area.  So his skin has

14   suffered some stasis ulcers, or some ulcers as a result

15   of his these splints.

16   "Q    And these are the six photographs that you reviewed

17   prior to your deposition?

18   "A    Yes.

19   "Q    And the video of the deposition -- I mean the video

20   you're referring to is contained on my laptop?

21   "A    Yes.

22   "Q    And it shows Mr. Fields walking with his pants

23   rolled up?

24   "A    Yes.

25   "Q    What we see Mr. Fields suffering from currently,

1    will these conditions improve?

2    "A   No.  And he -- because of the way he walks, if you

3    notice, he's depending on his joints, specifically his

4    hip joints, his knee joints, and his ankle joints, in

5    order to walk.  And you can already see he's developing

6    arthritis in his knee joints, with enlargement of the

7    knee joints.  And because of his lack of sensation in

8    these joints, he does not feel the pain that he's

9    inflicting on himself when he does walk.  And so he's

10   unaware that he's damaging himself every time he takes a

11   step.  And, because of that, he will be at high risk to

12   develop severe arthritis of the hips, knees, and ankles,

13   and will likely require hip replacements and knee

14   replacements if he continues to walk in the future.

15   "Q   Actually, let me ask it.  Is it your opinion that

16   Mr. Fields will require knee replacements and hip

17   replacements in the future?

18   "A   Yes.

19   "Q   What is the purpose of physical therapy for

20   somebody in Mr. Fields' situation?

21        "MR. TOOMEY:  Objection.

22   "Q   Actually, what is the purpose of physical therapy

23   for Mr. Fields?  What would it accomplish?

24        "MR. TOOMEY:  Objection.

25   "A   When there's been spinal cord damage, the nervous

1    system's response is to develop a condition we call

2    spasticity.  Spasticity is a contraction of the muscles,

3    because the muscles are not getting nerve information

4    from the nerve roots, because of the damaged spinal

5    cord.

6        "Spasticity is a chronic contraction of the muscles,

7    and physical therapy is aimed at preventing those

8    contractions and becoming what we call contractures.  A

9    contracture is a permanent condition in which the muscle

10   length is shortened, and cannot be . . . stretched out

11   again.  And the only treatment for a contracture is

12   surgical release of the tendons, because it simply can't

13   be stretched out again.

14       "So the goal of physical therapy in this situation

15   is to prevent a spastic contraction from becoming a

16   contracture.

17   "Q   In the video you saw, is Mr. Fields suffering from

18   contractures?

19   "A   No, he's not.

20   "Q   Every opinion that you have given me, has that been

21   to a reasonable degree of medical probability?

22   "A   Yes.

23           "MR. LAUER:  Okay.  At this time I will tender

24   the witness.

25           "MR. TOOMEY:  Well, the doctor has limit this

1    had deposition to . . . .

2         (Thereupon, the video deposition was turned off.)

3         MR. LAUER:  Judge, may I?  That's the end of my

4    direct examination.  And I believe Mr. Toomey would like me

5    to play the cross at this point.  Is that acceptable to the

6    Court?

7         THE COURT:  It is.

8         MR. TOOMEY:  It's very brief, Your Honor.

9         (Thereupon, the cross-examination of Dr. Emery was

10        played as follows:)

11        "Videographer:  We're now on the video record.

12   Today's date is March 8th, 2011, and the time

13   is 4:16 p.m.  This is Tape 1 of the Videotape deposition

14   of Dr. Waden Emery in the matter of Brett Fields versus

15   Prison Health Services, in the U.S. District Court,

16   Middle District of Florida.  Today's deposition is

17   taking place at Dr. Waden Emery's office at 5340 North

18   Federal Highway, Lighthouse Point, Florida.

19        "The videographer is Jordan Bruce, of Oland

20   Reporting, and the court reporter is Diana Hall, of

21   Oland Reporting.

22        "Would counsel please introduce themselves?"

23        "MR. TOOMEY:  Greg Toomey for Prison Health

24   Services.  All the defendants.

25        "MR. CASSATA:  Dion Cassata and Greg Lauer on

1        behalf of the Plaintiff.

2                "MR. LAUER:  I'm Greg Lauer on behalf of Brett

3        Fields.

4             (The witness was placed under oath.)

5                         CROSS EXAMINATION

6   BY MR. TOOMEY:

7        "Q   Good afternoon, Doctor.  Would you please tell us a

8        little bit about your practice and the type of medical

9        professionals you have working here?

10       "A   Yes.  I'm a neurologist, board certified by the

11       American Board of Psychiatry and Neurology.  I have been

12       in the private practice of neurology for 25 years.  I'm

13       a fellow of the American Academy of Neurology, which is

14       the highest level that a neurologist can attain.

15       "Q   Let me just stop -- I'm going to withdraw the

16       question and do it again.

17           "What type of medical professionals do you have in

18       your employ in this practice?

19       "A   I have a psychotherapist, Dr. Joyce Newcomb, Ph.D.

20       I have an occupational therapist, Cindy Pfeifer -- or

21       Cindy Mack is her married name, OTR.  I have Patricia

22       Kesselman, who is a registered EEG, EMG, nerve

23       conduction velocity, invoked potentials infusion

24       therapist.  She's got about every certification that you

25       have in terms of a technologist.  And then I have

1    medical assistants, billing people, front desk people.

2    And then I have assistants to the EEG tech.  And I have

3    a computer tech.

4    "Q   Okay.  What I didn't hear is that you have any

5    registered nurses in this practice.  You don't, do you?

6    "A   No, sir.

7    "Q   Nor a physician's assistant?  You don't have one of

8    those, either, do you?

9    "A   No.

10   "Q   All right.  And your sole practice is neurology.

11   You don't practice internal medicine, do you?

12   "A   No.

13   "Q   You gave us some opinions, before, regarding

14   Mr. Fields.  Can you tell us exactly what he -- I think

15   you told us he has to walk with a cane, and he has sort

16   of an odd walk as a result.  Can you tell us what he

17   cannot do as a result of his injuries?

18   "A   Once again, I have not examined this patient

19   neurologically, so I can't give you his definitive

20   neurologic examination.  I did see a video of him

21   walking, and I can describe his neurologic exam based on

22   that video.

23   "Q   Well, can you tell us, based on his condition, what

24   he can and cannot do?

25   "A   Based on the video that I saw, and his neurologic

1    condition, his gait is impaired.  He has a steppage

2    gait, which is a sign of a weakness in his legs.  He has

3    a broad-based station, which means his feet are wider

4    apart than a normal person would have.  And he has a

5    spastic gait, in which his muscles are stiff, so when he

6    walks, he does not have the normal looseness of his

7    muscles, if will you.

8    "Q   You are aware that Mr. Fields was ordered by his

9    physicians to go through some physical therapy, but he

10   did not; correct?

11         "MR. LAUER:  Objection.

12   "A   Those are not part of the records that I have

13   reviewed.

14   "Q   Okay.

15   "A   But it would not surprise me that patient may not

16   go through all the physical therapy that has been

17   ordered.

18   "Q   And it would also be normal, regular, for a

19   neurologist to order physical therapy for a patient of

20   this type, wouldn't it?

21   "A   Yes.

22   "Q   How would physical therapy benefit a patient of

23   this type?

24   "A   Technically, what physician therapy does is it

25   prevents joints from freezing up, so that, while the

1    muscles and the nerves recover after a spinal cord

2    injury, the joints will remain loose; so that, if the

3    muscles regain strength, because the nerves return to

4    normal or near normal, then the patient's joints will

5    work, so that they will be able to walk normally.

6    "Q   The only limbs that are affected in Mr. Fields are

7    his lower extremities; is that right?

8    "A   That's correct.

9    "Q   And Mr. Fields can move his lower extremities;

10   right?

11   "A   Yes, he can.

12   "Q   In your previous testimony, you told us that he has

13   some atrophy of his lower extremities.  If he were to

14   exercise those lower extremities, could he ease some of

15   the atrophy that's present?

16   "A   He could ease some of the atrophy that's present.

17   "Q   Would his condition be better if his legs were

18   stronger?

19   "A   Yes.

20   "Q   Okay.  Now, you told us that -- I'm trying to

21   remember what you reviewed.  You saw a videotape that

22   was about a minute and a half long; right?

23   "A   I don't remember the exact time.  It seemed a

24   little longer.  Maybe two minutes.

25   "Q   Can you remember what the videotape looked like?

1      "A   He was standing on the dock in the west coast of

2      Florida.  You could see the gulf in the background.  And

3      there were two different scenarios in which he was

4      walking along the boardwalk, in . . . near Naples, at a

5      public park it looked like.

6      "Q   And you told us you haven't personally examined

7      Mr. Fields; right?

8      "A   Yes.

9      "Q   But you reviewed records from both the jail and the

10     hospital.

11     "A   Correct.

12     "Q   Did you review any other records, other than those,

13     in terms of any follow-up treatment that he had after he

14     was released from the hospital?

15     "A   No.

16     "Q   Okay.  Now, is this spasticity of his legs, and the

17     need to use a cane, and the atrophy of the legs, are

18     those permanent conditions?

19     "A   Yes.

20     "Q   Oh, I guess let's take the atrophy back, because

21     you told us, with some exercise, he wouldn't have the

22     atrophy?

23     "A   No.  You asked if it would ease the atrophy, not

24     normalize.

25     "Q   Okay.

1    "A    The atrophy is present partially as disuse, or

2    maybe not going to physical therapy; but a good portion

3    of the atrophy is neurogenic in nature.   In other words

4    from the spinal cord damage.   So if you have nerve

5    damage, you develop neurogenic atrophy.

6    "Q    Okay.

7    "A    And that atrophy can only be improved if the spinal

8    cord came back to normal.

9    "Q    All right.

10   "A    So the atrophy can be improved with physical

11   therapy or exercises, but not the neurogenic atrophy.

12   "Q    All right.   So some of the atrophy is due to

13   sitting around.   Is that fair to say?   Instead of

14   exercising.

15   "A    Well, I would say just disuse.   I don't know if

16   he's sitting or what.

17   "Q    Oh, all right.   And some of the atrophy is due to a

18   spinal cord injury; is that right?

19   "A    Correct.

20   "Q    Okay.   Now, is there any chance that this can

21   resolve on its own, without treatment?

22   "A    After a neurologic injury to the central nervous

23   system, we have followed this type of patient, and after

24   two years time, the injuries that were present are

25   permanent injuries.

1    "Q   Okay.

2    "A   So there is improvement for up to two years.  After

3    two years, there's no expected improvement.  Unless we

4    get, you know, a cure for paralysis.  So, knowing that

5    his procedure was in August of 2007, two years later

6    would be August of 2009.  The video I saw was

7    afterwards.  I'd say that the injuries that I saw were

8    permanent.

9         "MR. TOOMEY:  Thanks, Doctor.  That's all.

10                    REDIRECT EXAMINATION

11   BY MR. LAUER:

12   "Q   Have you ever had an experience to work with

13   physician's assistants or registered nurses, ever in

14   your career?

15   "A   Yes.  Over 25 years of practice, I have had two

16   physician's assistants that were employees of mine.

17   And, over these years, I have had patients who became

18   RNs while they were working as a medical assistant.

19   I've also had medical assistants who later became

20   neurologists.  So I have employed all three levels of

21   certification.

22   "Q   And before you were in private practice, during

23   your residency and internship, did you have a chance to

24   work with physician's assistants and/or registered

25   nurses?

1      "A    Yes.  When I make rounds at the hospital, I work

2      with physician's assistants and nurses all the time.

3      "Q    And you're currently making rounds at the hospital.

4      "A    I'm on call for Imperial Point; yes.

5           "MR. LAUER:  Thank you.

6                      RECROSS EXAMINATION

7   BY MR. TOOMEY:

8      "Q    When was the last time you supervised an employee,

9      either a physician's assistant or a registered nurse?

10     "A    About . . . .  Time flies.  It's already March.  So

11     let's say four months.  I had an employee who graduated

12     from nursing school, and did all her clinicals and

13     everything while she was working for me, became a

14     graduate, fully RN, and decided to move on to hospital

15     work so she could have more experience.  So she left my

16     employ about November.

17     "Q    But she didn't work in your practice as a

18     registered nurse, did she?

19     "A    Not as a registered nurse.  She worked as a medical

20     assistant.  But she was an RN.

21     "Q    Okay.

22     "A    Maybe she wanted to go get paid as an RN, so that's

23     why she left.

24     "Q    I can certainly understand that.

25     "A    She was getting paid as an MA, but I was demanding

1       that she do RN type work.

2       "Q   When was the last time you employed a nurse as a

3       nurse or a --

4       "A   Never.  I never employed a nurse as an RN.  I never

5       needed to.

6       "Q   Okay.  But how about a physician pee assistant?

7       "A   The last time I had a PA was probably ten years

8       ago.  And he was hired as a PA.

9       "Q   As a neurologic PA?

10      "A   Yes.  And he was lazy.  So he got the boot.

11          "My previous PA, she unfortunately developed breast

12      cancer and died.  She was phenomenal.

13              "MR. TOOMEY:  Okay.  Thanks.

14              "Videographer:  This is the end of the

15      deposition of Dr. Emery.  We are off the record

16      at 4:27."

17              (Thereupon, the video deposition was turned off.)

18              THE COURT:  Did the jurors want a recess, or

19      another witness?

20              JUROR 11:  You're the boss.

21              THE COURT:  I'm the boss?  Well, that's a first.

22              We'll take a recess, then.  15 minutes.

23              Please do not discuss the case among yourselves,

24      or allow anyone to discuss it with you or in your presence.

25              JUROR 8:  Is this a recess so we can have a smoke?

1          THE COURT:  You need to talk to the CSO about

2     that.

3          (At 3:26 p.m., the jury was escorted from the

4     courtroom.)

5          THE COURT:  All right.  15 minutes.

6          (At 3:26 o'clock, p.m., court was recessed.)

7                         AFTER RECESS

8          (At 3:47 o'clock, p.m., court was reconvened.)

9          THE COURT:  Both sides ready for the jury?

10         MR. LAUER:  Judge, I'm prepared to call another

11    witness here in a second, but there's one other issue that I

12    think might be a decent thing to go over right now.

13         THE COURT:  Okay.  You may be seated.  I'm going

14    to stand.  Not you.  The other you.

15         MR. LAUER:  Part of my trial strategy, the way I

16    plan on proving this case, is that I will be using portions

17    of depositions, sworn testimony, in proceedings of party

18    opponents.  Some of them may be read.  My wife will be here

19    tomorrow.  She'll be on the witness stand.  She and

20    Mr. Cassata will go back and forth.  A lot of them I'm

21    planning on placing up here on the overhead.

22         I have had some discussions with opposing counsel,

23    and his understanding of the rules of evidence and

24    procedures differ from mine; and, in order to allow me to

25    prepare do this in a fluid manner tomorrow, a little

1    guidance from the Court, I think, may help.

2              There are a few objections to form in a few of

3    these places.  I don't know if it's too early to raise this

4    issue, but . . . .

5              THE COURT:  Are any of the depositions you intend

6    to use of people who will be called in person?

7              MR. LAUER:  They most likely will be called in

8    person, Judge.

9              THE COURT:  I'm not going to let do you both.

10             MR. LAUER:  Okay.

11             THE COURT:  You can, of course, for impeachment.

12   But I'm not, for example, going to let you read 20 pages of

13   John Smith, and then call John Smith as a witness.

14             MR. LAUER:  So I can make the tactical decision to

15   read 50 pages of John Smith, and don't call John Smith as a

16   witness, who is a party opponent, then, obviously, on

17   cross-examination, it's all re-opened and fair game?

18             THE COURT:  Say that again.

19             MR. LAUER:  Party opponent.  Well, let's just --

20   let's use a real life example.  Nurse Bettie Allen.  There

21   are large portions of her deposition that I want blown up

22   and placed right here.  It was my understanding that, if it

23   was a party opponent, a deposition could be used for any

24   purpose.  As I close my case, I could read interrogatory

25   answers, depositions, as well as calling that witness.  That

1    was my understanding.  I may be incorrect on that.

2         THE COURT:  You're incorrect.  Literally, the rule

3    says that; but it's my belief the Court has the authority to

4    control the proceedings, and I will not allow you to ask

5    redundant questions, and I'm not going to allow to you do

6    what you're proposing to do, if it involves both calling a

7    live witness and using deposition testimony of that live

8    witness.  But I cut you off.  Go ahead and finish up.

9         MR. LAUER:  No.  I think I understand exactly what

10   decision I need make then.  My question is, if I'm not

11   calling them, then that's fair game to use the deposition in

12   any way that I see fit?

13        THE COURT:  I'll hear objections, but what my

14   ruling is now is you can't do it both ways.  You can't cut

15   and paste, so to speak.

16        MR. LAUER:  Understood.

17        THE COURT:  All right.  Both sides ready for the

18   jury?

19        MR. LAUER:  Yes.

20        MR. TOOMEY:  Yes, sir.

21        THE COURT:  Have the jury step in, please.

22        (At 3:50 p.m., the jury was escorted into the

23        courtroom.)

24        THE COURT:  Mr. Lauer, you may call your next

25   witness.

```
 1              MR. LAUER:  The plaintiff will call Amanda
 2    Duhamel.
 3              THE COURT:  Come forward, please.
 4              THE CLERK:  If you'd raise your right hand,
 5    please.  Stand up.
 6              Do you solemnly swear or affirm to tell the truth,
 7    the whole truth, nothing but the truth, in the case now
 8    before the Court?
 9              THE WITNESS:  Yes.
10              THE CLERK:  You may have a seat.
11              If you would state your full name, spelling your
12    last.
13              THE WITNESS:  Amanda Ann Duhamel.  D U H A M E L.
14                        AMANDA DUHAMEL,
15    called as a witness by the Plaintiff, and having been first
16    duly sworn, was examined and testified as follows:
17                        DIRECT EXAMINATION
18    BY MR. LAUER:
19    Q     How old are you, Miss Duhamel?
20    A     23.
21    Q     Where were you born?
22    A     In Massachusetts.
23    Q     How long have you lived in Fort Myers?
24    A     Four years.
25    Q     How long have you known Mr. Fields for?
```

1   A        Four years.

2   Q        Have you, the two of you, had a dating relationship?

3   A        Yes, we have.

4   Q        Okay.  Four years ago, was he your boyfriend?

5   A        Yes.

6   Q        Did you know Mr. Fields prior to July and August of

7   2007?

8   A        Yes.

9   Q        What was Mr. Fields like physically?

10  A        He was very active.  He loved going to the beach, and

11  run, and . . . sports.  And hang out with people, and be

12  very active.

13  Q        All right.  August of 2007.  Early August.  How did

14  you find out that Mr. Fields was in the hospital?

15  A        He actually called me from the hospital and said he

16  just got out of surgery, can you please come down and see

17  him.

18  Q        Okay.  How long had the two of you been dating that

19  the point?

20  A        About a year.

21  Q        Were you living together?

22  A        Yes, we were.

23  Q        All right.  When you first saw him, what did you see?

24  A        Him laying in a . . . .  Him lying there for his

25  life, basically.

1    Q       What?

2    A       Him lying there for his life.  He couldn't move from

3    his waist down, and he was in a lot of pain.  I saw a

4    different person.  I seen death in his face.

5    Q       That was the first day?

6    A       Um-hum.

7    Q       That was the first day when you went and saw him?

8    A       (Witness nods head up and down.)

9    Q       How about the second day?

10   A       He was still very depressed.  You know, he didn't

11   want to accept the fact that, you know, he couldn't move his

12   legs.  He was still very depressed, and he didn't want to

13   accept it himself.

14   Q       Can you approximate for me about how many days you

15   think Mr. Fields was in the hospital for?

16   A       I believe it was about a month and a half, two

17   months.

18   Q       Now, how often did you visit him?

19   A       Just about every day.

20   Q       How much time every day were you able to spend with

21   him?

22   A       As much as I could.

23   Q       And how was his -- how was his emotional state during

24   that time in the hospital?

25   A       Very . . . very emotional.  He was very up and down.

1   He'd be happy one minute, and didn't know why it happened to

2   him and why he's still here.

3   Q     All right.  When Mr. Fields finally left the

4   hospital, where did he go?

5   A     He went to his uncle's house.

6   Q     Who was with him?

7   A     It was his aunt and his uncle, and his two cousins

8   were there.  I was living at my grandmother's house, so I'd

9   come and visit him and everything.

10  Q     Did there come a point where you started living with

11  Mr. Fields after this injury?

12  A     Yeah.  I mean, I was living with him.  We had our

13  moments.  It was very stressful on both of us, and we were

14  on and off and everything.  But for the most part we were

15  together.

16  Q     Okay.  After this happened, when did you start living

17  with him again?

18  A     It was like a month after he was out.  We went and

19  lived with his friend, Eddie, and from there we lived

20  together.

21  Q     Okay.  And what were you doing for work at the time?

22  A     At the time, I worked at a warehouse.  Advanced Auto

23  Parts warehouse.

24  Q     Working days or nights?

25  A     Days.  In the morning.

1   Q      Was there anything that concerned you about leaving

2   Mr. Fields by himself?

3   A      Yeah.  Almost whenever time I went to work, I'd be

4   afraid I'd come home and find him dead.

5   Q      All right.  When you started living together for

6   about that -- I guess it was a month after he got out, how

7   long were the two of you living together from that point?

8   Months?  Years?  Weeks?

9   A      A year.  About a year.

10  Q      Okay.  So, when you first moved back in, and you're

11  with him, living with him, what types of things did you have

12  to do for him?

13  A      I've done everything from bathing him, to helping him

14  move his legs, to transfer him, put pillows under his legs

15  so he wouldn't get sores.  Helping him get to his wheelchair

16  and back to the bed.  Everything.  Basically, I was his

17  right-hand man.  Everything.  Got him drinks, food.

18  Q      As far as bowel movements and using the restroom, how

19  was that for him in the first six, seven, eight months?

20  A      He basically lived in the bathroom.

21  Q      Why?

22  A      Because he would feel like he would have to go to the

23  bathroom, and he really wouldn't.  He would spend hours and

24  days in the bathroom.  He just -- he would feel like he had

25  to go to the bathroom, but he didn't have to, and . . . and

1    he would literally have to bend -- sit down and bend over,

2    like over like this, to push the urine out.  So there would

3    be pressure on his bladder.

4    Q     Now, since all this has happened, you've had a career

5    change; is that right?

6    A     Yeah.

7    Q     What do you do now?

8    A     I'm a certified nurse's assistant now.

9    Q     And why did you decide to become a certified nurse's

10   assistant?

11            MR. TOOMEY:  Objection.  Relevance.

12            THE COURT:  Overruled.

13   A     I actually became a CNA because I was helping him,

14   and his aunt is a CNA too, and just helping him just made me

15   want to have the career change to help other people that are

16   in his situation, and be there for somebody that actually

17   needs your help.  And so I could actually learn more about

18   his situation, and help him.  As much as I could.

19   Q     In those . . . in the first six, eight, ten weeks

20   after he was released from the hospital, where were the two

21   of you living?

22   A     We were first -- he was at his aunt's house.  And

23   then we moved to his friend Eddie's house.  And that's when

24   I moved in with him, at his friend Eddie's house.  And we

25   lived there for six weeks.

1    Q      And then, after that period, did you move?

2    A      Yeah.  We moved to his other friend's house, Chris.

3    And then we eventually got our own place.

4    Q      All right.  And, during this period of time, how was

5    it that Mr. Fields could move, could get around?  How did he

6    do it?

7    A      By his wheelchair.  And if his wheelchair wasn't

8    around, he would crawl on the ground.

9    Q      About how long was he in the wheelchair for?

10   A      The first, I'd say, about nine months.  Nine . . .

11   nine months, a year.  Then we went out 'cuz he was getting

12   very down on himself, so, you know, he wanted to go get him

13   a walker so he could learn how to walk and stuff, and told

14   us he needed to get his legs back.  Then we went and got him

15   a walker.  About a year later.

16   Q      Did you bring Mr. Fields to medical appointments,

17   physical therapy, things of that nature?

18   A      Yes, I did.

19   Q      How many of those did you go to with him?

20   A      Physical therapy, we went for the first two weeks,

21   and then we couldn't go anymore because he was denied by his

22   insurance, and we couldn't afford $600 a week for him to go

23   to physical therapy.

24   Q      Did you sit in with him during physical therapy?

25   A      Yeah.  The first two weeks, she showed us stuff to do

1    at home and everything.  And I sat there and just watched

2    everything she did so we could do it at home.

3    Q     All right.  And did you do that at home with

4    Mr. Fields?

5    A     Yeah.

6    Q     All right.  So now we're eight months, nine months

7    into this, and we're making a transition into a walker.

8    Tell me about how that happened.

9    A     He said he's too young to be in a wheelchair for the

10   rest of his life, and he wants to learn how to walk again.

11   So we went out and got him a walker.  I told him as long as

12   it had a seat on it, you know, I'll get you a walker.

13   Q     And why was it important to you that it have a seat

14   on it?

15   A     Because his legs were so little, and I was afraid if

16   he was walking on them too long, they'd hurt, or they'd

17   break or something.  Just so he would have a seat to sit

18   down.

19   Q     All right.  So tell me about the walker.

20   A     We got the walker.  It was really hard for him at

21   first, because he didn't -- his foot -- his ankles wouldn't

22   move.  So basically he was just dragging his feet along with

23   it.  So we went and we got some braces at Wal-Mart.  Or CVS.

24   Just the regular ankle things.  So it would hold his ankle

25   better.  And he basically just taught himself how to walk.

1    Q      How did he get rid of that wheelchair?

2    A      I went to work one day, and I came home, and the

3    wheelchair was by the garbage.  And he said I'm not using it

4    no more.

5    Q      All right.  Tell me about Mr. Fields taking his first

6    step, when you saw it.

7    A      I seen a whole different person.

8    Q      When about did it happen?

9    A      Right around when we were getting the walker, he used

10   the walls.  He stood up, he said watch.

11   Q      Where were you?  You said he used the walker?

12   A      We were in our apartment.  Well, it was a trailer, so

13   the walls were really close together.  He put his hands like

14   this and held onto the wall.  He said look.  I can do it.

15   And he took his first step.  I mean, he could take a step.

16   But then he'd fall.  But he'd get right back up to do it

17   again.

18   Q      And how many months after the first day you saw him

19   in the hospital was this first step?

20   A      It might have been a year when he took his first

21   step.  Nine months to a year he started.  Trying to get back

22   on his feet.

23   Q      How did Mr. Fields' personality, disposition, change

24   when he took that first step?

25   A      Well, before this all happened, he was a very happy

1    person.  He was very outgoing.  He didn't let anything

2    bother him.  Just he went as life took it.  And when this

3    happened to him, he became very depressed, and very . . .

4    just not him.  He became very angry.  Very upset.  And he

5    just didn't know why it had to happen to him.

6    Q     Did you have any experiences with Mr. Fields out in

7    public, where people were confused about what his condition

8    was?

9    A     Yeah.  When we got his walker, people would point and

10   say look at that drunk man.  Or see, he's messed up on

11   drugs.  When, really, it was his legs that he couldn't --

12   that's just how he walked.  We had people stare and laugh.

13   And now that he was like this, people would help, would hold

14   open the doors for him, and help him get something off the

15   shelf.  But when he was normal, you know, the door could

16   slam right in his face, and who cares, because he can do it

17   himself.  But when he got like this, he felt like everybody

18   was looking at him.

19        And there was one time, when we finally started

20   walking -- there was sometimes where he wouldn't use his

21   walker, later on, because he thought he could do it by

22   himself.  And he'd make it a little ways, you know, by

23   holding my shoulder.  And we'd go to Wal-Mart.  We actually

24   had an incident in Wal-Mart, and they thought he was lying.

25   They wouldn't gives an electric ride-on because he didn't

1    have his walker with him.

2    Q      What did they think was wrong with him?

3    A      He was drunk.

4           MR. TOOMEY:  Objection, Your Honor.

5    A      And he just wanted to play around.

6           MR. TOOMEY:  Move to strike.  What did they think

7    about him?

8           MR. LAUER:  The question was what did they think

9    was wrong with him.  If I need to lay a predicate, I

10   probably could.

11          THE COURT:  The objection is sustained.  The jury

12   will been instructed to disregard the answer.

13   BY MR. LAUER:

14   Q      Let's talk about -- because we've seen the

15   improvement, we've gone from the hospital bed, to the

16   wheelchair, to the walker.  Tell me about when the bicycle

17   starts.

18   A      Bicycle.  It had to have been a year and a half into

19   it.  And, you know, we couldn't do physical therapy or

20   anything like that.  At physical therapy, they had bikes

21   there that didn't move, they just -- you know, for his legs

22   and stuff.  And he just said I want my legs back.  And he

23   would hold onto the house, he'd get on his bike, and just

24   push off and just start pedaling.

25   Q      How many hours a day was he riding that bike?

1    A       Oh, he could be gone for 30 minutes, he could go gone

2    for two hours, three hours.  He would just ride.  I think it

3    was more for his frustration to take out.  He wanted to feel

4    as normal as he could.

5    Q       Now, Brett, Mr. Fields, at this point, he doesn't

6    have to use a cane to walk, does he?

7    A       No, he doesn't have to.

8    Q       Doesn't have to use a walker anymore?

9    A       He doesn't have to.

10           MR. TOOMEY:  Objection Your Honor.  Leading.

11           THE COURT:  I'm sorry?

12           MR. TOOMEY:  Leading.

13           THE COURT:  Sustained.

14   BY MR. LAUER:

15   Q       Does Mr. Fields need to use a cane at this point?

16   A       No.

17           MR. TOOMEY:  Objection, Your Honor.  Competency.

18           THE COURT:  Overruled.

19   BY MR. LAUER:

20   Q       When you were living with Mr. Fields, the two of

21   you -- I'm going to discuss sexual things with you in a

22   minute, but this isn't what I'm talking about right now.

23   The two of you used to share a bed.

24   A       Yes.

25   Q       What would happen with Mr. Fields in the middle of

1   the night?

2   A     We'd fall asleep, and I'd wake up to him screaming

3   like somebody was killing him.  Because he'd get these sharp

4   pains that go down his legs.  On both of them.  And it

5   didn't always happen.  It happened once in a while.  But it

6   would go on anywhere between 8 to 12 hours.  He'd be in

7   tears.  He'd try to move, and he couldn't, because it hurt.

8   He was just in excruciating pain.

9   Q     All right.  And you've had sex with Mr. Fields in the

10  past.

11  A     Yes.

12  Q     All right.  How is his ability to have sex -- this is

13  probably poor wording because it's a sensitive subject.  Has

14  it changed since this accident?

15  A     Yes.

16  Q     Okay.  What is it -- how is it now?

17  A     Well, for him to even feel anything, it actually has

18  to be rough.  He can't have the same sort of sex.

19  Q     Is there parts of his penis that are numb?

20        MR. TOOMEY:  Form.  Sorry, Your Honor.  Objection.

21  Again, competency.  He's asking if there are parts of

22  Mr. Fields' penis that are numb.

23        THE COURT:  Overruled.

24  BY MR. LAUER:

25  Q     In your experience, having been his girlfriend for

1  four years, are there now parts of Mr. Fields' penis that

2  are numb?

3  A      Yes.  The top.  He can't feel it.  I mean, you

4  can . . . you can't feel any light sensation.  It has to be

5  like -- you have to squeeze for him to feel anything.

6          MR. LAUER:  I have no further questions.  Tender

7  the witness for cross.

8          THE COURT:  All right.  Mr. Toomey?

9          MR. TOOMEY:  No questions, Your Honor.

10          THE COURT:  You may stand down.  Thank you.

11          You may call your next witness.

12          (The witness was excused from the witness box.)

13          MR. LAUER:  Judge, may I have a brief sidebar?

14          THE COURT:  You may.

15                         AT SIDEBAR

16          MR. LAUER:  Your Honor, never in my wildest dreams

17  did I think this case would have moved this quickly at this

18  point.  If I am absolutely forced, I could call, probably,

19  somebody; but it's not going to be prepared well.  It's

20  going to be out of order.  It will be detrimental to my

21  client.

22          Being that the time is now 4:15, I respectfully

23  request that we allow the jury to go home early.  And I

24  apologize.  There was a miscalculation on my part.

25  Unfortunately, to move forward now will be prejudicial to my

1    client.

2              THE COURT:  Mr. Toomey?

3              MR. TOOMEY:  Well, I'm a magnanimous kind of guy.

4    I don't have a problem with that, Your Honor.  I would

5    rather things were orderly than bad.  And I think we'll get

6    done.

7              THE COURT:  Spoken like a wise judge.  I echo

8    those words.

9                        IN OPEN COURT

10             THE COURT:  Ladies and gentlemen, the good news is

11   that we moved a little bit faster than anyone anticipated.

12   The bad news is we ran out of witnesses.  So the good news

13   is you get to go home early.

14             Does 9:00 o'clock tomorrow morning work for

15   everyone?  All right.

16             Please do not discuss the case among yourselves,

17   or allow anyone to discuss it with you or in your presence.

18   Do not read any news articles or watch any news broadcasts,

19   because now that we're in trial, there might be some mention

20   made of the case.  For those of you who are more computer

21   literate than I am, do not tweet, Twitter, Google, whatever

22   else you can do on a computer.  All the information that you

23   need to decide this case is going to come from right here,

24   and if you do any of those kinds of things, we're going to

25   have to try this case all over again.  So please don't.

1          See you at 9:00 o'clock in the morning.

2          (At 4:14 p.m., the jury was escorted from the

3     courtroom.)

4          THE COURT:  All right.  9:00 o'clock.

5          (At 4:15 o'clock, p.m., court was recessed.)